ORAL ARGUMENT NOT YET SCHEDULED

Case No. 11-1094
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

RURAL CELLULAR ASSOCIATION and
UNIVERSAL SERVICE FOR AMERICA COALITION
Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION,

Respondent.
_____

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION
_____

RURAL CELLULAR ASSOCIATION and
UNIVERSAL SERVICE FOR AMERICA COALITION
_____

Todd D. Daubert                    Richard P. Bress
Jennifer A. Morrissey              Matthew A. Brill
J. Isaac Himowitz                  Latham & Watkins LLP
SNR Denton US LLP                  555 11th Street, NW
1301 K Street, NW                  Suite 1000
Suite 600, East Tower              Washington, DC 20004
Washington, DC 20005

                                   *Attorneys for the Rural Cellular*
*Attorneys for the USA Coalition*  *Association*

July 7, 2011

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The undersigned attorneys of record, in accordance with D.C. Cir. R. 28(a)(1), hereby certifies as follows:

### A.    Parties and Amici

The Petitioners in this case are the Rural Cellular Association and Universal Service for America Coalition. Respondent is the Federal Communications Commission ("FCC"). Verizon, Verizon Wireless, and the National Association of State Utility Consumer Advocates have appeared as intervenors in support of Respondent. No party has requested to participate as an amicus.

As set forth in the appendix to the ruling under review, the persons who appeared before the agency in the proceeding below are:

AT&T, Inc.
ADTRAN, Inc.
Allied Wireless Communications Corporation
Choice Communications, LLC
Cellular South Licenses, Inc.
CenturyLink
Commnet Wireless, LLC
Corr Wireless Communications, L.L.C.
CTIA–The Wireless Association
Florida Public Service Commission
Free Press
Independent Telephone & Telecommunications Alliance
MTPCS, LLC d/b/a Cellular One and its affiliates
National Cable & Telecommunications Association
N.E. Colorado Cellular, Inc.
New Mexico Public Regulation Commission

i

Public Utilities Commission of Ohio
Public Services Commission of the United States Virgin Islands
PR Wireless, Inc.
Qwest Communications International Inc.
Rural Cellular Association
Rural Independent Competitive Alliance
Rural Telecommunications Group, Inc.
SouthernLINC Wireless and the Universal Service for America Coalition
Sovernet Communications
Sprint Nextel Corporation
Telephone Association of Maine
Union Telephone Company d/b/a Union Wireless
United States Cellular Corporation
United States Telecom Association
Verizon and Verizon Wireless

**B.    Decision Under Review**

Petitioners seek review of the final order of the Federal Communications Commission captioned *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service*, Order, 25 FCC Rcd 18146 (2010) ("*Order*") (JA __-__). *See* 76 Fed. Reg. 4827 (Jan. 27, 2011) (summarizing the *Order*).

**C.    Related Cases**

Undersigned counsel are not aware of any other cases pending in this Court or any other court that raise issues substantially the same as, or similar to, the issues to be raised in this case.

The above information is certified to be correct to the best of our knowledge, information and belief.

ii

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, the Rural Cellular Association ("RCA") and the Universal Service for America Coalition ("USA Coalition") submit the following corporate disclosure statement:

## RCA

RCA has no parent company. No publicly held company has a 10% or greater ownership interest in RCA.

RCA is an association representing the interests of nearly 100 rural and regional wireless licensees providing commercial services to subscribers throughout the nation. No carrier member has as many as 10 million customers, and most of RCA's members service fewer than 500,000 customers.

## USA COALITION

The USA Coalition has no parent company. No publicly held company has a 10% or greater ownership interest in the USA Coalition.

The USA Coalition is an unincorporated, ad-hoc membership organization. For purposes of this Petition for Review, the USA Coalition is comprised of Coral Wireless LLC d/b/a Mobi PCS ("Mobi PCS"), Southern Communications Services, Inc. d/b/a SouthernLINC Wireless ("SouthernLINC Wireless"), and Thumb Cellular LLC ("Thumb Cellular").

### Coral Wireless LLC d/b/a Mobi PCS

Coral Wireless LLC d/b/a/ Mobi PCS is a wholly-owned subsidiary of CW Holdings, Inc., which in turn is held by two groups of venture funds. No publicly held company has a 10% or greater ownership interest in Mobi PCS.

### SouthernLINC Wireless

Southern Communications Services, Inc. d/b/a SouthernLINC Wireless is a wholly-owned subsidiary of Southern Company, which is a publicly traded company. No publicly held company has a 10% or greater ownership interest in Southern Company's stock.

### Thumb Cellular

Thumb Cellular LLC is a wholly owned subsidiary of Agri-Valley Communications, Inc. No publicly held company has a 10% or greater ownership interest in Agri-Valley Communications, Inc.

## STATEMENT REGARDING JOINT APPENDIX

The parties have conferred and intend to use a deferred joint appendix.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .........i

CORPORATE DISCLOSURE STATEMENT ................................................. iii

STATEMENT REGARDING JOINT APPENDIX ...........................................v

TABLE OF CONTENTS................................................................................vi

TABLE OF AUTHORITIES ...................................................................... viii

GLOSSARY ...............................................................................................xv

STATEMENT OF JURISDICTION ..............................................................1

STATUTES AND REGULATIONS...............................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............................2

STATEMENT OF THE CASE ......................................................................2

STATEMENT OF FACTS ............................................................................4

SUMMARY OF ARGUMENT ....................................................................21

STANDING ..............................................................................................25

ARGUMENT .............................................................................................28

I.      STANDARD OF REVIEW ...............................................................28

II.     THE FCC LACKS AUTHORITY TO CREATE A POOL OF
        FUNDS FOR UNSPECIFIED PURPOSES AND USE AT AN
        UNDETERMINED FUTURE TIME......................................................31

        A.      The *Order* Is Fundamentally Inconsistent With the Universal
                Service Mandates of the Act. .......................................................32

        B.      The Act Must Be Interpreted Narrowly To Avoid Violations
                of the Origination and Taxing Clauses of the Constitution. ..........38

                1.      A Broader Interpretation of the Act Would Violate the
                        Origination Clause ..............................................................39

                2.      A Broader Interpretation of the Act Would Violate the
                        Taxing Clause ....................................................................43

        C.      The *Order* Violates the FCC's Own Rules. ..................................45

III.   THE FCC FAILED TO EXPLAIN HOW THE *ORDER* WILL
       ENSURE SUFFICIENT SUPPORT FOR COMPETITIVE ETCs .........49

       A.    The FCC Must Justify the Particular Levels of USF Support It
             Establishes. ....................................................................................50

       B.    The *Order* Falls Far Short of Justifying the Reduction in
             Support Levels. .............................................................................53

       C.    The FCC Cannot Justify the *Order* by Bootstrapping From
             the *Interim Cap Order*. ...............................................................56

CONCLUSION ....................................................................................................60

CERTIFICATE OF COMPLIANCE ..................................................................61

CERTIFICATE OF SERVICE ...........................................................................62

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

*Alenco Commc'ns, Inc. v. FCC*,
201 F.3d 608 (5th Cir. 2000) ................................................................ 36, 59

*Am. Library Ass'n v. FCC*,
406 F.3d 689 (D.C. Cir. 2005) ............................................................ 25, 27

*Appalachian Power Co. v. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) ....................................................................55

*Auer v. Robbins*,
519 U. S. 452 (1997) ....................................................................................29

*Bldg. & Constr. Trades Dep't, ALF-CIO v. Martin*,
961 F.2d 269 (D.C. Cir. 1992) .....................................................................52

*Bluewater Network v. EPA*,
370 F.3d 1 (D.C. Cir. 2004) ........................................................................52

*Catawba County v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) ......................................................................28

*Chase Bank USA, N.A. v. McCoy*,
131 S. Ct. 871 (2011) .............................................................................. 29, 48

*   *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ......................................................... 28, 29, 31, 38, 42

*Christensen v. Harris County*,
529 U.S. 576 (2000) .....................................................................................29

*Comcast v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) ....................................................................15

* Authorities upon which we chiefly rely are marked with asterisks.

*C-Span v. FCC*,
   545 F.3d 1051 (D.C. Cir. 2008) ...................................................30

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
   485 U.S. 568 (1988) ...................................................................38

*FCC v. Fox Television Stations, Inc.*,
   566 U.S. ___, 129 S. Ct. 1800 (2009) ...........................................48

*FEA v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976) ...................................................................44

*GTE Serv. Cor. v. FCC*,
   205 F.3d 416 (D.C. Cir. 2000) ...................................................47

*Hunt v. Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ...................................................................28

*Ill. Pub. Telecommc'ns Ass'n v. FCC*,
   117 F.3d 555 (D.C. Cir. 1997), *clarified on reh'g*, 123 F.3d 693 (D.C.
   Cir. 1997)....................................................................................54

*Iowa Utils. Bd. v. FCC*,
   219 F.3d 744 (8th Cir. 2000), *rev'd in part on other grounds sub nom.*
   *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467 (2002)...................56

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) ...................................................30

*Lead Indus. Ass'n v. EPA*,
   647 F.2d 1130 (D.C. Cir. 1980) ...................................................30

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................27

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
   375 F.3d 1182 (D.C. Cir. 2004) ...................................................52

\* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................... 30, 38, 49

*Mount Royal Joint Venture v. Kempthorne*,
   477 F.3d 745 (D.C. Cir. 2007) ...................................................30

\*   *Nat'l Cable Television Ass'n, Inc. v. United States*,
      415 U.S. 336 (1976) ................................................................. 43, 44

      *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*,
      979 F.2d 227 (D.C. Cir. 1992) ............................................... 29, 48

      *Nat'l Mining Ass'n v. Kempthorne*,
      512 F.3d 702 (D.C. Cir. 2008) ......................................................38

      *National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
      545 U.S. 967 (2005) ......................................................................13

      *Qwest Commc'ns Int'l, Inc. v. FCC*,
      398 F.3d 1222 (10th Cir. 2005)............................................... 50, 51

      *Qwest Corporation v. FCC*,
      258 F.3d 1191 (10th Cir. 2001)............................................... 50, 53

\*   *Rural Cellular Ass'n v. FCC*,
      588 F.3d 1095 (D.C. Cir. 2009) ................................... 11, 12, 58, 59

      *San Juan Cellular Tel. Co. v. Public Serv. Comm'n of Puerto Rico*,
      967 F.2d 683 (1st Cir. 1992) ........................................................43

      *Siegel v. SEC*,
      592 F.3d 147 (D.C. Cir. 2010) .....................................................52

      *Skinner v. Mid-Am. Pipeline Co.*,
      490 U.S. 212 (1989) .....................................................................44

      *Solid Waste Agency of N. Cook County v. United States Army Corps of
      Engineers*,
      531 U.S. 159 (2001) .....................................................................38

      *Tesoro Alaska Petroleum Co. v. FERC*,
      234 F.3d 1286 (D.C. Cir. 2000) ...................................................55

\*   *Texas Office of Pub. Util. Counsel v. FCC*,
      183 F.3d 393 (5th Cir. 1999)............................... 14, 39, 40, 41, 42

      *Tripoli Ricketry Ass'n v. ATF*,
      437 F.3d 75 (D.C. Cir. 2006) .......................................................52

x

*United States v. E.I Dupont De Nemours & Co.,*
 432 F.3d 161 (3d Cir. 2005) ...................................................................44

\* *United States v. Munoz-Flores,*
 495 U.S. 385 (1990) ................................................................... 39, 40

*United States v. Nixon,*
 418 U. S. 683 (1974) ..............................................................................48

*United Techs. Corp. v. U.S. Dep't of Def.,*
 601 F.3d 557 (D.C. Cir. 2010) ...............................................................52

*Verizon Tel. Cos. v. FCC,*
 570 F.3d 294 (D.C. Cir. 2009) ...............................................................52

*Vt. Pub. Serv. Bd. v. FCC,*
 No. 11-1184 (D.C. Cir., filed July 12, 2010) ........................................51

## CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS

5 U.S.C. § 553(b) ...................................................................................56

5 U.S.C. § 553(c) ...................................................................................56

5 U.S.C. § 706 ........................................................................................35

28 U.S.C. § 2342(1) .................................................................................1

28 U.S.C. § 2343 ......................................................................................1

28 U.S.C. § 2344 ...................................................................................1, 2

47 C.F.R. § 54.101 ...................................................................................7

47 C.F.R. § 54.101(a) .............................................................................39

47 C.F.R. § 54.301 ...................................................................................8

47 C.F.R. § 54.307(a)(1) ..........................................................................8

\* 47 C.F.R. § 54.709(a) ................................. 20, 24, 28, 53, 54, 56, 57

47 C.F.R. § 54.709(a)(2) .................................................................. 9, 53

47 C.F.R. § 54.709(a)(3) ................................................................ 9, 53, 55

47 C.F.R. § 54.709(b) ................................................ 9, 19, 20, 24, 31, 53, 54

47 U.S.C. § 151 ..........................................................................................5

47 U.S.C. § 214(e)(2) ................................................................................7

∗  47 U.S.C. § 254 ........................................................ 3, 44, 58, 63, 68, 69

∗  47 U.S.C. § 254(a)(2) ................................................ 26, 38, 39, 40

47 U.S.C. § 254(b) ................................................................ 6, 23, 39, 60

47 U.S.C. § 254(b)(1) ..............................................................................6

47 U.S.C. § 254(b)(3) ........................................................................ 7, 58

∗  47 U.S.C. § 254(b)(5) ............................................ 38, 40, 41, 42, 58

47 U.S.C. § 254(c) ..................................................................................16

∗  47 U.S.C. § 254(c)(1) ............................................ 15, 26, 38, 39, 40

∗  47 U.S.C. § 254(d) .................................. 6, 8, 26, 27, 38, 39, 40, 41, 42, 43, 48

47 U.S.C. § 254(e) .............................................. 40, 41, 43, 58

76 Fed. Reg. 4827 ....................................................................................2

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5,
   123 Stat. 115, § 6001 ..........................................................................17

Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 ....................46

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ......... 5, 46

∗  U.S. Const. art. I, § 7, cl. 1 ................................................ 27, 46

∗  U.S. Const. art. I, § 8, cl. 1 ................................................ 27, 50

## ADMINISTRATIVE DECISIONS

*Application of Sprintcom, Inc. and NPCR, Inc. for Relinquishment of ETC Designation*, Application, No. 2011-0133 (HI PUC, filed June 7, 2011) ................................................................................................27

*Application of Tennessee Tel. Serv., LLC, d/b/a Freedom Commc'ns USA, LLC for Designation as an ETC*, Order, No. U-16227, 2011 WL 1716474 (MI PSC 2011) .............................................................26

*Applications of Cellco P'ship d/b/a Verizon Wireless and Atlantis Holdings LLC*, Memorandum Opinion and Order and Declaratory Ruling, 23 FCC Rcd 17444 (2008) .................................................12

*Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14853 (2005).......................................13

*Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, Declaratory Ruling, 22 FCC Rcd 5901 (2007) ......13

*Connect America Fund*, Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 FCC Rcd 4554 (2011) ..........................15

*Federal-State Joint Board on Universal Service*, Order and Order on Reconsideration, 18 FCC Rcd 15090 (2003) ...................................................14

*Federal-State Joint Board on Universal Service*, Recommended Decision, 17 FCC Rcd 14095 (2002) ............................................................14

*Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd 8776 (1997) ........................................................ 5, 6, 7, 9

*High-Cost Universal Service Support*, Order on Remand and Memorandum Opinion and Order, 25 FCC Rcd 4072 (2010).......................51

\* *High-Cost Universal Service Support*, Order, 23 FCC Rcd 8834 (2008) .......................................................... 10, 11, 12, 20, 24, 46, 56, 57, 59

\* *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service*, Order, 25 FCC Rcd 18146 (2010) ............................... 1, 2, 3, 4, 7, 11, 19-28, 31-37, 39-41, 43-51, 53-60

∗ *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service, Request for Review of Decision of Universal Service Administrator by Corr Wireless Communications, LLC*, 25 FCC Rcd 12854 (2010) .................................................. 1, 16, 17, 18, 19, 21, 35, 37, 46

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798 (2002).........................................................13

*Petition of Tennessee Tel. Serv. LLC d/b/a Freedom Commc'ns USA, LLC For Withdrawal as an ETC in the Commonwealth of Ky.*, Order, No. 2011-00135, 2011 WL 1716474 (KY PSC 2011)...................................26

*Sprint Nextel Corp. and Clearwire Corp.*, Memorandum Opinion and Order, 23 FCC Rcd 17570 (2008) .................................................................12

*Telecommunication Carriers Eligible for Universal Service Support; Federal-State Joint Board on Universal Service*, WC Docket No. 09-197, CC Docket No. 96-45, Order, DA 11-89 (rel. Jan. 14, 2011).................26

*United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, Memorandum Opinion and Order, 21 FCC Rcd 13281 (2006) ...........................................................................13

## OTHER AUTHORITIES

*Connecting America: The National Broadband Plan* (2010), *available at* http://download.broadband.gov/plan/national-broadband-plan.pdf...............15

Letter from FCC Chairman Julius Genachowski to Rep. John Dingell, Chairman, House Committee on Energy and Commerce (July 26, 2010).........................................................................................................15

## **GLOSSARY**

| Abbreviation | Definition |
|---|---|
| "1996 Act" | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| "Act" | Communications Act of 1934, as amended |
| "APA" | Administrative Procedure Act |
| "CETC" | competitive eligible telecommunications carrier |
| "*Corr Order*" | *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service, Request for Review of Decision of Universal Service Administrator by Corr Wireless Communications, LLC*, Order and Notice of Proposed Rulemaking, 25 FCC Rcd 12854 (2010) |
| "ETC" | eligible telecommunications carrier |
| "FCC" | Federal Communications Commission |
| "*First USF Order*" | *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd 8776 (1997) |
| "*Interim Cap Order*" | *High-Cost Universal Service Support*, Order, 23 FCC Rcd 8834 (2008) |
| "LEC" | local exchange carrier |
| "NBP" | National Broadband Plan |
| "NPRM" | *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service, Request for Review of Decision of Universal Service Administrator by Corr Wireless Communications, LLC,* Order and Notice of Proposed Rulemaking, 25 FCC Rcd 12854 (2010) |

| Abbreviation | Definition |
|---|---|
| "*Order*" | *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service*, Order, 25 FCC Rcd 18146 (2010) |
| "Origination Clause" | U.S. Const. art. I, § 7, cl. 1 |
| "*Qwest I*" | *Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) |
| "RCA" | Rural Cellular Association |
| "Recovery Act" | American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 |
| "Taxing Clause" | U.S. Const. art. I, § 8, cl. 1 |
| "*TOPUC*" | *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) |
| "USA Coalition" | Universal Service for America Coalition |
| "USAC" | Universal Service Administrative Company |
| "USF" | universal service fund |

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 2342(1) and 2344. Venue is proper under 28 U.S.C. § 2343.

On September 3, 2010, the Federal Communications Commission ("FCC") issued an "Order and Notice of Proposed Rulemaking" in the matter of *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service, Request for Review of Decision of Universal Service Administrator by Corr Wireless Communications, LLC*, 25 FCC Rcd 12854 (2010) ("*Corr Order*" and "*NPRM*") (JA __-__). In response to the *NPRM*, Petitioners filed comments arguing, among other things, that the FCC lacked the authority to adopt the proposal under consideration. The FCC subsequently issued the final order on review. *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service*, Order, 25 FCC Rcd 18146 (2010) ("*Order*") (JA __-__). The *Order* adopted the proposal set forth in the *NPRM* without addressing the objections raised by Petitioners.

The *Order* is final. The FCC made the *Order* effective as of the date of the release, *Order* ¶ 7 (JA __), and the FCC is already implementing the rule announced therein. Petitioners timely petitioned this Court for review, 28 U.S.C. § 2344, within 60 days of publication of the FCC's order in the Federal Register, 76 Fed. Reg. 4827 (Jan. 27, 2011).

1

## STATUTES AND REGULATIONS

Relevant statutes and regulations are found in an addendum to this brief.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the FCC, in promulgating the *Order*, exceeded its statutory authority, violated the Constitution, violated its own rules, or otherwise acted arbitrarily, capriciously, or not in accordance with law in changing the way it projects demand for the purpose of calculating mandatory universal service contributions and using a portion of those contributions to establish a pool of funds for unspecified uses by the agency at an undefined point in the future.

2. Whether the FCC, in promulgating the *Order*, acted arbitrarily, capriciously, or not in accordance with law by permanently barring competitive eligible telecommunications carriers ("ETCs") from receiving certain amounts of universal service support without evaluating or explaining how the resulting reduced support satisfies the statute's mandate for "sufficient" support or responding to Petitioners' comments addressing that concern.

## STATEMENT OF THE CASE

The Communications Act of 1934, as amended (the "Act") requires all interstate telecommunications carriers to contribute to specific support

2

mechanisms that are intended to promote the universal availability of telephone service at affordable rates. The FCC is authorized to distribute such funds only in furtherance of express universal service objectives set forth in Section 254 of the Act.

The FCC now believes that its traditional universal service programs are outdated and ineffective, and that universal service funding instead should support broadband Internet access services rather than the currently supported telecommunications services. But instead of waiting until it had proposed, considered public comment on, and adopted comprehensive universal service reform, the FCC decided in the *Order* on review to collect and set aside mandatory contributions to the universal service fund ("USF") while the agency decided how to use the funds for other purposes, including potentially to support broadband Internet access services. The FCC adopted the *Order* despite the fact that it had not published a Notice of Proposed Rulemaking requesting comment on any proposals for using the diverted funds, and may never adopt any such proposals.

Petitioners seek review because the *Order's* diversion of funding from existing universal service support mechanisms to a reserve pool of funds that the FCC can use at its sole discretion for unspecified purposes at unspecified future times exceeds the FCC's authority under the Act, the Administrative

Procedure Act ("APA"), and the agency's own rules. Indeed, if the statute were construed to authorize creation of an open-ended pool of funds it would be unconstitutional because it would improperly empower the FCC to impose a tax. Petitioners further contend that the *Order* violates the APA by failing to explain how the reductions in universal service support it effects are consistent with the governing statute.

## STATEMENT OF FACTS

This case concerns "universal service," the national policy of ensuring that all consumers have access to high-quality telecommunications service at affordable rates. Congress charged the FCC with overseeing the collection of funds from telecommunications carriers and the redistribution of such funds as necessary to achieve the universal service goals set forth in the Act. The *Order* on review arises from the FCC's decision to collect funds for a purpose that is *not* authorized by the Act.

**The Act's Universal Service Mandate**

Universal service has been a central component of U.S. communications policy since Congress established the FCC. The Act, which established the FCC, directs the agency to "make available, so far as possible … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151.

For many years, the FCC and state regulators pursued this objective by building implicit subsidies into the telephone rates of monopoly carriers. This model changed, however, when Congress embraced local telecommunications competition in enacting the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ("1996 Act"). Local telecommunications competition made implicit subsidies unsustainable because monopoly carriers would not be able to recover the high costs of providing telecommunications services in certain rural and insular areas from rates paid by consumers in lower-cost areas now subject to competition. *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd 8776 ¶ 17 (1997) ("*First USF Order*").

Congress accordingly mandated replacement of all implicit subsidies with "specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d); *see First USF Order* ¶ 17. Congress also enumerated several principles on which the FCC, in consultation with the states (*i.e.*, the "Federal-State Joint Board on Universal Service" or "Joint Board") "shall base" universal service policies. 47 U.S.C. § 254(b). Among other things, Section 254(b) provides that "[q]uality services should be available at just, reasonable, and affordable rates," and that the available services and rates in "rural, insular, and high-cost areas"

should be "reasonably comparable" to those in urban areas. *Id.* §§ 254(b)(1), (b)(3).

In furtherance of these principles, the FCC established several mechanisms to support the availability of affordable and reasonably comparable services in rural areas (collectively the "High-Cost Program"), as well as three separate programs to benefit low-income consumers, schools and libraries, and rural health care facilities. *See generally First USF Order*. This case focuses on the High-Cost Program, which is the largest of the four universal service programs and provides funding for telephone services (including nine distinct service elements). *See* 47 C.F.R. § 54.101.

Section 214 of the Act establishes criteria for carriers to be designated as eligible to receive universal service support. 47 U.S.C. § 214(e)(2). Initially, only incumbent local exchange carriers ("LECs"), which had long served as monopoly providers of local telephone service, were the beneficiaries of universal service subsidies. Consistent with the market-based reforms of the 1996 Act, however, the FCC later determined that any competitive telecommunications carrier, whether wireline or wireless, designated as an eligible telecommunications carrier ("ETC") would also be eligible to receive universal service support. For the High-Cost Program, the FCC established that a competitive ETC ("CETC") "shall receive universal service support to the

6

extent that it captures subscribers' lines formerly served by an [incumbent] LEC receiving support or new customer lines in that [incumbent] LEC's study area." *First USF Order* ¶ 287; *see also id.* ¶ 311. An incumbent LEC receives support based on the costs it incurs to provide service within its service area. 47 C.F.R. § 54.301. To promote competitive neutrality and ease of administration, the FCC adopted the "identical support" rule, under which CETCs receive the same amount of support that the ILEC receives on a per-line basis. 47 C.F.R. § 54.307(a)(1); *see also First USF Order* ¶¶ 287-88, 312-13.

## Funding for the Specific, Predictable and Sufficient Universal Service Support Mechanisms

To fund the universal service programs, Congress requires "every telecommunications carrier that provides interstate telecommunications services" to "contribute, on an equitable and non-discriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Prior to the *Order* on review, the FCC complied with this requirement by requiring the administrator of the universal service fund, the Universal Service Administrative Company ("USAC"), on a quarterly basis, to (1) calculate a "contribution factor" that determines the percentage of interstate and international end-user telecommunications revenues that carriers must contribute to the fund, and (2) collect a corresponding amount from interstate

7

telecommunications carriers and certain private carriers. USAC calculates the contribution factor by comparing the "total projected quarterly expenses" for the four established universal service programs to the total projected revenues. 47 C.F.R. §§ 54.709(a)(2), (a)(3). If collections in a given quarter exceed the amount distributed to ETCs plus USAC's administrative expenses, USAC must use the excess contributions to reduce the contribution factor for the next quarter. *Id.* § 54.709(b).

**Universal Service Fund Reform and the "Interim Cap" on CETC Support**

Since the FCC first implemented the universal service provisions of the 1996 Act, the total cost of the High-Cost Program has increased significantly. One cause of this funding growth has been the successful deployment of affordable wireless services in rural, insular, and high-cost areas that support from the High-Cost Program enabled. Another significant reason for the increase is that the FCC permits incumbent LECs, unlike CETCs, to continue collecting the same amount of support from the High-Cost Program even when the total number of lines they serve declines for any reason, including when consumers purchasing wireless services abandon their wireline services. Thus, increased funding to CETCs has not been offset by reductions in support for incumbent LECs with declining line counts. Instead, as the FCC has explained: "If the incumbent's lines decreased while its fixed costs remained roughly the

8

same, its per-line costs would increase. Consequently, the incumbent would be entitled to higher support per line." *Federal-State Joint Board on Universal Service*, Fourteenth Report and Order, Twenty-Second Order on Reconsideration, and Further Notice of Proposed Rulemaking in CC Docket No. 96-45, and Report and Order in CC Docket No. 00-256, 16 FCC Rcd 11244 ¶ 125 (2001) (citation omitted). When the incumbent's per-line costs increase, the amount of support provided to CETCs pursuant to the identical support rule also increases.

As the cost of the High-Cost Program steadily increased, the FCC asked the Joint Board to consider reforms that would restrain funding growth. *See Federal-State Joint Board on Universal Service,* Order, 17 FCC Rcd 22642 (2002). The Joint Board suggested a number of structural reforms. For example, it found that terminating support for an incumbent carrier where a competitor wins the customer "would send more appropriate entry signals in rural and high-cost areas," maintain competitive neutrality, and "protect fund sustainability." *Federal-State Joint Board on Universal Service,* Recommended Decision, 19 FCC Rcd 4257 ¶¶ 56, 67 (2004). Despite repeatedly seeking comment on various reforms, however, the agency has not adopted any significant changes to the universal service contribution methodology or the High-Cost Program distribution methodology.

Instead, the FCC adopted an "interim, emergency" rule in 2008 that capped the level of support that competitive ETCs, but not ILECs, are eligible to receive. *High-Cost Universal Service Support*, Order, 23 FCC Rcd 8834 ¶ 1 (2008) ("*Interim Cap Order*"). The FCC recognized that "addressing inefficiencies in incumbent LEC support may be necessary for comprehensive reform," but it determined that such changes were not immediately necessary to constrain costs. *Id.* ¶ 11. The FCC claimed that the "interim, emergency" cap on high-cost support to CETCs was intended solely as a short-term measure to contain the allegedly "explosive growth" in CETC support disbursements and maintain the *status quo* while the FCC moved forward with permanent reforms it expected to adopt by the end of that year. *Id.* ¶ 1.

Under the "interim, emergency" cap, CETCs cannot receive in the aggregate more support in any given state than the total aggregate support they were eligible to receive during March 2008, calculated on an annualized basis. *Id.* ¶ 38. If the aggregate support that CETCs in a state are entitled to receive pursuant to the identical support rule exceeds the interim cap amount, then each CETC's support in that state is reduced by a proportionate amount to ensure that the total CETC support distributed equals the interim cap amount.[1] And if

---

[1] In contrast, if the aggregate support that CETCs in a state are eligible to receive pursuant to the identical support rule is less than the "interim,

an additional CETC enters the market in a state where total eligible support exceeds the interim cap amount, the support each existing CETC receives in that state is reduced proportionally to reflect the lines captured by the new CETC. Conversely, until the *Order* on review, if a CETC exited the market in a state where total eligible support exceeded the interim cap amount, the support each remaining CETC received for serving the state increased proportionately to reflect the additional funds available under the interim cap.[2]

When RCA and another party petitioned for review of the *Interim Cap Order*, this Court concluded that it was reasonable for the FCC to consider the financial sustainability of the fund in interpreting the Act and that the FCC had adequately explained its rationale for taking emergency interim action to ensure sustainability pending more comprehensive reform. *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1103-04 (D.C. Cir. 2009). The Court gave the FCC "substantial deference" in its balancing of the competing principles of "affordability" and "sufficiency" due to the temporary nature of the agency's

---

emergency" cap amount, then each CETC receives the full amount of support to which it is entitled.

[2]     For example, if three CETCs were eligible under the identical support rule to receive $400,000 each in a state where the "interim, emergency" cap equaled $900,000, each CETC would receive only $300,000.  However, if one CETC relinquished support, the other two CETCs would receive the full amount to which they were entitled under the identical support rule (*i.e.*, $400,000).

action and the need to avoid irreparable harm pending reform. But the Court warned that "additional and more searching judicial review may be appropriate" if the promised reforms were not adopted expeditiously and the cap remained in place long term. *Id.* at 1106. Despite the FCC's representations to this Court in 2008, the agency has yet to adopt further universal service reform, and the "interim, emergency" cap remains in place.

**The Sprint and Verizon Merger Universal Service Conditions**

In late 2008, after adopting the *Interim Cap Order*, the FCC approved acquisitions by Verizon and Sprint of other wireless carriers, but conditioned approvals for both transactions on the carriers' "voluntary" commitments to phase out over five years the high-cost USF support that the acquired companies were receiving. *See Applications of Cellco P'ship d/b/a Verizon Wireless and Atlantis Holdings LLC*, Memorandum Opinion and Order and Declaratory Ruling, 23 FCC Rcd 17444 ¶¶ 192-97 (2008); *Sprint Nextel Corp. and Clearwire Corp.*, Memorandum Opinion and Order, 23 FCC Rcd 17570 ¶¶ 106-08 (2008). The FCC justified that condition on the ground that "it would be beneficial to control the growth of the high-cost fund." 23 FCC Rcd 17570 ¶ 108; *see also* 23 FCC Rcd 17444 ¶ 197 (noting that Verizon was acquiring the "largest recipient" of high-cost CETC support). At that time, the FCC did not explain how the merger commitment would be implemented.

**FCC Consideration of Broadband Internet Access**

For several years, the FCC has been considering whether to expand the scope of high-cost universal service funding to support broadband Internet access services. But the FCC has long acknowledged doubts about its authority to accomplish that policy objective absent new legislation. The Act defines universal service as an evolving level of "telecommunications services," 47 U.S.C. § 254(c)(1), whereas the FCC has made clear that broadband Internet access services are "information services," regardless of whether they are provided via wireline networks,[3] wireless networks,[4] cable facilities,[5] or power lines.[6] Accordingly, when the Joint Board considered whether to add broadband Internet access to the list of services supported by the High-Cost Program, it concluded that so long as broadband was classified as an "information service," it "could not be included within the definition of supported services, because

---

[3]    *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14853 (2005).

[4]    *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, Declaratory Ruling, 22 FCC Rcd 5901 (2007).

[5]    *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798 (2002), *aff'd*, *National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

[6]    *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, Memorandum Opinion and Order, 21 FCC Rcd 13281 (2006).

section 254(c) limits the definition of supported services to telecommunications services."[7] The FCC came to the same conclusion in holding that customer premises equipment is ineligible for support.[8] The Fifth Circuit also shared this view, observing that providing support for information services through the High-Cost Program would be an "implausible" reading of the Act. *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 441-42 (5th Cir. 1999) ("*TOPUC*").

**The National Broadband Plan**

In February 2009, Congress passed the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 ("Recovery Act"). Among other things, the Recovery Act tasked the Department of Commerce, in consultation with the FCC, to "establish a national broadband service development and expansion program." *Id*. § 6001(a). Congress also directed the FCC to prepare a "National Broadband Plan" ("NBP") that would analyze possible measures to ensure access by all Americans to affordable broadband

[7]     *Federal-State Joint Board on Universal Service*, Recommended Decision, 17 FCC Rcd 14095 ¶ 19 (2002); *see also id.* ¶ 39 (rejecting a proposal that support be provided for voicemail, stating that "voicemail services are ineligible for federal universal service support because they are information services, not telecommunications services") (footnote and citations omitted).
[8]     *Federal-State Joint Board on Universal Service*, Order and Order on Reconsideration, 18 FCC Rcd 15090 ¶ 23 (2003) (ruling that customer premises equipment is ineligible for universal service support "because section 254(c) expressly limits the definition of universal service to 'telecommunications services'").

capability, evaluate the current status of deployment, and plan for general use of infrastructure and services. *Id.* § 6001(k). Importantly, the Recovery Act only directed preparation of the NBP; Congress did not amend the Act to authorize the FCC to implement any of the recommendations it might make.

The FCC released the NBP in March 2010 as a non-binding report that discussed a wide range of recommendations for consideration, including proposals designed to reorient the universal service fund to focus on broadband deployment. *See* Federal Communications Commission, *Connecting America: The National Broadband Plan* (2010), *available at* http://download.broadband.gov/plan/national-broadband-plan.pdf. The NBP also acknowledged that it was unclear whether the FCC had authority to shift support from telecommunications services to broadband Internet access. *See, e.g.*, NBP at 337 (acknowledging questions regarding the FCC's ability to provide direct support for broadband service in the absence of further legislation).[9]

---

[9] *See also, e.g.*, Letter from FCC Chairman Julius Genachowski to Rep. John Dingell, Chairman, House Committee on Energy and Commerce (July 26, 2010), *available at* http://ecfsdocs.fcc.gov/filings/2010/07/26/ 6015848348.html (accessed July 7, 2011) (expressing concern that *Comcast v. FCC*, 600 F.3d 642 (D.C. Cir. 2010), "has cast doubt on the [Title I] legal framework that the Commission chose for broadband Internet services about a decade ago to achieve core broadband policies," including "reforming USF"); *Connect America Fund*, Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 FCC Rcd 4554 ¶¶ 60-69 (2011) (seeking comment on

The *Corr Order* and *NPRM*

Despite the continued uncertainty about its authority to provide universal service support to broadband, the FCC has begun repurposing funds devoted to high-cost telecommunications services and escrowing them for possible later use in broadband programs. As a first step, on September 3, 2010, the FCC issued an order implementing the commitments by Verizon and Sprint to relinquish high-cost support. *See Corr Order*, 25 FCC Rcd 12854 (JA __-__). Instead of applying its rules — which require that the funds previously claimed by Verizon and Sprint be used to defray other providers' costs of offering service in rural, insular, and high-cost areas up to the level of the cap and then to reduce the contribution factor thereafter — the FCC "reserved" all support "surrendered" by the two carriers as a "*potential* down payment on proposed broadband universal service reforms as recommended by the National Broadband Plan." *Id.* ¶ 1 (JA __) (emphasis added).

The FCC instructed USAC to "continue projecting that competitive ETC support will be disbursed at the interim cap amount, independent of the merger commitments and the projected disbursements for individual competitive ETCs." *Id.* ¶ 21 (JA __-__). The FCC also, on an "interim basis," "waive[d] section 54.709(b), which requires that USAC account for any difference

FCC authority to use USF funds to support broadband services and conceding the absence of express statutory authority for the initiative).

between its projected revenue requirements and its actual revenue requirements as a prior period adjustment in the next quarterly demand filing." *Id.* ¶ 22 (JA __). The "interim" waiver ensured that the relinquished support would be held in reserve for other purposes.

The FCC made clear that the *Corr Order* is meant only to address the funds forsworn by Verizon and Sprint pursuant to their merger commitments. The *Corr Order* does not apply to other funds relinquished by ETCs, including Verizon and Sprint, that surrender their ETC designation in any given state. *Id.* ¶ 16 & n.39 (JA __). However, in the *NPRM* accompanying the *Corr Order*, the FCC proposed generally to treat funds relinquished by CETCs that surrender their ETC designation the same way the agency had treated the one-time reclamation of CETC support from Verizon and Sprint. The FCC also proposed to waive the excess carry-over requirement under Section 54.709(b) of the FCC's rules "on a permanent basis." *Id.* ¶¶ 23-25 (JA __-__). The *NPRM* made no mention of abandoning the longstanding rule, Section 54.709(a), governing the quarterly calculation of expenses and contribution factors.

The FCC asserted in the *NPRM* that its proposal to divert support surrendered by a competitive ETC when it relinquishes its eligible status into an unspecified "reserve" pool would "facilitate efficient use of reclaimed excess high-cost support." *Id.* ¶ 2 (JA __). It mentioned certain broadband initiatives

recommended by the NBP, but the FCC explicitly acknowledged that it had not yet proposed those programs, and that it was reserving the funds so that it could "rapidly implement the [programs] *if* adopted." *Id.* ¶ 20 (JA __) (emphasis added); *see also id.* ¶ 1 (JA __).

In response to the *NPRM*, Petitioners objected that reducing the interim cap to set aside funding for potential future use in a new broadband support mechanism — thus making "reclaimed" funds unavailable to other CETCs — would be unlawful and unwise. Although the FCC predicted in the *NPRM* that reducing the total amount of competitive ETC support in a state "will not reduce support flowing to any individual competitive ETC," *NPRM* ¶ 24 (JA __), Petitioners' comments explained that reductions in funding nevertheless would threaten to undermine sufficiency by depriving consumers of adequate support and preventing CETCs from expanding service or entering new markets.[10] In addition to these concerns regarding the sufficiency of funding for

---

[10]   For example, RCA explained that if the proposed rule had been in effect in 2008 when RCC Atlantic, Inc.'s ETC status was terminated, then 94% of the CETC support received in Vermont and *all* CETC support in New Hampshire would have been eliminated, leaving other carriers potentially unable to deliver affordable and high-quality service to consumers previously served by RCC. Comments of Rural Cellular Association at 4 (Oct. 7, 2010) (JA __). USA Coalition similarly challenged the sufficiency of support under the *Order*. *See* Comments of SouthernLINC Wireless and the Universal Service for America Coalition at 1 (Oct. 7, 2010) (JA __); *Corr Order*, Petition for Partial Reconsideration of SouthernLINC Wireless and the Universal Service for America Coalition at 6, 17-18 (Sept. 29, 2010) (JA __, __-__).

rural consumers, USA Coalition's comments explained that the FCC lacked authority to "reserve" funds for potential future use in supporting broadband Internet access, noting that establishing a general set-aside of that nature would render universal service contributions an unconstitutional tax.[11] Verizon, which has intervened in this case to support the FCC, also commented that the FCC lacked authority to reserve the relinquished funds as proposed. *See* Comments of Verizon and Verizon Wireless at 5-6 (Oct. 7, 2010) (JA __-__).

**The *Order* on Review**

On December 30, 2010, less than two months after comments were submitted, the FCC adopted the *Order* on review. The *Order* does two things when a CETC relinquishes its status in a particular state. First, the *Order* reduces that state's interim cap by the amount of funding the CETC had been due, thus making such funds unavailable to other CETCs. *Order* ¶¶ 5-6 (JA __-__). Second, the *Order* directs USAC to continue collecting funds as if the relinquished amounts were still being distributed and sets those funds aside for unspecified future uses by the FCC. Specifically, it directs USAC, for purposes of calculating contributions, to "continue to project competitive ETC demand at

---

[11]     *See* Comments of SouthernLINC Wireless and the Universal Service for America Coalition at 2-3 (Oct. 7, 2010) (JA __-__); *see also id.* at 1 (JA __) (incorporating arguments from and attaching *Corr Order*, Petition for Partial Reconsideration of SouthernLINC Wireless and the Universal Service for America Coalition (Sept. 29, 2010)).

the full amount of the cap as established by the *Interim Cap Order*, without reflecting any adjustments to the cap due to relinquishment or revocation of ETC status by a competitive ETC." *Order* ¶ 6 n.15 (JA ___).

The *Order* consists of only seven numbered paragraphs. It does not address any of the statutory principles on which the FCC "shall base" its universal service policies. 47 U.S.C. § 254(b). Instead, it bases the reduction in available CETC funding solely on a bare assertion that the reclaimed support "could" be used "more effectively" to support broadband Internet access. *Order* ¶ 5 (JA ___). The *Order* not only fails to explain why broadband funding would be more effective than support provided to CETCs that are delivering mobile (or fixed) services to high-cost customers today, but it also alludes to the prospect of a broadband mechanism without acknowledging that no broadband fund exists, that the FCC has not even set forth a detailed proposal for such a fund, or that the agency may well lack statutory authority to accomplish its policy objectives.

By the same token, the *Order* barely acknowledges, and makes no attempt to refute, commenters' objections that funding cuts to CETCs would undermine the sufficiency of support. The *Order* also fails to address commenters' arguments that setting aside USF support for broadband in advance of actually establishing such a funding mechanism would be unlawful.

The *Order* also departs without explanation from the agency's rule (Section 54.709(a)) governing the calculation of quarterly expenses. Under that provision, covered "expenses" are those that pertain to the four established universal service programs. Although the *Order* seeks to set aside funds for a potential broadband support mechanism by extending the *Corr Order's* waiver of the provision in Section 54.709(b) that requires USAC to reduce the quarterly contribution factor based on the prior quarter's excess contributions, *id.* ¶ 6 n.15 (JA __), it neglects to amend, or even mention, the rule governing how quarterly expenses are determined in the first place.

The *Order*, by its terms, was "effective upon release" on December 30, 2010. *Order* ¶ 7 (JA __). Since then, various competitive carriers have relinquished their ETC status, while others are in the process of doing so, thereby triggering the process for "reserving" the "relinquished" funds by depositing them into the newly created pool for the FCC's use at an undetermined point in the future for "potential" programs. The FCC has not provided any explanation of what will happen to the "reserved" funds if the agency ultimately does not adopt a broadband support mechanism.

## SUMMARY OF ARGUMENT

The *Order* unlawfully diverts funding from the established universal service High-Cost Program to create a discretionary reserve that the FCC may

use to fund initiatives of its choosing at some unspecified point in the future. The *Order* creates this unauthorized pool of funds by directing USAC to continue collecting mandatory contributions at the full interim cap level after a CETC relinquishes support, *Order* ¶ 6 n.15 (JA __), and then diverting the amount of relinquished support into a reserve pool rather than distributing it as required by the FCC's rules. The Court should vacate the *Order* because the FCC lacks the statutory and constitutional authority to establish this "Discretionary Pool" and because the FCC has failed to comply with the APA.

The *Order* violates the Act in several respects. Although the Act defines universal service as a list of services designated by the FCC and the Joint Board after consideration of enumerated factors, *see* 47 U.S.C. §§ 254(c)(1), (a)(2), the *Order* fails to tie the use of the diverted funds to any of the services on that list. Rather than establishing any specific directives for (or limitations on) the diverted funds, the *Order* merely states broadly that they *could* be used to support broadband Internet access in the future. The FCC's failure to ensure that the diverted "universal service" contributions will be used to defray carriers' expenses through existing universal service programs violates Sections 254(c)(1) and 254(a)(2) of the Act.

Relatedly, the *Order* violates the Act's mandate that universal service support be "specific" and "predictable." 47 U.S.C. § 254(d). Because the FCC

22

has failed to provide any concrete details about how the funds will be used or who will benefit from their expenditure, the Discretionary Pool is the antithesis of "specific." Similarly, the Discretionary Pool is not "predictable" because the FCC has not declared in advance what services the funds will support or provided restrictions from which one could deduce the planned uses of the funds. By the same token, the Discretionary Pool cannot be considered a support "mechanism[] established by the Commission," 47 U.S.C. § 254(d), for the obvious reason that the programs the funds supposedly will support have yet to be defined or established.

Even if the Act were ambiguous regarding the FCC's authority to establish the Discretionary Pool (and it is not), the Court should interpret the operative provisions narrowly to avoid raising serious doubts about their constitutionality. The Act originated in the Senate, which means that authorizing the FCC to reserve mandatory contributions for undefined purposes would violate the constitutional requirement that "[a]ll Bills for raising Revenue shall originate in the House of Representatives." U.S. Const. art. I, § 7, cl. 1 (the "Origination Clause"). In addition, the Court should interpret the Act narrowly to avoid serious doubt as to whether it effects an unconstitutional delegation of Congress's power to "lay and collect Taxes." U.S. Const. art. I, § 8, cl. 1. (the "Taxing Clause"). Because the *Order* would bestow the benefits of the diverted

23

funds on unknown parties (and potentially the public generally) rather than on those making the contributions, it constitutes a tax that must be clearly authorized by Congress. Here, Congress has not — and could not have without violating the Origination Clause — authorized the FCC to impose or collect any taxes.

In using mandatory universal service contributions to create the "Discretionary Pool," the *Order* also violates (or unlawfully amends *sub silentio*) Section 54.709(a) of the FCC's rules. That provision requires USAC to project expenses for universal service support based on demand for the four established support mechanisms and expected administrative costs. By directing USAC to project competitive ETC demand at the full interim cap amount regardless of the relinquishment or revocation of any carrier's ETC status, the *Order* effectively treats the relinquished support as a non-enumerated expense in violation of Section 54.709(a).

Finally, the FCC violated the APA by failing to explain how the reduced funding available to competitive ETCs will be "sufficient" to preserve and advance universal service. Rather, the *Order*'s few conclusory statements demonstrate only the *ultra vires* nature of the FCC's action, and its attempts to bootstrap from the *Interim Cap Order* are unavailing. The FCC has discretion to

24

determine exactly how much high-cost support is sufficient, but it may not sidestep that analysis altogether as it did in the *Order*.

## STANDING

Petitioners possess the requisite Article III standing to bring this challenge. Associations, such as Petitioners, have standing if (1) at least one of their members has standing; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit. *Am. Library Ass'n v. FCC*, 406 F.3d 689, 696-97 (D.C. Cir. 2005).

1.    **Petitioners' Members Have Standing.** Petitioners' members satisfy each of the relevant standing requirements: (a) injury in fact, (b) causation, and (c) redressability. *Id.* at 696.

*First*, the *Order* reduces the total amount of support available to competitive ETCs in a state under the interim cap whenever a competitive ETC relinquishes its ETC designation in that state, causing Petitioners' members to suffer injury in fact by denying them funding to which they would be entitled absent the *Order*. *Order* ¶ 5 (JA __). Petitioners' members provide service as competitive ETCs and receive USF support in nearly every state where the *Order* has had effect since it was issued on December 30, 2010. For instance, the interim cap support levels in Florida, Tennessee, North Carolina, Arizona,

25

and Utah have already been reduced pursuant to the *Order* as the result of Sprint's relinquishment of its competitive ETC status in those states, reducing the amount of support for other competitive ETCs in that state, including Petitioners' members. *See Telecommunication Carriers Eligible for Universal Service Support; Federal-State Joint Board on Universal Service*, WC Docket No. 09-197, CC Docket No. 96-45, Order, DA 11-89 (rel. Jan. 14, 2011) (approving Sprint's relinquishment of its competitive ETC status in Florida, Tennessee, and North Carolina).

Other ETCs also have relinquished their ETC status since the *Order*'s effective date. *See, e.g, Petition of Tennessee Tel. Serv. LLC d/b/a Freedom Commc'ns USA, LLC For Withdrawal as an ETC in the Commonwealth of Ky.*, Order, No. 2011-00135, 2011 WL 1716474 (KY PSC 2011) (granting relinquishment of Freedom Communications' ETC status in Kentucky); *Application of Tennessee Tel. Serv., LLC, d/b/a Freedom Commc'ns USA, LLC for Designation as an ETC*, Order, No. U-16227, 2011 WL 1716474 (MI PSC 2011) (granting relinquishment of Freedom Communications' ETC status in Michigan). The *Order* diminishes the pool of funds that otherwise would be available to the remaining competitive ETCs serving those areas, including Petitioners' members. And additional ETC relinquishments are likely to go into effect in the immediate future. *See Application of Sprintcom, Inc. and NPCR,*

*Inc. for Relinquishment of ETC Designation*, Application, No. 2011-0133 (HI PUC, filed June 7, 2011) (decision pending).

Petitioners' members also suffer injury in fact because all of Petitioners' carrier members make universal service contributions. To the extent that these carriers' contributions are being inappropriately set aside pursuant to the *Order* and not distributed or returned as they would have been pursuant to 47 C.F.R. § 54.709(b) (requiring expenditure of all funds within a quarter of their receipt), these carriers suffer additional injury in fact.

*Second*, there is a clear causal connection between the *Order* and the injury to Petitioners' CETC members, which are receiving less USF support in the affected states than the amounts to which they would otherwise be entitled. The *Order* is likewise the direct cause of carriers' contributions of funds that are being held in reserve by the FCC. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

*Third*, the harm to Petitioners' members is redressable by this Court because vacatur would place the competitive ETCs in the same position as before the *Order*, with the escrowed funds distributed to ensure the appropriate level of funding for competitive ETCs in each state under the interim cap. *See Am. Library Ass'n*, 406 F.3d at 696.

27

2.     **Petitioners Seek To Protect Interests Germane to Their Associations' Purpose.** Both RCA and the USA Coalition are committed to protecting the interests of carriers and consumers in rural, insular, and high-cost areas. Petitioners' carrier members provide service in these areas, and many rely on USF support to provide those services. These carrier members joined these associations to protect their legal and economic interests.

3.     **Individual Membership Participation Not Required.** Because none of the Petitioners' claims requires individualized proof, all claims are properly resolved in a group context. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344 (1977).

## ARGUMENT

## I.     STANDARD OF REVIEW

When deciding whether the FCC has the statutory authority to adopt the rules included in the *Order*, the Court reviews the FCC's interpretation of the statute under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At step one, *Chevron* requires the Court to decide whether "Congress has directly spoken to the precise question at issue. *Chevron*, 467 U.S. at 842. If so, the Court must "give effect to the unambiguously expressed intent of Congress," *id.* at 842-43, as discerned using traditional tools of statutory construction. *See, e.g., Catawba County v. EPA*, 571 F.3d 20 (D.C.

Cir. 2009) (traditional tools of statutory construction include structure, legislative history, purpose). If the agency's interpretation of the statute does not conform to the plain meaning of the statute, the Court must reverse the agency's decision.

At step two, where the statute is silent or ambiguous, "the question for the Court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The Court may reverse the agency's construction of an ambiguous provision if it finds that construction "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Courts also defer to an agency's interpretation of its own regulations under *Auer v. Robbins*, 519 U. S. 452 (1997). But, as the Supreme Court recently reiterated, courts will not defer to the agency's interpretation when the "regulation in question [i]s unambiguous, and adopting the agency's contrary interpretation would 'permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.'" *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 882 (2011) (quoting *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)). It is well established that "an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked." *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992).

Courts "review *de novo*" — without deference — "a challenge to the constitutionality of [an agency's] regulations." *C-Span v. FCC*, 545 F.3d 1051, 1054 (D.C. Cir. 2008) (citing *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004)).

The APA also requires courts to "set aside" an agency's action if the agency acted arbitrarily or capriciously in adopting its interpretation, for example by failing to provide a cogent explanation of its decision. 5 U.S.C. § 706. In determining whether agency action is arbitrary and capricious, "a reviewing court does not serve as a mere rubber stamp for agency decisions." *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1145 (D.C. Cir. 1980). Agency decisions will be upheld only if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted). An agency's action is arbitrary and capricious when it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to difference in view or the product of agency expertise." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 753 (D.C. Cir. 2007) (internal quotations omitted).

## II.    THE FCC LACKS AUTHORITY TO CREATE A POOL OF FUNDS FOR UNSPECIFIED PURPOSES AND USE AT AN UNDETERMINED FUTURE TIME

The *Order* unlawfully diverts mandatory contributions from the established universal service High-Cost Program into an unauthorized pool that the FCC can retain indefinitely and use for any purpose it chooses. Specifically, the *Order* directs USAC to continue collecting mandatory contributions at the full interim cap level after a CETC relinquishes support, *Order* ¶ 6 n.15 (JA __), but to reserve, rather than distribute, the amount of the relinquished support. The Act does not authorize the FCC to create this "Discretionary Pool." Indeed, the Act cannot authorize the FCC to require contributions for such an undefined purpose because doing so would empower the FCC to impose a tax in violation of the Origination Clause of the Constitution. The *Order* thus fails at *Chevron* step one. Even if the Act were ambiguous, it nonetheless would have to be narrowly construed as not authorizing the Discretionary Pool to avoid an improper delegation of Congress's taxing authority under the Taxing Clause. Finally, the *Order*'s creation of the Discretionary Pool violates the FCC's own rules for calculating mandatory USF contributions.

31

**A.     The *Order* Is Fundamentally Inconsistent With the Universal Service Mandates of the Act.**

The Act does not authorize the FCC to use mandatory universal service contributions to create a fund for an undefined future use. First, the Act requires the FCC and the Joint Board to develop a list of services supported by the mandatory contributions and limits the scope of the universal service program to those services. 47 U.S.C. §§ 254(c)(1), (a)(2). But the Discretionary Pool is in no way tied to any of the supported services on the list that the FCC and the Joint Board have established. Rather, the *Order* diverts the funds specifically so that they will not be used for any of the supported services on the current list. Second, the Act requires telecommunications carriers to contribute to "the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." *Id.* § 254(d). *See also id.* § 254(b)(5). But the Discretionary Pool, to which the *Order* requires telecommunications carriers to contribute, is neither a "specific" nor a "predictable" support mechanism. In fact, it is so open-ended that it is not even a support mechanism "established by the Commission" at all. By collecting contributions before establishing the program(s) for which they purportedly will be used, the FCC has impermissibly put the cart before the horse.

1.     The Act directs the FCC to "preserve and advance universal service," *id.* § 254(d); *see also id.* § 254(b), and to work with the Joint Board to

32

designate services to receive support from federal universal service support mechanisms, *id.* §§ 254(a)(2), (c)(1). In accordance with the latter statutory mandate, the FCC and the Joint Board have designated nine services that "shall be supported" by the universal service fund in rural, insular, and high-cost areas under the High-Cost Program. 47 C.F.R. § 54.101(a). The *Order* does not alter the list of designated services (nor could it since the Joint Board was not consulted).

The *Order* makes clear that the Discretionary Pool is not intended to support the designated services as the Act requires. There would be no point of creating the Discretionary Pool if it were. Instead, the purpose of the Discretionary Pool is to reserve funds for other purposes altogether. The FCC could not specify how it intends to use the funds diverted by the *Order* since the agency had yet to propose any specific changes to the supported services list, to the scope of existing support programs, or to any of its universal service rules. Indeed, the *Order* does not limit the FCC's use of the funds at all, referring instead merely to *potential* future uses of the money. *Order* ¶ 5 (JA __) ("[R]educing the pool of support in a state *could* enable excess funds from the legacy high-cost program to be used more effectively to advance universal service broadband initiatives, as recommended by the National Broadband Plan.") (emphasis added); *see also id.* ("[T]he public interest would be better

33

served by taking this interim step to reclaim such support rather than redistributing it, particularly as we proceed with broader reforms to transition to a universal service system that promotes broadband deployment more directly."). Because the Discretionary Pool does not support any of the services *currently* designated by the Joint Board and the FCC as "supported services" and is not part of the *current* High-Cost Program or any of the other specific support mechanisms, it violates Sections 254(c)(1) and 254(a)(2) of the Act.

2.    For similar reasons, the *Order* violates the Act's mandate that the FCC assess contributions only for "specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). *See also* 47 U.S.C. §§ 254(b)(5), (e). The fundamental problem is that the *Order* addresses only the collection of the funds, not the disbursement of the funds via a qualifying universal support "mechanism."

First, the Discretionary Pool is not a "specific" support mechanism. *Id.* §§ 254(d), (b)(5), (e). Far from "[p]recisely formulated or restricted; specifying; definite, or making definite; explicit; of an exact or particular nature," Webster's New Int'l Dictionary 2414-15 (2d Ed. 1960), the Discretionary Pool created by the *Order* instead is "indefinite, unrestricted, vague, general" — the antonyms of "specific." *Id.* at 2415. Indeed, the *Order* provides no concrete

34

details about how the funds will be used or who will be the beneficiaries of the funds. The FCC's fleeting reference to the NBP, *Order* ¶ 5 (JA __), does not supply the necessary specificity: the NBP is a 340-page document that includes hundreds of proposals, many of which will require congressional authorization. Nor can the *NPRM* that preceded the *Order* supply the lacking specificity. Any details the *NPRM* supplied regarding possible uses of the Discretionary Pool cannot substitute for restrictions actually imposed in the final *Order*. In any event, the *NPRM* itself is not specific: it proposes "to use that support to help fund broadband universal service programs, consistent with the recommendations of the National Broadband Plan described above," *NPRM* ¶ 23 (JA __), referring to a non-exhaustive list of programs, many of which, as the FCC itself recognized, it had not, and still has not, adopted. *NPRM* ¶¶ 1, 22 (JA __, __).

Second, for similar reasons, the Discretionary Pool is not a "predictable" support mechanism. 47 U.S.C. §§ 254(d), (b)(5). The *Order* itself does not purport to declare in advance what services the funds will be used to support; nor does it provide restrictions from which one could determine the uses of the funds in advance. It merely states that the funds "could" be used to advance broadband initiatives, *Order* ¶ 5 (JA __), which include a vast array of proposals that the FCC may or may not adopt. Moreover, the FCC has admitted

35

that its authority to adopt the proposals is uncertain. *See supra* at 15 n.9. The *Order* also fails to mention what will happen to the money if the FCC does not later adopt any broadband programs. The Discretionary Pool thus is anything but a "predictable" support mechanism.

The Fifth Circuit's decision in *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000), confirms this conclusion. The court held that USF support for high-cost loops was "predictable" within the meaning of the Act because "[t]he methodology governing subsidy disbursements [wa]s plainly stated and made available to LEC's." *Id.* at 622. And with respect to switching cost support, it reiterated that "the Commission reasonably construed the predictability principle to require only predictable *rules* that govern distribution of the subsidies . . ." *Id.* at 623. In stark contrast, the *Order* on review provides no methodology or rules whatsoever to govern the *potential* future distribution of the "reclaimed" funds that the FCC is continuing to collect, let alone the required predictable rules.

Finally, the Discretionary Pool cannot be considered a support mechanism "established by the Commission," 47 U.S.C. § 254(d), for the obvious reason that the programs it may one day support have not been established. The *Order* merely provides for the collection and retention of funds. It does not provide for their distribution, whether by creating a program

36

or using a previously created one. Until the FCC explains what services the funds will be used to support, it cannot be considered an "established" support mechanism.[12]

The record developed in the brief period following the *NPRM* further underscores the *Order*'s departure from the governing statute. Verizon, which has intervened on behalf of the FCC in this case, pointed out in its comments to the agency that "references in Section 254 to 'specific' and 'predictable' USF programs and support — and contributions collected for 'established' universal service mechanisms — counsel against reserving support for mechanisms that do not yet exist." Comments of Verizon and Verizon Wireless at 5 (Oct. 7, 2010) (JA __). *Cf.* Comments of SouthernLINC Wireless and the Universal Service for America Coalition at 1 (Oct. 7, 2010) (JA __); Petition for Partial Reconsideration of SouthernLINC Wireless and the Universal Service for America Coalition at 6, 17-18 (Sept. 29, 2010) (JA __). The FCC completely failed to respond and did nothing to explain how the Discretionary Pool is consistent with the Act. That failure results in a violation of the APA's reasoned

---

[12] While the FCC was not authorized to establish the Discretionary Pool at all, it in any event would have to show that a new fund advances the requirement of ensuring "sufficient" support. 47 U.S.C. §§ 254(d), (e). By definition, the FCC could not make the required showing with respect to a pool of funds diverted for unspecified purposes, unidentified recipients, and unknowable funding level needs.

decisionmaking requirement, in addition to the clear mandates of the Act. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52.

**B.    The Act Must Be Interpreted Narrowly To Avoid Violations of the Origination and Taxing Clauses of the Constitution.**

Even if the Act were ambiguous regarding the FCC's authority to establish the Discretionary Pool (and it is not), this Court should not interpret the Act as authorizing the FCC to establish the Discretionary Pool because that interpretation would violate the Constitution. At the very least, that broad interpretation would raise serious doubts about the constitutionality of the Act. It is well-settled that "'where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Solid Waste Agency of N. Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 173 (2001) (rejecting agency interpretation to avoid constitutional doubt) (quoting *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). *See also, e.g., Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) (the "canon of constitutional avoidance trumps *Chevron* deference, and we will not submit to an agency's interpretation of a statute if it 'presents serious constitutional difficulties'" (internal citations omitted)).

1.    **A Broader Interpretation of the Act Would Violate the Origination Clause**

As explained above, the *Order* requires telecommunications carriers to contribute to a fund that the FCC *may* use in the future for *unspecified purposes* and programs that *do not yet exist*. It therefore imposes a tax. The Act, however, cannot authorize the FCC to impose a tax because it originated in the Senate,[13] and Article I of the United States Constitution provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives." U.S. Const. art. I, § 7, cl. 1.

There are two relevant considerations for determining whether a statute constitutes a "Bil[l] for raising Revenue" within the meaning of the Origination Clause. The general rule is that "a statute that creates a particular governmental program and that raises revenue to support *that program*, as opposed to a statute that raises revenue to support Government generally, is not a 'Bil[l] for raising Revenue.'" *United States v. Munoz-Flores*, 495 U.S. 385, 398 (1990) (emphasis added); *see also TOPUC*, 183 F.3d at 427 n.51. To avoid circumvention of the general rule, there must also be some relationship between the persons paying for the program and the beneficiaries of the program. *See TOPUC*, 183 F.3d at 427-28 & nn.51, 56 (citing *Munoz-Flores*, 495 U.S. at 400 n.7). As the Fifth

---

[13] *See* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (enacting S. 652); Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 (enacting S. 3285). *See also TOPUC*, 183 F.3d at 427 n.49.

Circuit explained, "an assessment on one group for the benefit of a completely unrelated group is how courts have distinguished taxes raised for general federal outlays from fees raised for specific programs." *Id.* at 428 n.56. The court added that "*some* relationship" is required; "[o]therwise, Congress could *always* avoid the Origination Clause requirement because, in theory, all revenue is raised to fund some 'particular program.'" *Id.* (emphasis in original).

These two factors clearly demonstrate that the *Order* "rais[es] Revenue." First, the *Order* does not "creat[e] a particular governmental program" and "rais[e] revenue to support that program." *Munoz-Flores*, 495 U.S. at 398. Instead, the *Order* raises money for a vague purpose to support programs that the FCC has not yet adopted and may never adopt. Nothing in the *Order* prevents the FCC from, say, financing the construction of a new wing at its headquarters. As explained above, *see supra* at Section 3, the *Order* simply does not address how the funds it collects will be distributed. Accordingly, it does not create a particular program and limit the use of the funds it raises to that program.

Second, the *Order* requires no connection between the payors — providers of interstate telecommunications, 47 U.S.C. § 254(d) — and the future beneficiaries of the Discretionary Pool. *See TOPUC*, 183 F.3d at 427-28 & nn.51, 56. The FCC has not determined what benefits the fund will support or

what program will implement those benefits, let alone who the beneficiaries will be. The text of the *Order* provides almost no guidance. Its brief statement that excess funds "could" be used to advance the goals set forth in the NBP, *Order* ¶ 5 (JA __), provides no restrictions because even if the FCC were to follow through on that plan, the NBP contains a wide variety of proposals with different potential beneficiaries. Intervenor Verizon conceded in its previous comments that the Discretionary Pool raises serious constitutional concerns because the "specific benefits and intended program beneficiaries of new USF broadband initiatives will not be known until the Commission makes additional decisions." Comments of Verizon and Verizon Wireless at 6 (Oct. 7, 2010) (JA __). Furthermore, the proposed beneficiaries of any broadband initiatives could well be different than the payors because some providers of broadband Internet access do not provide any service that is subject to universal service contribution obligations.

It is only the close relationship between the payors into a universal service program and the beneficiaries of that program that "prevents the sums . . . from being classified as 'revenue' within the meaning of the Origination Clause." *TOPUC*, 183 F.3d at 428. Without specifying who the beneficiaries of the Discretionary Pool are, the *Order* cannot ensure the necessary nexus.

In *TOPUC*, the Fifth Circuit expressed concern about whether the universal service provisions of the Act as then administered violated the Origination Clause. Ultimately, the court determined that the USF contribution requirements as applied to paging carriers were permissible because they were "part of a particular program supporting the expansion of, and increased access to, the public institutional telecommunications network," and "[e]ach paging carrier directly benefits from a larger and larger network." *Id.* at 427-28. Here, by contrast, the Discretionary Pool is not limited to any established USF programs and the beneficiaries of the funds are not specified.

The court also upheld against an Origination Clause challenge the use of universal service support for Internet access and internal connections to schools and libraries. Conceding that it was a "close question," the court concluded that the "attenuated relationship" between the public telecommunications network and the FCC's use of USF for Internet access and internal connections to schools and libraries did not raise "sufficiently serious constitutional doubts to override our normal *Chevron* step-two deference." *Id.* at 443 n.95. The already-established and clearly defined schools and libraries program stands in stark contrast to the Discretionary Pool at issue here — there is no limit on how attenuated the relationship could be between telecommunications carriers and the unknown beneficiaries of the Discretionary Pool.

42

For all of these reasons, if the Act were interpreted to authorize the *Order*, then it would be an unconstitutional "Bil[l] for raising Revenue" that originated in the Senate. Because, at the very least, such a construction would raise serious constitutional doubts, the Act should not be interpreted to authorize the *Order*.

### 2.    A Broader Interpretation of the Act Would Violate the Taxing Clause

In addition, this Court should interpret the Act narrowly to avoid serious concerns that it would otherwise be an unconstitutional delegation of Congress's power to "lay and collect Taxes." U.S. Const. art. I, § 8, cl. 1. (the "Taxing Clause"). Courts generally distinguish between taxes and fees based on the use of the funds. The classic "tax" raises money that is contributed to a "general fund" and spent for the benefit of the entire community. *See San Juan Cellular Tel. Co. v. Public Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992). A "fee," by contrast, "bestows a benefit on the [regulated party], not shared by other members of society." *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340-41 (1974). Because only Congress has the authority to impose taxes, in *National Cable Television* the Supreme Court narrowly interpreted a statute not to authorize agencies to assess fees for benefits inuring to the public generally "to avoid constitutional problems." 415

U.S. at 340-43; s*ee also Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 223-244 (1989).

The Court later described *National Cable Television* as a "clear statement" rule: "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Skinner*, 490 U.S. at 224 (citing *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548, 560 n.10 (1976));[14] s*ee also United States v. E.I Dupont De Nemours & Co.*, 432 F.3d 161, 167 (3d Cir. 2005).

This clear statement rule applies here, and it is not satisfied. The rule applies because the *Order* requires contributions from telecommunications carriers without ensuring that those contributions will "inur[e] directly to [their] benefit." *Skinner*, 490 U.S. at 224. At best, the *Order* requires the funds to be used to advance the NBP, but that plan sets forth amorphous goals and provides no assurance that the distribution of funds would inure to the benefits of existing USF contributors. And the Act fails to satisfy the clear statement rule because it does not "indicate clearly" — or at all — its intent to delegate to the

---

[14] The Court also noted that "[o]f course, any such delegation must also meet the normal requirements of the nondelegation doctrine." *Skinner*, 490 U.S. at 224.

FCC the power to collect and hold onto mandatory universal service contributions for an indeterminate future use. Accordingly, the Act does not authorize the *Order*.

### C.     The *Order* Violates the FCC's Own Rules.

The *Order* also violates Section 54.709(a) of the FCC's rules. Prior to the *Order*, the FCC's rules ensured that the universal service contribution and high-cost fund disbursement methodologies functioned together as a "pass-through" system by (1) explicitly enumerating the expenses for which mandatory contributions are used; (2) ensuring that contributions are no greater than necessary to fund those expenses; and (3) requiring that any excess contributions be used to offset expenses in the following quarter, *i.e.*, by lowering the contribution factor. 47 C.F.R. §§ 54.709(a)(2)-(3), (b). The rules specify that the "[t]otal projected expenses" are the "projections of demand" and the "projections of administrative expenses" for the FCC's four universal service programs. *Id.* § 54.709(a)(3).

The *Order* severs the link between contributions and these enumerated expenses. Under Section 54.709(a), when the FCC reduces the interim cap amount for a particular state pursuant to the *Order*, the projected demand for high-cost support, and thus total expenses, should decrease by the same

amount.[15] But the *Order* instead directs that "USAC shall continue to project competitive ETC demand at the full amount of the cap as established by the *Interim Cap Order*, without reflecting any adjustments to the cap due to relinquishment or revocation of ETC status by a competitive ETC." *Order* ¶ 6 n.15 (JA __). It effectively treats the pool of "relinquish[ed]" funds as an additional (non-enumerated) expense. This clearly violates Section 54.709(a). But the *Order* does not amend Section 54.709(a). It does not acknowledge, much less provide an explanation for, the inconsistency. Indeed, it does not even cite Section 54.709(a).

Instead, the FCC claims that its directive to USAC relies on the waiver of Section 54.709(b) of its rules, which the agency adopted in the *Corr Order*. *See Order* ¶ 6 n.15 (JA __); *Corr Order* ¶ 22 (JA __). The temporary waiver of Section 54.709(b), however, relieves the FCC only of its obligation to reduce the contribution factor for the following quarter when collections in a given quarter exceed the amount actually spent on USF programs. It in no way alters the list of enumerated expenses that provides the basis for contribution calculations in the first place.

---

[15] This assumes the interim cap is having an effect. If the aggregate amount of support that CETCs would have received pursuant to the identical support rule were less than the interim cap amount, then projected demand would decrease only if the reduction in the interim cap pushed it below the aggregate amount of support that the remaining CETCs would have received pursuant to the identical support rule.

Section 54.709(a)(3), which allows the FCC "to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest," also cannot save the *Order*. It does not grant the FCC unbridled authority to consider demand for other potential programs that could be adopted down the road; instead it gives the FCC authority to alter the "projections of demand," which can only reasonably refer to the estimated demand for the four established universal service programs. 47 C.F.R. § 54.709(a)(3) ("the Administrator must submit its projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director").

The alternative reading would be completely untethered from the regulation and the universal service provisions of the Act. It would lead to the absurd result of allowing the FCC to project "demand" to include, for example, a new fleet of vehicles for use by the FCC. The FCC cannot circumvent the statutory limits by construing its rules to provide unfettered discretion to collect whatever funds its deems appropriate. *See GTE Serv. Cor. v. FCC*, 205 F.3d 416, 423-24 (D.C. Cir. 2000) (rejecting as impermissibly broad the FCC's interpretation of what equipment was "necessary" for interconnection and

access to unbundled network elements — and thus eligible for collocation —
where the FCC's standard included "*unnecessary* multi-purpose features"). The
*Order* thus cannot be reconciled with Section 54.709(a) of the FCC's rules,
which binds the agency, *see Sullivan*, 979 F.2d at 234, and this Court cannot
defer to the agency's interpretation. S*ee Chase Bank USA, N.A. v. McCoy*, 131
S. Ct. at 882.

The *Order* also cannot be read to amend Section 54.709(a) *sub silentio* as
such a reading would violate the APA for multiple reasons. The agency did not
provide the requisite notice and opportunity for comment as necessary to amend
the rule, 5 U.S.C. §§ 553(b), (c), and it did not explain in the *Order* how such
an amendment would be consistent with the mandates of the Act or address
Petitioners' comments that such an action would flatly conflict with the Act's
requirements. *See* Comments of SouthernLINC Wireless and the Universal
Service for America Coalition at 1 (Oct. 7, 2010) (JA __); Petition for Partial
Reconsideration of SouthernLINC Wireless and the Universal Service for
America Coalition at 5, 11-15 (Sept. 29, 2010) (JA __). The Supreme Court has
made clear that "[a]n agency may not … depart from a prior policy *sub silentio*
or simply disregard rules that are still on the books." *FCC v. Fox Television
Stations, Inc.*, 566 U.S. ___, 129 S. Ct. 1800, 1810-11 (2009) (citing *United
States v. Nixon*, 418 U. S. 683, 696 (1974)). Accordingly, if the FCC intended

48

the *Order* to amend Section 54.709(a), it failed to provide notice of any such amendment and otherwise violated the APA.

## III.    THE FCC FAILED TO EXPLAIN HOW THE *ORDER* WILL ENSURE SUFFICIENT SUPPORT FOR COMPETITIVE ETCs

In setting aside relinquished funds in the Discretionary Pool, the *Order* reduced high-cost funding that had been available under the interim cap. But the *Order* makes no effort to explain whether or how the reduced pool of funds will be adequate to preserve and advance universal service. The *Order* thus cannot survive scrutiny for the independent reason that it fails to grapple with the statute's core directive requiring sufficient universal service support.

Section 254 of the Act provides that the FCC "shall" base its policies on the principle that "[t]here should be specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5); s*ee also id.* § 254(e) (support "should be explicit and sufficient to achieve the purposes of this section"); *id.* § 254(b)(3) (rural consumers should have access to affordable services that are reasonably comparable to those available to urban consumers). Although the FCC has discretion to determine how it will implement these directives, it must at a minimum engage in reasoned decisionmaking, including by "cogently explain[ing] why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.. Ass'n*, 463 U.S. at 48. Here, in its haste to issue an order before Sprint relinquished

approximately $5.4 million in high-cost support, *Order* ¶ 7 (JA __), the FCC

flunked that bedrock APA requirement by refusing even to consider whether its

new rule would yield support "sufficient" to meet the goals of Section 254.

### A.     The FCC Must Justify the Particular Levels of USF Support It Establishes.

The statutory duty to ensure "sufficient" support, together with the APA,

requires the FCC to provide a reasoned justification of how the specific funding

levels it authorizes will achieve universal service objectives. The FCC has

repeatedly shirked that obligation in adopting and amending USF-related rules,

leading the courts to set aside prior orders as arbitrary and capricious. In *Qwest*

*Corporation v. FCC*, 258 F.3d 1191 (10th Cir. 2001) ("*Qwest I*"), for example,

the petitioner challenged the FCC's failure to justify the level of funding

available under the "non-rural" support mechanism. There, as here, the agency

resorted to generalizations and unsupported assumptions, rather than data-

driven findings regarding the funding necessary to ensure that rural consumers

have access to affordable services that are reasonably comparable to those

available in urban areas. The court reversed the order because "the FCC ha[d]

not explained how its funding mechanism [wa]s sufficient." *Id.* at 1200.

After the FCC attempted to bolster its analysis on remand, the Tenth

Circuit again granted Qwest's petition for review, finding that the FCC "failed

to appropriately respond to [the court's] decision in *Qwest I*." *Qwest Commc'ns*

*Int'l, Inc. v. FCC*, 398 F.3d 1222, 1239 (10th Cir. 2005). Among other things, the FCC "failed to reasonably define" the term "'sufficient,'" despite the court's order that the FCC more precisely define the term "'in a way that can be reasonably related to the statutory principles.'" *Id.* at 1233 (internal citations omitted). The FCC had defined "sufficient" solely in terms of "reasonable comparability," which the court held was impermissible because it "ignore[d] all but one principle enumerated in §254(b)" and did not explain why "reasonable comparability conflicts with or outweighs the principle of affordability, or any other principle for that matter, in this context." *Id.* at 1234. The court again remanded, holding that "the FCC must articulate a definition of 'sufficient' that appropriately considers the range of principles identified in the text of the statute." *Id.*[16]

This Court's precedent further confirms the FCC's duty to provide a cogent explanation for how the rule change effected by the *Order* will promote sufficiency (among other statutory objectives). The Court has made clear that, where an agency has discretion to consider several statutory principles, its order

---

[16] Five years later, the FCC finally responded to the remand order. *High-Cost Universal Service Support*, Order on Remand and Memorandum Opinion and Order, 25 FCC Rcd 4072 (2010). The Vermont Public Service Board and the Maine Public Utilities Commission have challenged that long-delayed response, alleging that the FCC once again failed to consider all of the necessary factors. *Vt. Pub. Serv. Bd. v. FCC*, No. 11-1184 (D.C. Cir., filed July 12, 2010). Oral argument in the case is scheduled for September 16, 2011.

may not stand if the agency "has not adequately explained its exercise of that discretion." *Bluewater Network v. EPA*, 370 F.3d 1, 21 (D.C. Cir. 2004). *See also, e.g., Siegel v. SEC*, 592 F.3d 147, 161–62 (D.C. Cir. 2010); *Tripoli Ricketry Ass'n v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006). It is equally well-established under this Court's precedent that an agency's conclusory statements do not satisfy the requirement of reasoned decisionmaking. As the Court has explained, "[t]o state a conclusion is not to reason." *Bldg. & Constr. Trades Dep't, ALF-CIO v. Martin*, 961 F.2d 269, 277 (D.C. Cir. 1992); *see also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (noting that the Court "do[es] not defer to the agency's conclusory or unsupported suppositions"). Accordingly, this Court has repeatedly held agency action invalid where, as here, the agency supplied only conclusory statements rather than a reasoned explanation for its action. *See, e.g., Verizon Tel. Cos. v. FCC*, 570 F.3d 294, 304–05 (D.C. Cir. 2009) (ruling that the agency's "conclusory statements that [certain] factors are being considered cannot substitute for the reasoned explanation that is wanting in this decision") (internal citations omitted); *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 565 (D.C. Cir. 2010) ("A naked conclusion . . . is not enough.").

**B.    The *Order* Falls Far Short of Justifying the Reduction in Support Levels.**

The FCC made no serious effort in the *Order* to justify the reductions in support it effects. The *Order's* few "explanatory" statements are entirely conclusory. As described above, the FCC's principal rationale for redirecting relinquished support from the High-Cost Program was that "reducing the pool of support in a state could enable excess funds from the legacy high-cost program to be used more effectively to advance universal service broadband initiatives, as recommended by the National Broadband Plan." *Order* ¶ 5 (JA __). Far from providing a legitimate justification based on the principles set forth in Section 254, that speculative assertion merely underscores the *ultra vires* nature of the FCC's action, as shown above. *See supra* Section II. As the Tenth Circuit held, the FCC "may exercise its discretion to balance the [Section 254] principles against one another when they conflict," but it "may not depart from them altogether to achieve some other goal," *Qwest I*, 258 F.3d at 1200, such as setting aside funds for a potential new mechanism to support information services.

Even apart from problems arising from the FCC's pursuit of an inchoate plan to support broadband services, the agency's conclusory suggestion that a new broadband support mechanism would use funds "more effectively" than the existing High-Cost Program is just the sort of *ipse dixit* that "epitomizes

53

arbitrary and capricious decisionmaking." *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997), *clarified on reh'g*, 123 F.3d 693 (D.C. Cir. 1997). The *Order* makes no attempt to demonstrate that future broadband support would advance the statutory objectives at all, much less "more effectively" than high-cost support that is enabling CETCs to deliver valued services to rural consumers today.

Lacking any affirmative justification for reducing support, the *Order* attempts to shift to CETCs the burden of disproving statutory compliance. The *Order* speculates that allowing CETCs to access relinquished support up to the level of the interim cap "would not *necessarily* result in future deployment of expanded voice service, much less broadband service," *Order* ¶ 5 (JA __) (emphasis added), implying that CETCs were required to make such a showing to prevent the proposed rule change. The FCC has it backwards. It is the *agency's* responsibility to explain how the *Order* complies with the statute's sufficiency principle; the FCC cannot adopt a rule based solely on the assertion that *CETCs* have failed to show that existing support levels were certain to spur future service deployments.

Not only did the FCC fail to explain how the reduced support available would be "sufficient," but it altogether ignored comments showing that the reductions put that principle in jeopardy. As noted above, Petitioners explained

how the reduction in capped support levels threatened to eliminate support that previously benefited consumers in certain high-cost areas. *See supra* at 18 n.10 (citing Comments of Rural Cellular Association at 4 (JA __), Comments of SouthernLINC Wireless and the Universal Service for America Coalition at 1 (JA __)). The *Order* states that RCA and others "claimed that *additional* support would allow competitive ETCs to provide more or better service to consumers," *Order* ¶ 5 n.13 (JA __) (emphasis added). But the *Order* simply ignores commenters' arguments that the reduction in *existing* support levels available under the cap might well prevent consumers from receiving affordable and reasonably comparable services. Thus, the FCC compounded the problem of relying on conclusory assertions in defense of its rule change by ignoring key arguments in the record that challenged the agency's unsupported claims. *See, e.g., Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("This Court is obligated to overturn a rulemaking as arbitrary and capricious where the [agency] has failed to respond to specific challenges that are sufficiently central to its decision." (internal citations omitted)); *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("Unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned.").

**C.    The FCC Cannot Justify the *Order* by Bootstrapping From the *Interim Cap Order*.**

The *Order*'s cursory nature appears to stem in part from the view that the *Interim Cap Order* enables the FCC make whatever further reductions in support it deems necessary, without any further obligation to justify such reductions. In particular, the *Order* asserts that "the goal of the *Interim Cap Order* is to rein in high-cost universal service disbursements for potentially duplicative voice services," and the reductions effected by the *Order* are "consistent with that goal." *Order* ¶ 5 (JA __). That attempt to bootstrap from the *Interim Cap Order* fails for several reasons.

As an initial matter, the FCC previously had claimed, and represented to this Court, that the *Interim Cap Order* was solely an emergency measure to halt growth in high-cost funding until the FCC could adopt permanent reform within months, *Interim Cap Order* ¶¶ 1, 21. The FCC had never before articulated the goal of eliminating support for "potentially duplicative voice services," and the term does not even appear in the *Interim Cap Order*.[17] In fact, the FCC

_____

[17] Indeed, characterizing "voice services" provided by competitive carriers as "duplicative" cannot be squared with the fundamentally procompetitive goals of the 1996 Act given that the presence of multiple competitors inherently involves "duplication" of existing services. *See, e.g.*, *Iowa Utils. Bd. v. FCC*, 219 F.3d 744, 761 (8th Cir. 2000) (noting Congress's intention "that all Americans," including those in rural areas, "should share the benefit of the lower cost of competitive telephone service and the benefit of new telephone technologies"), *rev'd in part on other grounds sub nom. Verizon Commc'ns,*

specifically disclaimed in the *Interim Cap Order* making any "final determination regarding the level of support to competitive ETCs that is sufficient . . . for achieving the Act's universal service goals." *Id.* ¶ 9. Accordingly, the *Interim Cap Order* plainly cannot serve as a basis for justifying *later* actions premised on a goal it did not even espouse.

Moreover, to the extent that the FCC intended its allusions to "duplicative voice services" to refer to *Interim Cap Order*'s observation that high-cost support had increased because USF was supporting multiple lines for consumers who subscribed to wireless service from a CETC in addition to an incumbent LEC's wireline service, *see id.* ¶¶ 20-21, it fares no better. The *Order* does not address this situation at all. The FCC's rules continue to permit support for multiple lines per household, just as before the *Order*. Rather than undertaking some type of structural reform to address the purported concern about "duplicative" support, the agency simply reduced the total funding available in the apparent (but wholly undocumented) belief that the aggregate amount may have been excessive even after imposition of the interim cap.

---

*Inc. v. FCC*, 535 U.S. 467 (2002). As discussed further below, the FCC may have intended to allude its concern about potentially duplicative *subsidies*, notwithstanding its confusing references to "duplicative *services*," but that concern no more justifies the *Order*'s reductions in support than a more general skepticism regarding competition.

Responding to a purported problem of "duplication" by arbitrarily reducing total funding available in a state is the antithesis of reasoned decisionmaking.

Far from bolstering the *Order*, the attempt to piggyback on the *Interim Cap Order* betrays the FCC's failure to undertake principled reform grounded in the principles set forth in Section 254. The *Interim Cap Order* justified its "emergency" relief by promising a serious examination of what support levels are necessary to promote affordability and reasonable comparability. *Id.* ¶¶ 21, 23, 37. Yet the agency still has not completed that examination three years later. If anything, that failure calls into question the continuing legitimacy of the cap. *Rural Cellular Ass'n v. FCC*, 588 at 1106 (noting that "more searching judicial review may be appropriate" if the FCC fails to adopt comprehensive, high-cost universal service reform "in an expeditious manner").

In any event, now that the interim cap has made any further growth in CETC funding impossible, any continuing claims about a need for "emergency" relief are untenable. That is, the interest in the overall sustainability of the universal service fund cannot justify cuts in CETC funding when CETCs are the *only* carriers whose universal service funding is subject to an absolute limit. Rather, any such reductions have to be justified in their own right based on the sufficiency principle set forth in Section 254, and the *Order* did not even attempt to make such a showing. Indeed, based on the FCC's continuing failure

to grapple with genuine reform of the High-Cost Program — including with respect to the acknowledged inefficiencies in incumbent LEC operations, which are a key driver of potentially wasteful subsidization — the agency has no legitimate basis to conclude how much support is necessary.

By the same token, nothing in this Court's decision upholding the interim cap provides any assistance to the FCC in this context. *Rural Cellular Ass'n* upheld a different rule (the interim cap, as opposed to a permanent change to the support methodology), based on a more extensive explanation (several pages of analysis versus a single paragraph of misdirection)[18] and a different rationale (the interest in ensuring that support for telecommunications carriers is sustainable, as opposed to the agency's newfound interest in transitioning from legacy support to funding for broadband Internet access). 588 F.3d 1095. It provides no justification for the FCC's slapdash effort to withdraw additional CETC support in the *Order*. Moreover, the Court emphasized in that case that "[t]he pertinent question is whether the interim cap will undercut adequate telephone services for customers, since '[t]he purpose of universal service is to benefit the customer, not the carrier.'" *Id.* at 1103 (quoting *Alenco*, 201 F.3d at

---

[18]     Notably, the *Interim Cap Order* included a section titled "A Cap on Competitive ETC Support is Required to Preserve the Sustainability and Sufficiency of Universal Service," *Interim Cap Order* ¶¶ 6–11, and it separately considered and responded to comments contending that the interim cap violated the principle of sufficiency, *id.* ¶ 14.

621). Although the *Order* claims that further reductions in the cap are warranted to generate purportedly more "effective" funding for broadband Internet access, *Order* ¶ 5 (JA __), that policy interest in no way relieves the agency of its obligation to explain how the reduced support levels will remain sufficient to enable the provision of "adequate telephone services." *Rural Cellular Ass'n*, 588 F.3d at 1103. The FCC has discretion to determine exactly how much high-cost support is sufficient, but it may not sidestep that analysis altogether.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant this Petition for Review and vacate the *Order*.

Respectfully submitted,


  /s/ Todd D. Daubert
Todd D. Daubert
Jennifer A. Morrissey
J. Isaac Himowitz
SNR Denton US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
202-408-6400 telephone
202-408-6399 facsimile
todd.daubert@snrdenton.com
jennifer.morrissey@snrdenton.com

*Attorneys for USA Coalition*

  /s/ Matthew A. Brill
Richard P. Bress
Matthew A. Brill
Latham & Watkins LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004
202-637-2200 telephone
202-637-2201 facsimile
matthew.brill@lw.com

*Attorneys for Rural Cellular Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

**Certificate of Compliance with Type-Volume Limitation
Typeface Requirements, and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) because this brief contains 13,680 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using Microsoft

Word 2002 in Times New Roman size 14.

      /s/   Jennifer A. Morrissey

                Jennifer A. Morrissey
                 On behalf of the *USA Coalition* and the
                 *Rural Cellular Association*


Dated: July 7, 2011

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and the Court's Administrative Order dated March 30, 2011, I hereby certify that on July 7, 2011, I electronically filed the following with the Clerk of the Court via the CM/ECF System:

## PETITIONERS' INITIAL BRIEF

I further certify that on the same date, I served the foregoing by the Notice of Docket Activity generated by the CM/ECF System, or by U.S. First Class mail, postage prepaid on the following participants to this proceeding:

*For the Federal Communications Commission:*

        Maureen K. Flood, Counsel
        Federal Communications Commission
        Office of General Counsel
        Room 8-B724 Federal Communications Commission
        445 12th Street, SW
        Washington, DC 20554

        Richard Kiser Welch, Deputy Associate General Counsel
        Federal Communications Commission
        Office of General Counsel
        Room 8-A765 Federal Communications Commission
        445 12th Street, SW
        Washington, DC 20554

*For Intervenor Verizon*

        Michael E. Glover
        Edward Shakin
        Christopher M. Miller
        Verizon
        1320 North Courthouse Road

Ninth Floor
Arlington, VA 22201

John T. Scott, III
Verizon Wireless
1300 I Street, NW
Suite 400 West
Washington, DC 20005

Brett A. Shumate
Helgi C. Walker
Wiley Rein, LLP
1776 K Street, NW
Washington, DC 20006-2359

*For Intervenor the National Association of State Utility Consumer Advocates*

David Cleveland Bergmann
Office of the Ohio Consumers' Counsel
10 West Broad Street
Suite 1800
Columbus, OH 43215-3485

Respectfully submitted,

/s/ Jennifer Morrissey
Jennifer Morrissey
SNR Denton US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
202-408-9112 telephone
202-408-6399 facsimile
jennifer.morrissey@snrdenton.com

# STATUTORY ADDENDUM

## Statutory Addendum Table of Contents

**Article I § 7, cl. 1** ...................................................................................1

**Article I § 8, cl. 1** ...................................................................................1

**5 U.S.C. § 553** .........................................................................................2

**47 U.S.C. § 151** .......................................................................................3

**47 U.S.C. § 214(e)** ..................................................................................4

**47 U.S.C. §§ 254 (a) - (e)** .......................................................................7

**47 CFR § 54.101** ...................................................................................10

**47 CFR § 54.307(a)(1)** ..........................................................................13

**47 CFR § 54.709** ...................................................................................14

**American Recovery and Reinvestment Act of 2009** ...........................16

# United States Constitution

## Article I § 7, cl. 1

All bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills. …

## Article I § 8, cl. 1

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; …

# 5 U.S.C. § 553

TITLE 5 - GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I - THE AGENCIES GENERALLY
CHAPTER 5 - ADMINISTRATIVE PROCEDURE
SUBCHAPTER II - ADMINISTRATIVE PROCEDURE

Sec. 553. Rule making

…

b) General notice of proposed rule making shall be published in the Federal
Register, unless persons subject thereto are named and either personally served or
otherwise have actual notice thereof in accordance with law. The notice shall
include -
(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the
subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not
apply -
(A) to interpretative rules, general statements of policy, or rules of agency
organization, procedure, or practice; or
(B) when the agency for good cause finds (and incorporates the finding and a brief
statement of reasons therefor in the rules issued) that notice and public procedure
thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an
opportunity to participate in the rule making through submission of written data,
views, or arguments with or
without opportunity for oral presentation. After consideration of the relevant matter
presented, the agency shall incorporate in the rules adopted a concise general
statement of their basis and
purpose. When rules are required by statute to be made on the record after
opportunity for an agency hearing, sections 556 and 557 of this title apply instead
of this subsection.

# 47 U.S.C. § 151

TITLE 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS

Sec. 151. Purposes of chapter; Federal Communications Commission
created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

# 47 U.S.C. § 214(e)

Title 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation

Sec. 214. Extension of lines or discontinuance of service; certificate of public convenience and necessity


(e) Provision of universal service
(1) Eligible telecommunications carriers
A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received— (A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and (B) advertise the availability of such services and the charges therefor using media of general distribution.

(2) Designation of eligible telecommunications carriers
A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

(3) Designation of eligible telecommunications carriers for unserved areas
If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common

carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

(4) Relinquishment of universal service

A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

(5) "Service area" defined

The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

(6) Common carriers not subject to State commission jurisdiction
In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

# 47 U.S.C. §§ 254 (a) - (e)

TITLE 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part II - Development of Competitive Markets

Sec. 254. Universal service

(a) Procedures to review universal service requirements

    (1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

    (2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

(b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

    (1) Quality and rates: Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced services: Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Access in rural and high cost areas: Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions: All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms: There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries: Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h) of this section.

(7) Additional principles: Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

(c) Definition

(1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services -

(A) are essential to education, public health, or public safety;
(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
(C) are being deployed in public telecommunications networks by

telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

## (2) Alterations and modifications

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

## (3) Special services

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section.

## (d) Telecommunications carrier contribution

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

## (e) Universal service support

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

## 47 CFR § 54.101

Sec. 54.101   Supported services for rural, insular and high cost areas.

(a) Services designated for support. The following services or functionalities shall be supported by federal universal service support mechanisms:

(1) Voice grade access to the public switched network. "Voice grade access" is defined as a functionality that enables a user of telecommunications services to transmit voice communications, including signalling the network that the caller wishes to place a call, and to receive voice communications, including receiving a signal indicating there is an incoming call. For the purposes of this part, bandwidth for voice grade access should be, at a minimum, 300 to 3,000 Hertz;

(2) Local usage. "Local usage" means an amount of minutes of use of exchange service, prescribed by the Commission, provided free of charge to end users;

(3) Dual tone multi-frequency signaling or its functional equivalent. "Dual tone multi-frequency" (DTMF) is a method of signaling that facilitates the transportation of signaling through the network, shortening call set-up time;

(4) Single-party service or its functional equivalent. "Single-party service" is telecommunications service that permits users to have exclusive use of a wireline subscriber loop or access line for each call placed, or, in the case of wireless telecommunications carriers, which use spectrum shared among users to provide service, a dedicated message path for the length of a user's particular transmission;

(5) Access to emergency services. "Access to emergency services" includes access to services, such as 911 and enhanced 911, provided by local governments or other public safety organizations. 911 is defined as a service that permits a telecommunications user, by dialing the three-digit code "911," to call emergency services through a Public Service Access Point (PSAP) operated by the local government. "Enhanced 911" is defined as 911 service that includes the ability to provide automatic numbering information (ANI), which enables the PSAP to call back if the call is disconnected, and automatic location information (ALI), which permits emergency service providers to identify the geographic location of the calling party. "Access to emergency services" includes access to 911 and enhanced

911 services to the extent the local government in an eligible carrier's service area has implemented 911 or enhanced 911 systems;

(6) Access to operator services. "Access to operator services" is defined as access to any automatic or live assistance to a consumer to arrange for billing or completion, or both, of a telephone call;

(7) Access to interexchange service. "Access to interexchange service" is defined as the use of the loop, as well as that portion of the switch that is paid for by the end user, or the functional equivalent of these network elements in the case of a wireless carrier, necessary to access an interexchange carrier's network;

(8) Access to directory assistance. "Access to directory assistance" is defined as access to a service that includes, but is not limited to, making available to customers, upon request, information contained in directory listings; and

(9) Toll limitation for qualifying low-income consumers. Toll limitation for qualifying low-income consumers is described in subpart E of this part.

(b) Requirement to offer all designated services. An eligible telecommunications carrier must offer each of the services set forth in paragraph (a) of this section in order to receive federal universal service support.

(c) Additional time to complete network upgrades. A state commission may grant the petition of a telecommunications carrier that is otherwise eligible to receive universal service support under §54.201 requesting additional time to complete the network upgrades needed to provide single-party service, access to enhanced 911 service, or toll limitation. If such petition is granted, the otherwise eligible telecommunications carrier will be permitted to receive universal service support for the duration of the period designated by the state commission. State commissions should grant such a request only upon a finding that exceptional circumstances prevent an otherwise eligible telecommunications carrier from providing single-party service, access to enhanced 911 service, or toll limitation. The period should extend only as long as the relevant state commission finds that exceptional circumstances exist and should not extend beyond the time that the state commission deems necessary for that eligible telecommunications carrier to complete network upgrades. An otherwise eligible telecommunications carrier that is incapable of offering one or more of these three specific universal services must

demonstrate to the state commission that exceptional circumstances exist with respect to each service for which the carrier desires a grant of additional time to complete network upgrades.

## 47 CFR § 54.307(a)(1)

Sec. 54.307 Support to a competitive eligible telecommunications carrier.

(a) Calculation of support. A competitive eligible telecommunications carrier shall receive universal service support to the extent that the competitive eligible telecommunications carrier captures the subscriber lines of an incumbent local exchange carrier (LEC) or serves new subscriber lines in the incumbent LEC's service area.

(1) A competitive eligible telecommunications carrier serving loops in the service area of a rural incumbent local exchange carrier, as that term is defined in Sec. 54.5 of this chapter, shall receive support for each line it serves in a particular service area based on the support the incumbent LEC would receive for each such line, disaggregated by cost zone if disaggregation zones have been established within the service area pursuant to Sec. 54.315 of this subpart. A competitive eligible telecommunications carrier serving loops in the service area of a non-rural incumbent local exchange carrier shall receive support for each line it serves in a particular wire center based on the support the incumbent LEC would receive for each such line. A competitive eligible telecommunications carrier serving loops in the service area of a rate- of-return carrier shall be eligible to receive Interstate Common Line Support for each line it serves in the service area in accordance with the formula in Sec. 54.901.

## 47 CFR § 54.709

Sec. 54.709 Computations of required contributions to universal service support mechanisms.

(a) Prior to April 1, 2003, contributions to the universal service support mechanisms shall be based on contributors' end-user telecommunications revenues and on a contribution factor determined quarterly by the Commission. Contributions to the mechanisms beginning April 1, 2003 shall be based on contributors' projected collected end- user telecommunications revenues, and on a contribution factor determined quarterly by the Commission.

…

(2) Prior to April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues, net of prior period actual contributions. Beginning April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions. The Commission shall approve the Administrator's quarterly projected costs of the universal service support mechanisms, taking into account demand for support and administrative expenses. The total subject revenues shall be compiled by the Administrator based on information contained in the Telecommunications Reporting Worksheets described in Sec. 54.711(a).

(3) Total projected expenses for the federal universal service support mechanisms for each quarter must be approved by the Commission before they are used to calculate the quarterly contribution factor and individual contributions. For each quarter, the Administrator must submit its projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. For each quarter, the Administrator must submit its projections of administrative expenses for the high-cost mechanism, the low-income mechanism, the schools and libraries mechanism and the rural health care mechanism and the basis for those projections to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. Based on data submitted to the

Administrator on the Telecommunications Reporting Worksheets, the Administrator must submit the total contribution base to the Office of the Managing Director at least thirty (30) days before the start of each quarter. The projections of demand and administrative expenses and the contribution factor shall be announced by the Commission in a public notice and shall be made available on the Commission's website. The Commission reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest at any time within the fourteen-day period following release of the Commission's public notice. If the Commission take no action within fourteen (14) days of the date of release of the public notice announcing the projections of demand and administrative expenses, the projections of demand and administrative expenses, and the contribution factor shall be deemed approved by the Commission. Except as provided in Sec. 54.706(c), the Administrator shall apply the quarterly contribution factor, once approved by the Commission, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions.


(b) If the contributions received by the Administrator in a quarter exceed the amount of universal service support program contributions and administrative costs for that quarter, the excess payments will be carried forward to the following quarter. The contribution factors for the following quarter will take into consideration the projected costs of the support mechanisms for that quarter and the excess contributions carried over from the previous quarter.

…

## American Recovery and Reinvestment Act of 2009
## Pub. L. No. 111-5, 123 Stat. 115  § 6001(a) and (k)

SEC. 6001. BROADBAND TECHNOLOGY OPPORTUNITIES PROGRAM.

(a) The Assistant Secretary of Commerce for Communications and Information (Assistant Secretary), in consultation with the Federal Communications Commission (Commission), shall establish a national broadband service development and expansion program in conjunction with the technology opportunities program, which shall be referred to as the Broadband Technology Opportunities Program. The Assistant Secretary shall ensure that the program complements and enhances and does not conflict with other Federal broadband initiatives and programs.

…

(k)(1) Not later than 1 year after the date of enactment of this section, the Commission shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate, a report containing a national broadband plan.

(2) The national broadband plan required by this section shall seek to ensure that all people of the United States have access to broadband capability and shall establish benchmarks for meeting that goal. The plan shall also include--

> (A) an analysis of the most effective and efficient mechanisms for ensuring broadband access by all people of the United States;

> (B) a detailed strategy for achieving affordability of such service and maximum utilization of broadband infrastructure and service by the public;

> (C) an evaluation of the status of deployment of broadband service, including progress of projects supported by the grants made pursuant to this section; and

> (D) a plan for use of broadband infrastructure and services in advancing consumer welfare, civic participation, public safety and homeland security, community development, health care delivery, energy independence and efficiency, education, worker training, private sector investment, entrepreneurial activity, job creation and economic growth, and other national purposes.

(3) In developing the plan, the Commission shall have access to data provided to other Government agencies under the Broadband Data Improvement Act (47 U.S.C. 1301 note).