BRIEF FOR RESPONDENTS

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

NO. 11-1094

———————

RURAL CELLULAR ASSOCIATION AND UNIVERSAL SERVICE
FOR AMERICA COALITION,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

———————

SHARIS A. POZEN
ACTING ASSISTANT ATTORNEY GENERAL

ROBERT B. NICHOLSON
KRISTEN C. LIMARZI
ATTORNEYS

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

AUSTIN C. SCHLICK
GENERAL COUNSEL

PETER KARANJIA
DEPUTY GENERAL COUNSEL

RICHARD K. WELCH
DEPUTY ASSOCIATE GENERAL COUNSEL

MAUREEN K. FLOOD
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### 1.  Parties.

Petitioners are the Rural Cellular Association and the Universal Service for America Coalition (collectively "petitioners").  Respondents are the Federal Communications Commission and the United States. Verizon/Verizon Wireless and the National Association of State Utility Consumer Advocates ("NASUCA") have intervened in support of respondents.

### 2.  Rulings under review.

*High-Cost Universal Service Support,* 25 FCC Rcd 18146 (2010), 76 Fed. Reg. 4827 (Jan. 27, 2011).

### 3.  Related cases.

The *Order* on review has not previously been before this Court. Counsel are not aware of any related cases that are pending before this Court or any other court.

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES .......................................................... iii

GLOSSARY ............................................................................. viii

JURISDICTION .........................................................................1

STATEMENT OF ISSUES .............................................................2

STATUTES AND REGULATIONS .................................................3

COUNTERSTATEMENT OF THE CASE .....................................3

COUNTERSTATEMENT OF THE FACTS ..................................4

I.     STATUTORY BACKGROUND...........................................4

II.    THE HIGH-COST UNIVERSAL SERVICE PROGRAM .......7

III.   THE INTERIM CAP ON COMPETITIVE ETC HIGH-COST
       SUPPORT DISBURSEMENTS ..........................................10

       A.    The *Interim Cap Order* ........................................10

       B.    *Rural Cellular Association v. FCC* .......................13

       C.    The *Corr Wireless Order* ....................................15

       D.    Subsequent Developments ...................................21

IV.    IMPLEMENTATION OF UNIVERSAL SERVICE REFORM.............21

V.     THE PROCEEDING BELOW .........................................23

SUMMARY OF ARGUMENT .....................................................25

ARGUMENT .........................................................................29

I.     THE ORDER IS REVIEWED UNDER DEFERENTIAL
       STANDARDS OF REVIEW .............................................29

II.   THE COMMISSION REASONABLY DETERMINED THAT IT
      WAS NOT REQUIRED TO REDISTRIBUTE RELINQUISHED
      HIGH-COST SUPPORT TO OTHER CARRIERS TO ENSURE
      THAT SUPPORT REMAINS SUFFICIENT FOR PURPOSES OF
      SECTION 254(b)(5) ...............................................................................31

      A.   Petitioners' Claims Were Considered And Rejected By The
           Commission In The *Interim Cap Order* And By This Court In
           *Rural Cellular Association.*..................................................................31

      B.   As In *Rural Cellular Association*, Petitioners Have Failed To
           Demonstrate That High-Cost Support Will Be Insufficient As A
           Result Of The *Order*..........................................................................36

      C.   The *Order* Is Consistent With The *Interim Cap Order.* ....................40

III.  PETITIONERS' CHALLENGE TO THE TEMPORARY
      RESERVE IS NOT PROPERLY BEFORE THIS COURT AND,
      IN ANY EVENT, IS WITHOUT MERIT ...............................................44

      A.   The Court Lacks Jurisdiction To Entertain Petitioners'
           Arguments Because They Are Effectively Challenges To The
           *Corr Wireless Order,* Not The *Order* On Review. ............................44

      B.   The Commission Acted Within Its Discretion In Temporarily
           Reserving Reclaimed High-Cost Support. .........................................48

           1.   The Commission's rules authorize the FCC to adjust the
                demand projection used to determine the quarterly
                contribution factor. ..........................................................................48

           2.   Section 254 of the Act permits the Commission to collect
                universal service contributions before it establishes
                mechanisms for distributing subsidies. ...........................................51

           3.   The Commission's interpretation of the Act is consistent with
                constitutional requirements. ...........................................................58

CONCLUSION ...........................................................................................65

# TABLE OF AUTHORITIES[1]

## CASES

\* *Alenco Commc'ns Inc. v. FCC,* 201 F.3d 608 (5th Cir. 2000)............................................................... 11, 42, 59, 60

*Arkansas AFL-CIO v. FCC,* 11 F.3d 1430 (8th Cir. 1993)..................................................................40

*Auer v. Robbins,* 519 U.S. 452 (1997) ........................................54

*Bechtel v. FCC,* 10 F.3d 875 (D.C. Cir. 1993).................................39

*Bechtel v. FCC,* 957 F.2d 873 (D.C. Cir. 1992).........................47

*BellSouth Corp. v. FCC*, 17 F.3d 1487 (D.C. Cir. 1994)................................................................ 52, 53

*Capital Cities/ABC, Inc. v. FCC,* 29 F.3d 309 (7th Cir. 1994).................................................................40

*Cellular Telecomms. & Internet Ass'n v. FCC,* 330 F.3d 502 (D.C. Cir. 2003) .......................................52

*Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ....................................... 32, 33

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...............................................34

*Comcast v. FCC,* 526 F.3d 763 (D.C. Cir. 2008).........................67

*Consol. Rail. Corp. v. ICC,* 646 F.2d 642 (D.C. Cir. 1981) ............................................................... 46, 48

*Covad Commc'ns Co. v. FCC,* 450 F.3d 528 (D.C. Cir. 2006)..................................................................44

*Fla. Power & Light Co. v. United States*, 846 F.2d 765 (D.C. Cir. 1988).................................................70

*Int'l Bhd. of Teamsters v. United States,* 735 F.2d 1525 (D.C. Cir. 1984).................................................56

---

[1] Cases and other authorities principally relied upon are marked with asterisks.

*Louisiana Ass'n of Indep. Producers and Royalty Owners v. FERC,* 958 F.2d 1101 (D.C. Cir. 1992) .................................... 56

*Motion Picture Ass'n of Am., Inc. v. FCC,* 309 F.3d 796 (D.C. Cir. 2002) ..................................................................... 58

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967 (2005) ............................................. 33, 34, 62

*National Cable Television Association v. United States,* 415 U.S. 336 (1974) ...................................................... 70

*Nuclear Info. Res. Serv. v. NRC,* 969 F.2d 1169 (D.C. Cir. 1992) ................................................................................ 48

*Qwest Communications International v. FCC,* 398 F.3d 1222 (10th Cir. 2005) ................................................................. 37

*Qwest Corporation v. FCC,* 258 F.3d 1191 (10th Cir. 2001) ........................................................................................ 37

*Riegel v. Medtronic, Inc.,* 552 U.S. 312 (2008) ............................................. 34

\*    *Rural Cellular Association v. FCC,* 588 F.3d 1095 (D.C. Cir. 2009) ........................................ 2, 3, 9, 10, 14, 15, 16, 28, 29, 32, 33, 34, 36, 37, 42, 43, 45, 47, 49, 62

*Rural Tel. Coal. v. FCC,* 838 F.2d 1307 (D.C. Cir. 1988) ................................................................................................ 71

\*    *Skinner v. Mid-America Pipeline Co.,* 490 U.S. 212 (1989) ............................................................................. 69, 70, 71

*State of Wisconsin v. FERC,* 104 F.3d 462 (D.C. Cir. 1997) ........................................................................................ 48

*Talk Am. Inc. v. Michigan Bell Tel. Co.,* 131 S. Ct. 2254 (2011) ..................................................................... 34, 54

\*    *Texas Office of Pub. Util. Counsel v. FCC,* 183 F.3d 393 (5th Cir. 1999) .................................... 5, 6, 7, 64, 68, 69, 71, 72

*Thompson v. Clark,* 741 F.2d 401 (D.C. Cir. 1984) ..................... 44

*Troy v. Browner,* 120 F.3d 277 (D.C. Cir. 1997) .......................... 62

*United States Satellite Broad. Co v. FCC,* 740 F.2d 1177 (D.C. Cir. 1984) ...................................................... 43

\*    *United States v. Munoz-Flores,* 495 U.S. 385 (1990) ................ 65, 66, 68, 69

iv

*United States v. Naftalin,* 441 U.S. 768 (1979).............................57

*Vt. Pub. Serv. Bd. v. FCC*, No. 10-1184 (D.C. Cir.
   Jul. 12, 2010) ...............................................37

**ADMINISTRATIVE DECISIONS**

*Connect America Fund,* Notice of Inquiry and
   Notice of Proposed Rulemaking, 25 FCC Rcd
   6657 (2010) ...............................................18

*Connect America Fund,* Notice of Proposed
   Rulemaking and Further Notice of Proposed
   Rulemaking, 26 FCC Rcd 4554 (2011).............................. 23, 55

*Federal-State Joint Board on Universal Service*, 12
   FCC Rcd 8776 (1997) .................................... 7, 8, 9, 58

*Federal-State Joint Board on Universal Service,* 18
   FCC Rcd 22559 (2003) ...............................................5

*High-Cost Universal Support*, 25 FCC Rcd 4072
   (2010), *pet. rev. filed sub nom Vt. Pub. Serv. Bd.
   v. FCC*, No. 10-1184 (D.C. Cir. Jul. 12, 2010)........................33

*Rural Health Care Support Mechanism*, Notice of
   Proposed Rulemaking, 25 FCC Rcd 9371 (2010).....................21

*Schools and Libraries Universal Service Support
   Mechanism*, 25 FCC Rcd 18762 (2010)................................. 22, 50, 58, 60

*Universal Service Reform; Mobility Fund,* Notice of
   Proposed Rulemaking, 25 FCC Rcd 14716
   (2010) ...............................................22

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2)(A) ...............................................30
28 U.S.C. § 2342(1) ...............................................1
28 U.S.C. § 2344 ............................................... 27, 46
31 U.S.C. § 1301 ...............................................60
31 U.S.C. § 1341 ...............................................60
31 U.S.C. § 1342 ...............................................60
47 U.S.C. § 151 ...............................................4

47 U.S.C. § 214(e)(1) ...................................................7

47 U.S.C. § 214(e)(2) ...................................................7

47 U.S.C. § 251 ...........................................................5

47 U.S.C. § 252 ...........................................................5

47 U.S.C. § 253(a) ......................................................5

47 U.S.C. § 254(a) ......................................................6

47 U.S.C. § 254(b) .....................................................56

47 U.S.C. § 254(b)(1) ..................................................6

47 U.S.C. § 254(b)(1)-(7) ...........................................6

\*    47 U.S.C. § 254(b)(5) ............................ 4, 6, 13, 14, 25, 28, 33, 52, 57

47 U.S.C. § 254(c)(1) .................................................57

47 U.S.C. § 254(c)(1)-(2) ..........................................55

\*    47 U.S.C. § 254(d) ................................... 8, 51, 52, 57, 63, 64

47 U.S.C. § 254(h) .....................................................57

47 U.S.C. § 402(a) ................................................ 1, 46

47 U.S.C. § 402(b) .....................................................27

47 C.F.R. § 1.3 ..........................................................13

47 C.F.R. § 54.706 ......................................................7

47 C.F.R. § 54.709(a) ............................................ 27, 48

47 C.F.R. § 54.709(a)(2) ........................................ 19, 48

\*    47 C.F.R. § 54.709(a)(3) .................................. 19, 28, 46, 48

47 C.F.R. § 54.709(b) ........................................... 19, 27

Pub. L. No. 104-104, 110 Stat. 56 ..............................5

The American Recovery and Reinvestment Act of
    2009, Pub. L. No. 111-5, 123 Stat. 115 (2009) .........17

**OTHERS**

*Wireline Competition Bureau Announces E-rate
    Inflation-Based Cap for Funding Year 2011*,
    2011 WL 3438194 (Aug. 5, 2011) ........................22

# GLOSSARY

| | |
|---|---|
| 1996 Act | The Telecommunications Act of 1996 |
| Act | The Communications Act of 1934, as amended |
| CETC | Competitive Eligible Telecommunications Carrier |
| Coalition | Universal Service for America Coalition |
| ETC | Eligible Telecommunications Carrier |
| FCC or Commission | Federal Communications Commission |
| ILEC | Incumbent Local Exchange Carrier |
| NOI | Notice of Inquiry |
| NPRM | Notice of Proposed Rulemaking |
| Plan | National Broadband Plan |
| RCA | Rural Cellular Association |
| USAC | Universal Service Administrative Company |
| USF | Federal Universal Service Fund |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————

NO. 11-1094

——————

RURAL CELLULAR ASSOCIATION AND UNIVERSAL SERVICE FOR
AMERICA COALITION,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

——————

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

——————

BRIEF FOR RESPONDENTS

——————

## JURISDICTION

The *Order* on review was released on December 30, 2010, and was

published in the Federal Register on January 27, 2011. *High-Cost Universal*

*Service Support,* 25 FCC Rcd 18146 (2010) ("*Order*") (JA    ), 76 Fed. Reg.

4827 (Jan. 27, 2011). To the extent that petitioners are challenging the

*Order*, this Court's jurisdiction rests on 47 U.S.C. § 402(a) and 28 U.S.C. §

2342(1).

## STATEMENT OF ISSUES

Petitioners Rural Cellular Association ("RCA") and the Universal Service for America Coalition ("Coalition") challenge a Federal Communications Commission ("Commission" or "FCC") *Order* amending a rule – upheld in *Rural Cellular Association v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) – that established an interim cap on high-cost universal service support disbursements to competitive eligible telecommunications carriers. Those carriers ("competitive ETCs") are eligible to receive subsidies under the FCC's "high-cost support" program, a "universal service" program "designed to support rural providers serving high-cost areas," *id.* at 1099.

Under the amended rule, when a competitive ETC serving a state voluntarily surrenders high-cost support that it previously received, the interim cap for that state is reduced by the amount of relinquished high-cost support.

This case presents the following issues for review:

1. Whether the Commission's decision to amend the interim-cap rule was the product of reasoned decisionmaking.

2. Whether the Court lacks jurisdiction to consider petitioners' claim that the Commission lacked authority to reserve temporarily, for a period of 18 months, any high-cost support surrendered by competitive ETCs; and if

the Court determines it has jurisdiction to entertain that claim, whether the

Commission acted consistently with the Communications Act, the

Constitution, and its own rules, with respect to the temporary reserve.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are appended to this brief.

## COUNTERSTATEMENT OF THE CASE

The *Order* on review amended the interim-cap rule, which the

Commission had adopted in 2008 to rein in the explosive growth of high-cost

support disbursements to competitive ETCs. *See Rural Cellular Ass'n,* 588

F.3d at 1102. Under the revised interim-cap rule now before the Court, when

a competitive ETC voluntarily forgoes high-cost support in a particular state,

the interim cap in that state is lowered by the amount of relinquished high-

cost support. In adopting the amended rule, the Commission thus declined to

redistribute the relinquished subsides to increase the "already large," *id.*,

subsidies received by the competitive ETCs that remain eligible for high-cost

support.

Each of those remaining competitive ETCs continues to receive the

same amount of high-cost support under the revised interim-cap rule. And

the Commission previously found that level of support to be "sufficient" for

purposes of section 254(b)(5) of the Communications Act, 47 U.S.C. §

3

254(b)(5) – a finding this Court affirmed in *Rural Cellular Association*.

Accordingly, the Commission concluded in the *Order* that there is no reason

to redistribute high-cost support relinquished by a competitive ETC to other

carriers.  Instead, reducing the interim cap would enable any excess funds to

be used more effectively to implement upcoming universal service reforms.

RCA and the Coalition, associations of wireless telephone service

providers designated as competitive ETCs, petition for review of the *Order*,

claiming that any relinquished high-cost support should be redistributed to

other competitive ETCs.  In other words, petitioners seek to *increase* the

amount of high-cost support their members currently receive under the

interim cap.

## COUNTERSTATEMENT OF THE FACTS

### I.     STATUTORY BACKGROUND

The availability of reasonably priced telecommunications services in

all parts of the nation, known as "universal service," is a longstanding goal of

telephone regulation.  *See* 47 U.S.C. § 151 (directing the Commission "to

make available, so far as possible, to all the people of the United States … a

rapid, efficient, Nation-wide and world-wide wire and radio communications

service with adequate facilities at reasonable charges….").  Pursuant to that

goal, federal universal service programs have, among other things, subsidized

service in rural and insular areas, which often face higher costs of providing

telephone service due to low population density, terrain, and other factors.

*See, e.g., Federal-State Joint Board on Universal Service,* 18 FCC Rcd

22559, 22573 (¶ 25) (2003).

When local telephone markets were protected monopolies, states and,

to a lesser extent, the FCC relied largely on implicit subsidies to further

universal service.  *See Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d

393, 406 (5th Cir. 1999) ("*TOPUC*") ("Implicit subsidies ... involve the

manipulation of rates for some customers to subsidize more affordable rates

for others.").  Under this system, regulators might, for example, "require the

carrier to charge 'above-cost' rates to low-cost, profitable urban customers [in

order] to offer the 'below-cost' rates to expensive, unprofitable rural

customers."  *Id.*

The system of implicit subsidies became unsustainable 15 years ago,

when Congress amended the Communications Act of 1934 to open local

telephone markets to competition through the Telecommunications Act of

1996 ("1996 Act"), Pub. L. No. 104-104, 110 Stat. 56.  *See* 47 U.S.C. §§ 251,

252, 253(a).  As the court explained in *TOPUC*, "implicit subsidies can work

well only under regulated conditions.  In a competitive environment, a carrier

that tries to subsidize below-cost rates to rural customers with above-cost

rates to urban customers is vulnerable to a competitor that offers at-cost rates to urban customers."  183 F.3d at 406.  Congress therefore required the Commission to "replace the [existing] patchwork quilt of explicit and implicit subsidies with 'specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service.'"  *TOPUC,* 183 F.3d at 406 (*quoting* 47 U.S.C. § 254(b)(5)).  To accomplish that task, Congress delegated to the Commission broad discretion to balance the "difficult policy choices" associated with implementing the new universal service provisions. *Id.* at 411.

In new section 254 of the Communications Act, Congress required the Commission to convene a Federal-State Joint Board to recommend universal service reforms, and delegated authority to the FCC to adopt rules to implement the new universal service provisions added by the 1996 Act.  47 U.S.C. § 254(a).  It also established a non-exclusive list of principles on which the Commission and the Joint Board must base universal service policies.  47 U.S.C. § 254(b)(1)-(7).  Of particular relevance here, Congress directed that: (1) there should be "specific, predictable and sufficient" federal and state universal service mechanisms (47 U.S.C. § 254(b)(5)); (2) "[q]uality services should be available at just, reasonable, and affordable rates" (47 U.S.C. § 254(b)(1)); and (3) "[c]onsumers in all regions of the Nation" should

6

have access to telecommunications and information services that are

"reasonably comparable" in rates and quality to those provided in urban areas

(47 U.S.C. § 254(b)(3)).

Section 254(e) restricts high-cost universal service support to an entity

designated as an "eligible telecommunications carrier," or "ETC." *Id.* An

ETC, which may be designated by a state commission or the FCC, *see* 47

U.S.C. § 214(e)(2), (6), must offer the services supported by the federal

universal service mechanism and advertise the availability of those services.

*See* 47 U.S.C. § 214(e)(1).

## II.     THE HIGH-COST UNIVERSAL SERVICE PROGRAM

In 1997, after receiving the Joint Board's recommendations, the

Commission adopted rules to implement the new universal service provisions

of the 1996 Act. *Federal-State Joint Board on Universal Service*, 12 FCC

Rcd 8776 (1997) ("*First Report and Order*"). The *First Report and Order*

defined a set of "core" services eligible for universal service support,

established a fund (known as the federal universal service fund, or "USF") to

support those services, and set a timetable for implementation.

The federal universal service fund is financed primarily by assessments

paid by providers of interstate telecommunications services. *See* 47 C.F.R. §

54.706. Such contributions are to be made on "an equitable and

7

nondiscriminatory basis" to support "the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Fund "assessments are calculated by applying a quarterly 'contribution factor' to the contributors' interstate revenues, and contributors almost always pass their contribution assessments through to their customers," typically in the form of line items on their customers' bills. *Rural Cellular Ass'n,* 588 F.3d at 1099.

The universal service fund consists of four complementary FCC programs: (1) the schools and libraries program; (2) the low-income support program; (3) the rural health care program; and (4) the high-cost support program. "High-cost support disbursements, however, overwhelmingly represent the largest category of the USF expenditures." *Id.* at 1099.

Prior to the 1996 Act, only incumbent local exchange carriers ("ILECs") received high-cost support. But in the *First Report and Order*, 12 FCC Rcd 8776 (¶¶ 287, 311), the Commission found that high-cost support should be "portable" to any carrier that serves a particular customer, even if that carrier is a new market entrant. The Commission provided that "[a] competitive carrier that has been designated as an eligible telecommunications carrier" under the Act "shall receive universal service support to the extent that it captures subscribers' lines formerly served by an

ILEC receiving support or new customer lines in that ILEC's study area."
*Id.,* 12 FCC Rcd 8776 (¶ 287).

ILECs receive high-cost support based on their own costs of providing service. *See High-Cost Universal Service Support,* 23 FCC Rcd 8834, 8841 (¶ 14) (2008) ("*Interim Cap Order*") (JA   ), *aff'd, Rural Cellular Ass'n,* 588 F.3d 1095. For ease of administration, the Commission initially decided that providing a competitive ETC with the same per-line support as the ILEC was the "least burdensome way to administer" portability. *First Report and Order*, 12 FCC Rcd 8776 (¶¶ 288, 313). Thus, "under the Commission's 'identical support rule,' competitive ETCs …, mainly wireless providers, receive support for each line based not on their own costs, but rather on the same per-line support ILECs in the relevant service area receive." *Rural Cellular Ass'n*, 588 F.3d at 1099.

Rural ILECs challenged the *First Report and Order*, claiming that the possibility of losing support to competitors would lead to support levels that are neither "sufficient" nor "predictable" within the meaning of section 254(b). The Fifth Circuit rejected those challenges, finding that "universal service … requires sufficient funding of *customers,* not *providers.*" *Alenco Commc'ns Inc. v. FCC,* 201 F.3d 608, 620 (5th Cir. 2000). "So long as there is sufficient and competitively-neutral funding to enable all customers to

receive basic telecommunications services, the FCC has satisfied the Act and is not further required to ensure sufficient funding of every local telephone provider as well." *Id.*

## III. THE INTERIM CAP ON COMPETITIVE ETC HIGH-COST SUPPORT DISBURSEMENTS

### A. The *Interim Cap Order*

In 2008, the Commission imposed an interim cap on high-cost support disbursements to competitive ETCs. *Interim Cap Order* ¶ 1 (JA   ). The Commission found that an interim cap was necessary to "rein in the explosive growth in high-cost universal service support disbursements," *id.*, which had ballooned from $2.6 billion per year in 2001 to $4.3 billon per year in 2007 – a 65 percent increase. *Id.* ¶¶ 6, 22 (JA   ). This growth, the Commission stressed, had resulted from increased support to competitive ETCs. *Id.* ¶ 6 (JA   ). The Commission predicted that, absent the interim cap, future increases "would require excessive (and ever growing) contributions from consumers." *Id.*

The Commission attributed the explosive growth in competitive ETC high-cost support to the identical support rule. When the Commission adopted this rule, "[it] envisioned that competitive ETCs would compete directly against [ILECs] and try to take existing customers from them." *Id.*

10

¶ 19 (JA   ).  But wireless carriers, which "serve a majority of competitive

ETC lines, and have received a majority of competitive ETC support," *id.*,

"do not capture lines from the [ILEC] to become a customer's sole provider,

except in a small portion of households."  *Id.*  Rather, these carriers generally

"provide mobile wireless telephony service in addition to a customer's

existing wireline service."  *Id.*  And because the identical support rule also

"promote[s] the sale of multiple supported wireless handsets in given

households," *id.* ¶ 9 (JA   ), "many households subscribe to both services and

receive support for multiple lines, which has led to a rapid increase in the size

of the fund."  *Id.* ¶ 21 (JA   ).

     The Commission further found that the identical support rule "fails to

create efficient investment incentives for competitive ETCs."  *Id.*  "Because a

competitive ETC's per-line support is based solely on the per-line support

received by the [ILEC], rather than its own network investments in an area,"

it has an incentive to increase its profits by "expand[ing] the number of

subscribers … located in the lower-cost parts of high-cost areas" instead of

expanding the geographic scope of its network, particularly into areas with

the lowest population densities (and correspondingly, the highest costs).  *Id.*

This "contraven[es] the Act's universal service goal of improving the access

11

to telecommunications services in rural, insular, and high-cost areas." *Id.* (*citing* 47 U.S.C. § 254(b)(3)).

The FCC concluded that the interim cap would maintain the stability of the USF until the Commission was able to reform the rules that led to the dramatic, unanticipated growth in high-cost support disbursements. *See id.* ¶¶ 1, 21-23 (JA   ). The Commission capped the "total annual competitive ETC support" in each state "at the level of support that competitive ETCs in that state were eligible to receive during March 2008 on an annualized basis." *Id.* ¶ 1 (JA   ). Under the interim cap, competitive ETCs have experienced a reduction in their per-line high-cost support where the number of competitive ETC lines in a state has increased. *Id.* ¶¶ 26-28 (JA   ). The Commission found, however, that because "competitive ETC support is based on the [ILEC's] costs, rather than on the competitive ETC's own costs, there is no reason to believe – and no record data showing – that support subject to an interim cap would necessarily result in insufficient support levels" for competitive ETCs. *Id.* ¶ 14 (JA   ). Nonetheless, to protect against any possibility that the interim cap might deny particular competitive ETCs sufficient support, the Commission provided a safety valve: a competitive ETC "will not be subject to the interim cap to the extent that it files cost data"

with the FCC "demonstrating that its costs meet the support threshold in the same manner as the [ILEC]." *Id.* ¶ 1 (JA   ); *see also id.* ¶ 31 (JA   ).[1]

### B.   *Rural Cellular Association v. FCC*

Petitioner RCA and several wireless carriers sought judicial review of the *Interim Cap Order.*  In *Rural Cellular Association*, this Court affirmed the Commission's rule imposing an interim cap on high-cost universal service support disbursements to competitive ETCs.  588 F.3d at 1102

The Court held that the Commission acted within its broad discretion in applying the universal service principles in section 254 of the Act.  In particular, it was reasonable for the Commission to find that section 254 empowered the FCC to maintain the sustainability of the USF, even though "sustainability" is not specifically mentioned in the statute.  *Id.*

Rejecting petitioners' "apparent[]" view that "§ 254(b)(5) compels the Commission to welcome wretched excess," *id.* at 1102, the Court held that

---

[1] The Commission stated in the *Interim Cap Order* that "th[is] limited exception" to the interim cap would "become effective [when] the relevant reporting and recording requirements are approved by the Office of Management and Budget" ("OMB").  *Interim Cap Order*, n.108 (JA  ).  The Commission's Wireline Competition Bureau has since determined that it will consider competitive ETCs' requests for additional high-cost support under the exception established in the *Interim Cap Order* pursuant to already codified general waiver authority.  *See* 47 C.F.R. § 1.3 ("Any provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefore is shown.").

13

the Commission could interpret section 254(b)(5) to require "sufficient, but not excessive" universal service support.  *Id.* at 1102-04.  "[T]he principle of providing sufficient funding mechanisms to advance universal service … may need to be balanced against the principle of affordability for consumers," the Court explained, and the Commission "enjoys broad discretion when conducting exactly this type of balancing."  *Id.* at 1103.  The Court thus rejected petitioners' argument that the Commission was prohibited from imposing cost controls, finding that "petitioners have failed to demonstrate that their high-cost support would actually be insufficient under the interim cap." *Id.*

Additionally, the Court held that the Commission did not violate the programmatic principle of competitive neutrality (adopted by the FCC pursuant to section 254(b)(7)), because that regulatory principle only prohibits "unfair" treatment.  *Id.* at 1104.  The Court reasoned that it was not unfair for the Commission to impose an interim cap on competitive ETC (but not ILEC) high-cost support because competitive ETCs, which benefit from the "inequities and inefficiencies that exist under the current regime," were responsible for the dramatic growth in the federal universal service fund.  *Id.*

The Court also rejected petitioners' argument that the Commission acted arbitrarily and capriciously when it enacted the interim cap.  The Court

14

explained that the Commission is entitled to substantial deference when it
relies on its predictive judgment to enact interim rules to preserve universal
service. *Id.* at 1105-06, 1108. The Court also found that the Commission's
decision to impose the interim cap was reasonable based on record evidence
showing that high-cost support disbursements to competitive ETCs had
grown substantially between 2001 and 2007, resulting in a commensurate
increase in the quarterly universal service contribution factor paid by
consumers. *Id.* at 1107-08.

### C.  The *Corr Wireless Order*

Following the Commission's enactment of the interim cap, Verizon
Wireless and Sprint Nextel each voluntarily committed to surrender their
high-cost support – estimated as approximately $530 million in 2008 – in
equal 20 percent increments over a period of five years. *See High-Cost
Universal Service Support,* 25 FCC Rcd 12854, 12586 (¶¶ 1, 4) (2010) ("*Corr
Wireless Order*") (JA  ). The carriers did so in connection with the FCC's
authorization of license transfers associated with their mergers with other
companies. In the orders approving those license transfers, however, the
Commission "provided no specific direction regarding how" the carriers'
merger commitments "should be implemented." *Id.* ¶ 4 (JA  ).

15

In 2009, Corr Wireless (a competitive ETC) asked the Commission to clarify that "any support reclaimed from Verizon Wireless and Sprint Nextel" as a result of their voluntary commitments should "be redistributed to other competitive [ETCs]." *Id.* ¶ 1 (JA   ).  According to Corr, "when existing participants leave the pool, the number of participants goes down and each participant's share should go up." *Id.* ¶ 6 (JA   ).

The Commission disagreed, finding that "nothing in the *Interim Cap Order* requires the Commission to redistribute" relinquished support and, as a consequence, increase the amount of high-cost support distributed to the remaining competitive ETCs in a particular state. *Id.* ¶ 10 (JA   ).  Consistent with its "stated goal in the *Interim Cap Order* of reining in high-cost universal service support disbursements," the Commission held that "the public interest would be better served by distributing support to other competitive ETCs in the same manner that it would have been distributed in the absence of … merger commitments" – not providing those carriers *additional* support without a demonstration of cost-based need.  *Id.*  Also consistent with its findings in the *Interim Cap Order* ((¶ 21) (JA   )) that competitive ETCs have a profit motive to serve high-density (and, correspondingly, low-cost) areas, the Commission found that disbursing

16

"additional support would not necessarily result in the expansion of service to

… unserved territories." *Corr Wireless Order* ¶ 11 (JA   ).

The Commission directed the Universal Service Administrative

Company ("USAC")[2] to reserve any reclaimed funds "as a fiscally

responsible down payment on proposed broadband universal service reforms

… recommended in the National Broadband Plan,"[3] including to: index the

annual cap on the schools and libraries fund to inflation; support a Mobility

Fund to improve 3G wireless service in states with the worst wireless

coverage; improve utilization of the rural health care program; and "in the

long term, directly support broadband Internet services." *Id.* ¶ 20 (JA   ).

The Commission noted that it had "recently launched proceedings" to reform

its universal service programs, and had "s[ought] comment on a proposal to

---

[2] USAC is an independent, not-for-profit corporation designated as the administrator of the federal universal service fund by the FCC.  USAC administers USF programs for high-cost companies serving rural areas, low-income consumers, rural health care providers, and schools and libraries.

[3] The American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009), charged the Commission with developing a national plan for broadband deployment.  The Commission delivered a National Broadband Plan to Congress on March 16, 2010.  The Plan proposed revisions to, and additional funding for, the Commission's four universal service programs (*i.e.*, the high-cost, low-income, schools and libraries, and rural health care programs) in an effort to promote broadband deployment and utilization.  The Plan is available at: http://www.broadband.gov/download-plan.

transition all legacy competitive ETC high-cost support for voice-grade service to new universal service programs for broadband." *Id.*, n.44 (*citing Connect America Fund,* Notice of Inquiry and Notice of Proposed Rulemaking, 25 FCC Rcd 6657, 6681-82 (¶¶ 60-61) (2010)).

The Commission explained that "[r]eserving funds now … will ensure that we have funds on hand to rapidly implement" such reforms "while minimizing unnecessary volatility in the contribution factor." *Id.* ¶ 20 (JA   ). Had the Commission not taken this step, the contribution factor "would otherwise decline and then increase as the universal service fund transitions to support broadband." *Id.*; *see also id.* ¶ 22, n.48 (JA   ) (predicting fluctuations in the contribution factor had the FCC not temporarily reserved reclaimed support). Consumers, who ultimately pay carriers' universal service contributions, will thus benefit from the *Order.* The Commission intends to use support relinquished by competitive ETCs (the "temporary reserve") as a down-payment on future universal service programs, which will commensurately reduce the amount of universal service contributions USAC will be required to collect prospectively. *Corr Wireless Order* ¶ 20 (JA   ); *see also Order* ¶ 5 & n.15 (JA   ).

Under an FCC rule, USAC typically calculates the contribution factor based on the ratio of total projected quarterly costs of the four universal

18

service programs to contributors' total projected end-user interstate and

international revenues.  47 C.F.R. § 54.709(a)(2).  Under an exception to that

rule,[4] however, the Commission in the *Corr Wireless Order* instructed USAC

to project that competitive ETC support would be disbursed at the interim cap

amount, without regard to any support payment reductions attributable to the

Verizon Wireless and Sprint Nextel merger commitments.  *Corr Wireless*

Order at ¶ 21 (JA   ); *see also* ¶ 26 & n.54 (JA   ).

To enable its creation of the temporary reserve, the Commission

waived rule 54.709(b) for a period of 18 months from adoption of the order.

*See id.* ¶ 25 (JA   ) ("we adopt an interim waiver of section 54.709(b) to

enable us to direct USAC to reserve reclaimed funds") (*citing* 47 C.F.R. §

54.709(b)).  That rule requires USAC to carry forward any "excess

payments" from USF contributors to reduce the contribution factor in the

subsequent quarter.  *Id.* ¶ 22 & n.45 (JA   ).  Unless the Commission

"modifies [rule] 54.709(b)," as discussed below, the waiver will expire on

January 31, 2012.  *Id.* ¶ 22 (JA   ).   In that event, any reclaimed funds held in

reserve will be used to reduce future quarterly contribution factors, to the

---

[4] 47 C.F.R. § 54.709(a)(3) provides that "[t]he Commission reserves the
right to set projections of demand and administrative expenses at amounts …
the Commission determines will service the public interest."

benefit of consumers, as required by that rule.  In other words, absent an extension of the waiver, the temporary reserve that petitioners challenge in this case will expire by the terms of the *Corr Wireless Order* on January 31, 2012.

In a Notice of Proposed Rulemaking accompanying the *Corr Wireless Order*, the Commission "s[ought] comment on modifying [its] rules to better enable the Commission to reclaim" high-cost support relinquished by competitive ETCs, "and to use that support to … fund broadband universal service programs consistent with the recommendations of the National Broadband Plan described above." *Id.* ¶ 23 (JA   ).  The Commission first proposed to amend the uncodified interim-cap rule so that when any competitive ETC relinquishes its ETC status in a state, the cap amount for that state would be reduced by the amount of support the competitive ETC was eligible to receive. *Id.*

The Commission next "s[ought] comment on amending [rule] 54.709(b) to permit the Commission to provide USAC alternate instructions for implementing prior period adjustments." *Id.* ¶ 25 (JA   ).  That proposed amendment, the Commission explained, would "enable [it] to direct USAC to reserve reclaimed funds as [it] consider[s] broadband universal service reform" as well as "provide USAC with alternate instructions regarding

20

future excess funds in other situations without having to adopt a rule waiver."

*Id.*

### D.  Subsequent Developments

Petitioner Universal Service for America Coalition and a group of

wireless carriers each filed with the Commission petitions for administrative

reconsideration of the *Corr Wireless Order*.[5]  Those petitions are still pending

before the agency.  No party or commenter sought judicial review of the *Corr

Wireless Order*.

## IV.  IMPLEMENTATION OF UNIVERSAL SERVICE REFORM

Just prior to the *Corr Wireless Order and NPRM,* the Commission

sought comment on proposals to increase utilization of the rural health care

program.  *Rural Health Care Support Mechanism*, Notice of Proposed

Rulemaking, 25 FCC Rcd 9371 (2010).

Shortly thereafter, the Commission issued an order adopting rules to

index schools and libraries support to inflation.  *Schools and Libraries

Universal Service Support Mechanism*, 25 FCC Rcd 18762, 18780-83 (¶¶ 34-

---

[5] Petition for Partial Reconsideration of SouthernLINC Wireless and the
Universal Service for America Coalition, CC Docket No. 96-45, WC Docket
No. 05-337 (Sept. 29, 2010) ("*Coalition Petition for Reconsideration*") (JA );
Joint Petition for Reconsideration, CC Docket No. 96-45, WC Docket No.
05-337 (Oct. 4, 2010).

40) (2010) ("*Schools and Libraries Order*").  This adjustment increased the

FCC-imposed annual funding cap for that program from $2.25 billion to

$2,270,250,000 (an increase of less than 2 percent) for funding year 2010.

*Id.,* 25 FCC Rcd at 18783 (¶ 40).[6]  The Commission explained "that

additional universal service funds required to" make this adjustment "will be

offset by the Commission's recent decision to use reclaimed funds

surrendered [by] competitive [ETCs] as a 'fiscally responsible down payment

on proposed broadband universal service reforms.'"  *Id.,* 25 FCC Rcd at

18781-82 (¶ 38) (*quoting Corr Wireless Order* ¶ 20 (JA   )).

    The Commission also took steps to implement the other universal

service reforms described in the *Corr Wireless Order and NPRM*.  The

Commission, for example, sought comment on "creat[ing] a … Mobility

Fund … to significantly improve coverage of current-generation or better

mobile voice and Internet service for consumers in areas where such coverage

is … missing."  *Universal Service Reform; Mobility Fund,* Notice of

Proposed Rulemaking, 25 FCC Rcd 14716 (¶ 1) (2010).

---

[6] The Commission recently announced that the inflation-based cap for
funding year 2011 will be $2,290,682,250.  Public Notice, *Wireline
Competition Bureau Announces E-rate Inflation-Based Cap for Funding Year
2011*, 2011 WL 3438194 (Aug. 5, 2011).

22

And it issued a second notice of proposed rulemaking seeking comment on reforms to high-cost universal service support and intercarrier compensation. *Connect America Fund,* Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 FCC Rcd 4554 (2011) ("*USF/ICC Transformation NPRM*"). As the Commission explained, the goal of this reform effort is to "[m]odernize and refocus [the universal service fund] and [intercarrier compensation] to make affordable broadband available to all Americans" while simultaneously "[c]ontrol[ling] the size of USF as it transitions to support broadband, including by reducing waste and inefficiency." *Id.,* 26 FCC Rcd at 4560 (¶ 10); *see also id.* at 4584 (¶ 80).

## V.    THE PROCEEDING BELOW

In the *Order* on review, the Commission amended the interim-cap rule, consistent with its first proposal in the Notice of Proposed Rulemaking that accompanied the *Corr Wireless Order*, *see* ¶ 23 (JA   ). Under the amended rule, a state's high-cost support under the interim cap will be reduced if a competitive ETC serving the state relinquishes its ETC status. *Order* ¶ 5 (JA).

The Commission found that this amendment was consistent with the *Interim Cap Order* – which sought to "rein in high-cost universal service disbursements for potentially duplicative voice service" – because it

23

"reduce[d] the overall cap on competitive ETC support in a state … rather than redistributing … excess funding to other competitive ETCs." *Id.* Several parties supported this amendment. *Id.*, n.11 (JA   ).

The Commission explained that "[p]roviding … excess support to other competitive ETCs … would not necessarily result in future deployment of expanded voice service, much less broadband service." *Id.*  Instead, as the Commission found in the *Order* ¶ 5 (JA   ), directing the relinquished monies to competitive ETCs "could simply subsidize duplicate voice service" because most consumers still subscribe to wireline *and* wireless service.  *See also Interim Cap Order* ¶¶ 20-21 (JA   ).  The Commission therefore found "that the public interest would be better served by taking this interim step to reclaim such support, rather than redistributing it," so that reclaimed high-cost support could "be used more effectively to advance universal service broadband initiatives" (or, if no action is taken by January 31, 2012, to reduce the quarterly universal service contribution factor).  *Order* ¶ 5 (JA   ).

"Consistent with the *Corr Wireless Order*," the FCC directed USAC to continue collecting universal service contributions as if any amounts relinquished by competitive ETCs were still being distributed "until the expiration of the waiver of section 54.709(b) [on January 31, 2012] or otherwise directed by the Commission." *Id.*, n.15 (JA   ).

24

While the *Order* amended the interim cap rule, it did not amend section 54.709(b) of the Commission's rules, as the *Corr Wireless Order* had proposed (¶ 25 (JA   )).  Instead, the Commission left intact its prior creation of a temporary reserve.  *Id.* ¶ 22 (JA   ).

## SUMMARY OF ARGUMENT

1.  Three years ago, in the *Interim Cap Order,* the Commission adopted a rule setting an interim cap on the amount of high-cost universal service support distributed to competitive ETCs.  Petitioner RCA claimed that the interim cap would render high-cost support insufficient, in violation of section 254(b)(5) of the Act.  The Commission disagreed, and so did this Court.  *Rural Cellular Ass'n,* 588 F.3d at 1102-04.

There was no reason for the Commission to revisit or re-explain its earlier finding in the proceeding below.  As the Commission explained when it proposed the amended rule adopted in the *Order* on review, competitive ETCs, including petitioners, will continue to receive the same amount of support under the revised interim-cap rule when another competitive ETC relinquishes its support.  And both the Commission and this Court have already determined that level of support is "sufficient" within the meaning of section 254(b)(5).

Petitioners' latest demand for high-cost support is even less justified than the demand rejected in *Rural Cellular Association*.  Without making any meaningful attempt to demonstrate that support is actually insufficient for any competitive ETC to provide service to consumers, petitioners now contend that they are entitled to the *additional* high-cost surrendered by other competitive ETCs – specifically, the $530 million in support surrendered by Verizon Wireless and Sprint Nextel.  The Court should deny petitioners' latest proposal to "increase [their] already large stake," *Rural Cellular Ass'n*, 588 F.3d at 1102, in universal service subsidies.

Petitioners contend that once the Commission halted the explosive growth in competitive ETC support by enacting the interim cap, its work was done.  This ignores the Commission's ongoing duty to evaluate the effectiveness of its regulations.  Having earlier found that the identical support rule was not working as intended, because it (1) subsidizes multiple lines provided by multiple carriers to a single household or business, and (2) fails to encourage investment in the lowest density/highest cost areas most in need of subsidies, the Commission in the *Order* reasonably declined to perpetuate a regime that thwarted rather than advanced the statute's objectives.

26

2.  Petitioners further contend that the Commission lacked authority to temporarily reserve, until January 31, 2012, any high-cost support surrendered by competitive ETCs.  Br. 31-49.  Petitioners' claim is jurisdictionally barred and, in any event, meritless.

(a).  Petitioners' challenge is not properly before this Court and should be dismissed.  The Commission established the temporary reserve in the *Corr Wireless Order* by waiving 47 C.F.R. § 54.709(b) for a period of 18 months. But for the waiver of that rule, which requires "excess payments" to roll forward to reduce the next quarter's universal service contribution factor, the Commission could not have directed USAC to temporarily hold any relinquished support in reserve.  The 60-day period for seeking judicial review of the *Corr Wireless Order* has passed, so RCA's claim is time-barred.  *See* 47 U.S.C. § 402(b); 28 U.S.C. § 2344.  Conversely, the Coalition's challenge is "incurably premature" because its petition for administrative reconsideration of the *Corr Wireless Order* remains pending before the Commission.

(b).  Petitioners' argument also lacks merit.  Petitioners first claim that the Commission violated 47 C.F.R. § 54.709(a).  But that rule contains an exception under which "[t]he Commission reserves the right to set projections of demand and administrative expenses at amounts the Commission

27

determines will serve the public interest." 47 C.F.R. § 54.709(a)(3). The Commission, in the *Order*, exercised that authority to temporarily project competitive ETC demand for high-cost support at the full amount of the cap as established in the *Interim Cap Order*, without reflecting adjustments due to relinquishment or revocation of ETC status by a competitive ETC.

Nor is there merit to petitioners' claim that the Commission violated section 254 of the Act. According to petitioners, the Commission must "establish" the "specific" and "predictable" mechanisms required by section 254(b)(5), and identify the services that those mechanisms will fund (*see* section 254(c)(1)), before it may collect contributions to "preserve and advance universal service" under section 254(d). But the Commission is only required to satisfy those statutory requirements prior to *distributing* universal service support; no statutory provision prohibits it from *collecting* in advance the contributions necessary to fund those services and mechanisms. Like its interpretation of its own rules, the Commission's reasonable interpretation of the Communications Act is entitled to deference by the Court.

Finally, petitioners are unable to buttress their statutory argument by invoking the doctrine of constitutional avoidance. Petitioners have not raised any doubts – much less "serious doubts" (Br. 38) – about the constitutionality of the Commission's temporary reserve under the Origination Clause (U.S.

28

Const., art. I, § 7, cl. 1) and the Taxing Clause (art. I, § 8, cl. 1). The temporary reserve was created to preserve and advance universal service, not to raise revenues to support Federal Government (or even Commission) operations generally. And the temporary reserve will be used either to subsidize the expansion and reform of the Commission's larger universal service program – a program that confers substantial benefits to telecommunications carriers such as petitioners – or to lower the contribution factor for future universal service fund assessments.

## ARGUMENT

### I.  THE ORDER IS REVIEWED UNDER DEFERENTIAL STANDARDS OF REVIEW

Judicial review of the Commission's interpretation of section 254(b) of the Communications Act is governed by *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). As this Court noted in *Rural Cellular Association*, "[s]ince the principles outlined use 'vague, general language,' courts have analyzed language in § 254(b) under *Chevron* step two." 588 F.3d at 1101-02 (citation omitted). Hence, the question for this Court is whether the Commission's interpretations of section 254's undefined terms, such as "predictable," "specific," and "sufficient," are "permissible construction[s]." *Id.* at 1102 (*citing Chevron*, 467 U.S. at 843). In making that inquiry, "*Chevron* requires a federal court to accept the agency's

[reasonable] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *accord, Rural Cellular Ass'n*, 588 F.3d at 1102 (court "will uphold the agency's interpretation as long as it is reasonable … even if 'there may be other reasonable, or even more reasonable, views.'") (citations omitted).

Under the Administrative Procedure Act ("APA"), the Commission's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This "very deferential" standard "focuses on the reasonableness of the agency's decision making processes." *Rural Cellular Ass'n*, 588 F.3d at 1105. "[T]he ultimate standard of review is a narrow one," and the "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Commission "need only articulate a 'rational connection between the facts found and the choice made.'" *Rural Cellular Ass'n,* 588 F.3d at 1105 (citation omitted). Judicial deference to the Commission's "expert policy judgment" is especially appropriate when, as in this case, the "subject matter … is technical, complex, and dynamic." *Brand X*, 545 U.S. at 1003 (citation omitted).

30

Finally, an "agency's reading of its own rule is entitled to substantial deference." *Riegel v. Medtronic, Inc*., 552 U.S. 312, 328 (2008). The courts "defer to an agency's interpretation of its regulations … unless the interpretation is plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Talk Am. Inc. v. Michigan Bell Tel. Co*., 131 S. Ct. 2254, 2261 (2011) (internal quotation marks and citations omitted).

## II.  THE COMMISSION REASONABLY DETERMINED THAT IT WAS NOT REQUIRED TO REDISTRIBUTE RELINQUISHED HIGH-COST SUPPORT TO OTHER CARRIERS TO ENSURE THAT SUPPORT REMAINS SUFFICIENT FOR PURPOSES OF SECTION 254(b)(5)

### A.  Petitioners' Claims Were Considered And Rejected By The Commission In The *Interim Cap Order* And By This Court In *Rural Cellular Association.*

Petitioners assert that the Commission has a "duty to provide a cogent explanation for how the rule change effected by the *Order* will promote sufficiency (among other statutory objectives)" (Br. 51) – a duty they allege the FCC failed to satisfy "by refusing even to consider whether its new rule would yield support 'sufficient' to meet the goals of Section 254." Br. 50. Petitioners are incorrect. The Commission satisfied that duty in the *Interim*

31

*Cap Order*.  And as we explain below, the *Order* on review did nothing to

undercut the continued validity of that holding.

        In the *Interim Cap Order* ¶ 8 (JA   ), the Commission found that

"adopting an interim cap is consistent with" section 254(b)(5)'s requirement

"that support be 'sufficient' to meet the Act's universal service purposes."

The Commission noted that it "previously ha[d] concluded that the statutory

principle of 'sufficiency' proscribes support in excess of that necessary to

achieve the Act's universal service goals."  *Id.*  Thus, consistent with its

precedent, the Commission enacted the cap as an "interim cost control[] to

the aspect that most directly threatens the specificity, predictability, and

sustainability of the [USF]:  the rapid growth of competitive ETC support."

*Id.* ¶ 9 (JA   ).

        The Commission, moreover, found that competitive ETCs had failed to

demonstrate that their high-cost support would be insufficient under the

interim cap.  As the Commission explained, "because competitive ETC

support is based on the [ILEC's] costs, rather than on the competitive ETC's

own costs, there is no reason to believe – and no record data showing – that

support subject to an interim cap would necessarily result in insufficient

support levels."  *Id.* ¶ 14 (JA   ).

In *Rural Cellular Association*, this Court rejected RCA's challenge to the *Interim Cap Order*. 588 F.3d at 1102-04. There, as here, RCA argued that high-cost support would be insufficient under the interim cap, in violation of section 254(b)(5). This Court disagreed, concluding that it was "entirely reasonable" for the Commission to impose the interim cap "in the face of evidence showing that [competitive ETCs] were receiving subsidies in excess of what is needed to allow them to remain in the market." *Id.* at 1103. "In any event," the Court held, "petitioners … failed to demonstrate their high-cost support would actually be insufficient under the interim cap." *Id.* The Court explained that "[t]he pertinent question is whether the interim cap will undercut adequate telephone service for customers," but "[p]etitioners … seem to ignore this fact in their cry for more subsidies, which they have failed to prove are necessary to provide basic [telephone] service to customers who have none." *Id.*[7]

---

[7] Petitioners heavily rely on *Qwest Corporation v. FCC,* 258 F.3d 1191 (10th Cir. 2001), and *Qwest Communications International v. FCC,* 398 F.3d 1222 (10th Cir. 2005), in which the Tenth Circuit remanded a subsequently superseded FCC definition of "sufficient" for purposes of the non-rural high-cost support mechanism, one of seven mechanisms established by the FCC to provide subsidies to rural, insular and high-cost areas. But the FCC revised its definition of "sufficient" following the *Qwest* remand. *See High-Cost Universal Support*, 25 FCC Rcd 4072 (2010), *pet. rev. filed sub nom Vt. Pub. Serv. Bd. v. FCC*, No. 10-1184 (D.C. Cir. Jul. 12, 2010). Moreover,

(continued on next page)

So too here.  There was no reason for the Commission to revisit its findings from the *Interim Cap Order* in the proceeding below because petitioners are in the same position today under the revised interim cap:  They will continue to receive exactly the same amount of support under the amended interim-cap rule when a competitive ETC such as Verizon Wireless or Sprint Nextel relinquishes its high-cost support in a state.  *Corr Wireless Order* ¶¶ 10, 24 (JA   ).  And both the Commission and this Court have already determined that support is "sufficient" for purposes of section 254(b)(5) of the Act.

Petitioners separately challenge the *Order*'s finding that reducing the pool of legacy high-cost support in a state "could enable excess funds from the … program to be used more effectively to advance universal service broadband initiatives" under a possible future program.  *Order* ¶ 5 (JA   ).  Specifically, petitioners contend that the *Order* fails to demonstrate that "future broadband support would advance the statutory objectives at all, much less 'more effectively' than high-cost support that is enabling CETCs to

---

petitioners fail to acknowledge that this Court upheld the Commission's interpretation of "sufficient," as well as its finding that competitive ETC support would be sufficient under the interim cap, in *Rural Cellular Association,* 588 F.3d at 1102-04.  That circuit precedent, rather than the Tenth Circuit's *Qwest* decisions, is controlling here.

deliver valued services to rural customers today."  Br. 54.   In so arguing,

petitioners disregard the Commission's prior determination that the current

method of distributing support to competitive ETCs (*i.e.,* the "identical

support rule") is not working as intended.  Specifically, the Commission

found that identical support "contraven[es] the Act's universal service goal of

improving the access to telecommunications services in rural, insular and

high-cost areas," because it encourages competitive ETCs to serve high-

density (and, correspondingly, low-cost) portions of an ILEC's territory – not

the unserved and under-served areas most in need of universal service

subsidies.  *Interim Cap Order* ¶ 21 (*citing* 47 U.S.C. § 254(b)(3)) (JA   ).

Rather than exacerbating these inefficiencies by adding the

relinquished subsidies to competitive ETCs' already large high-cost

subsidies, the Commission in the *Order* concluded that it should reserve those

subsidies for potential universal service initiatives that would better achieve

section 245(b)'s objectives.  That decision was eminently reasonable given

the Commission's prior findings in the *Interim Cap Order* – upheld by this

Court – and its stated intent to eliminate support for competitive ETCs.  *Corr*

*Wireless Order*, n.44 (JA   ).

In the context of this iterative proceeding, the Commission "need not

repeat itself incessantly."  *Bechtel v. FCC,* 10 F.3d 875, 878 (D.C. Cir. 1993).

35

Where, as here, "a party attacks a policy on grounds that the agency already has dispatched in prior proceedings, the agency can simply refer to those proceedings if their reasoning remains applicable and adequately refutes the challenge."  *Id.*; *see also Arkansas AFL-CIO v. FCC,* 11 F.3d 1430, 1442 (8th Cir. 1993) (the court "will not require the [Commission] to reinvent the wheel in each case and engage in endless repetitions of its reasoning," such that the FCC's citation of a prior judicial decision "sufficed to identify the reasoning behind its decision."); *Capital Cities/ABC, Inc. v. FCC,* 29 F.3d 309, 313 (7th Cir. 1994) (FCC's reference to the court's prior opinion provided sufficient explanation for its decision to eliminate previously remanded rules).  No changed circumstances rendered the *Interim Cap Order's* reasoning inapplicable in the proceeding below.  Thus, the Commission sufficiently explained its decision by reasoning that reclaiming high-cost support relinquished by competitive ETCs would be "consistent with" the *Interim Cap Order*.  *Order* ¶ 5 & n.11 (JA   ).

    **B.   As In *Rural Cellular Association*, Petitioners Have Failed To Demonstrate That High-Cost Support Will Be Insufficient As A Result Of The *Order*.**

Petitioners further claim that "[t]he FCC made no serious effort in the *Order* to justify the reductions in support it effects."  Br. 53.  Petitioners' premise is incorrect.  The *Order* did not reduce petitioners' high-cost support.

Rather, the Commission refused to provide petitioners a more than half-billion dollar windfall by redistributing support voluntarily surrendered by their competitors (*i.e.,* Verizon Wireless and Sprint Nextel). There was no need to "justify the reductions" because there were no reductions – petitioners receive the same support they would have received under the interim cap after Verizon Wireless and Sprint Nextel relinquish their universal service subsidies.

Petitioners nonetheless claim that the Commission improperly "shift[ed] to CETCs the burden of disproving statutory compliance" when "[i]t is the *agency's* responsibility to explain how the *Order* complies with the statute's sufficiency principle." Br. 54. The Commission, however, did satisfy that duty: in the *Interim Cap Order* ¶¶ 8, 14 (JA   ), the agency concluded that high-cost support under the interim cap is sufficient for purposes of section 254(b)(5). To the extent that petitioners' disagree, both this Court and the Fifth Circuit have confirmed that it is petitioners' burden to rebut that finding. *See Rural Cellular Ass'n,* 588 F.3d at 1103-04 (affirming FCC's decision to award additional high-cost support to competitive ETCs only upon a showing of cost-based need); *Alenco,* 201 F.3d at 621 (holding that it was petitioners' burden to "present … evidence disputing the sufficiency" of a cap on corporate operations expenses).

37

Petitioners failed to make the required showing before the Commission. "The pertinent question," this Court has explained, "is whether the interim cap will undercut adequate telephone services for customers, since '[t]he purpose of universal service is to benefit the customer, not the carrier.'" *Rural Cellular Ass'n,* 588 F.3d at 1103 (*quoting Alenco,* 201 F.3d at 621). In the proceeding below, petitioners' only "evidence" that high-cost support would be insufficient absent redistribution of relinquished support was a projection of "what would have happened had the Commission adopted the reclamation rule over two years ago" – specifically, that aggregate high-cost support would have declined under the interim cap in several states after Verizon Wireless relinquished its ETC status. Comments of Rural Cellular Association at 3-4 (JA   ). All this shows is that Verizon Wireless surrendered its own high-cost support in those states – it does not demonstrate that any carrier would terminate (or reduce) its service.[8] Nor does a decline in aggregate high-cost support show that other competitive ETCs receive less high-cost support following Verizon Wireless's surrender of its support. To the contrary, they continue to receive the same amounts

---

[8] Verizon Wireless has informed the Commission that it still provides service (albeit without high-cost support) throughout the same service areas in those states where it has relinquished its ETC status subsequent to the *Order* on review.

under the interim cap. As a result, petitioners failed to submit any "significant" comments that warranted an explicit response from the Commission. *United States Satellite Broad. Co v. FCC,* 740 F.2d 1177, 1188 (D.C. Cir. 1984).[9]

Moreover, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Covad Commc'ns Co. v. FCC,* 450 F.3d 528, 550 (D.C. Cir. 2006) (*citing Thompson v. Clark,* 741 F.2d 401, 409 (D.C. Cir. 1984)). The Commission had already considered the relevant factors in the *Interim Cap Order,* where it found no reason to believe that consumers will be left without access to affordable telecommunications services due to the interim cap. As the Commission explained, "many wireless carriers that do not receive high-cost support compete against wireless competitive wireless ETCs that do receive support, and many wireless competitive ETCs served high-cost territories before they were

---

[9] The Coalition did not even try to demonstrate that high-cost support would be insufficient. *See* Br. 18, n.10 & 55. Instead, it simply argued that "the Commission has no legal … standard – apart from the identical support rule for defining the level of support that is sufficient." *Coalition Petition for Reconsideration* at 17-18 (JA   ). The Commission and this Court previously rejected that argument. *See Interim Cap Order* ¶¶ 16-21 (JA   ), *aff'd, Rural Cellular Ass'n,* 588 F.3d at 1102-04.

designated as eligible to receive support." *Interim Cap Order* ¶ 13 (JA   ). Given that earlier finding, there was no basis for the Commission to conclude that high-cost support under the interim cap would be insufficient if the agency declined to redistribute the support surrendered by other competitive ETCs.

Finally, even if the *Order* did generally render support insufficient in a particular state (which is not the case), competitive ETCs may seek an exemption from the interim cap if they demonstrate that their own costs "meet the support threshold in the same manner as the [ILEC]." *Interim Cap Order* ¶ 31 (JA   ); *see also* pp. 12-13 & n.1, above.  In other words, petitioners may secure greater per-line support under the interim cap if they submit cost data to the Commission showing that their high-cost universal service support is insufficient to provide adequate telephone service to customers. *Id*.  This Court, in *Rural Cellular Association*, "th[ought] it not unreasonable for the Commission to ask that providers be prepared to calculate their own costs."  588 F.3d at 1104.

## C. The *Order* Is Consistent With The *Interim Cap Order*.

Petitioners characterize the *Interim Cap Order* as an emergency measure enacted to guard the sustainability of the universal service fund.  Br. 56-57.  That is correct, as far as it goes.  *See Interim Cap Order* ¶ 1 (JA   ).

Petitioners, however, are incorrect in claiming that the *Interim Cap Order* "cannot serve as a basis for justifying *later* actions," Br. 57, notably the Commission's decision, in the *Order*, to amend the interim-cap rule so that petitioners would not receive a consumer-subsidized windfall every time a competitive ETC surrenders its high-cost support.  As this Court has held, "it [i]s entirely proper for [the agency] to apply the expertise and knowledge it had gained in [a prior] proceeding," *Consol. Rail. Corp. v. ICC,* 646 F.2d 642, 655 (D.C. Cir. 1981), which is precisely what the Commission did in the *Order*.

In the *Interim Cap Order* ¶ 19 (JA   ), the Commission explained that when it adopted the identical support rule, "[it] envisioned that competitive ETCs would compete directly against [ILECs] and try to take existing customers from them."  But that prediction has "proven inaccurate," *id*.: wireless carriers, which "serve a majority of competitive ETC lines, and have received a majority of competitive ETC support … do not capture lines from the [ILEC] to become a customer's sole service provider, except in a small portion of households."  *Id.* ¶ 20 (JA  ).  Instead, these carriers generally "provide mobile wireless telephony service in addition to a customer's existing wireline service," *id*., often selling "multiple supported wireless handsets in given households" under so-called "family plans."  *Id.* ¶ 9 (JA   ).

41

As a result, "many households subscribe to *both* [wireline and wireless] services and receive support for multiple lines." *Id*., ¶ 21 (JA   ) (emphasis added).  This Court relied on these findings in *Rural Cellular Association*, 588 F.3d at 1104, acknowledging that "since the current regime appears to count each line and handset the same based on the ILEC's costs, CETCs receive subsidies well in excess of their costs…."  *See also id.* (noting that competitive ETCs benefit from the "inequities and inefficiencies that exist under the current regime.").

Having previously found that the identical support rule was not working as intended, because it subsidizes multiple lines provided by multiple carriers to a single household or business, the Commission reasonably declined to perpetuate that flawed regime.  *Bechtel v. FCC,* 957 F.2d 873, 881 (D.C. Cir. 1992) (holding that the FCC has a "duty to evaluate its policies over time to ascertain whether they work – that is, whether they actually produce the benefits the Commission originally predicted they would.").  As the Commission explained in the *Order* on review, "the goal of the *Interim Cap Order* is to rein in high-cost universal service disbursements for potentially duplicative voice services," and the rule amendment – which adjusts a state's interim cap amount downward if a competitive ETC relinquishes its ETC status – is "consistent with that goal."  *Order* ¶ 5 (JA   ).

42

This is not impermissible "bootstrap[ping]" (Br. 56), as petitioners

contend; rather, it is an entirely permissible application of the Commission's

prior findings concerning the identical support rule. This Court has

repeatedly found that an agency can "rely, absent changed circumstances, on

earlier findings." *State of Wisconsin v. FERC,* 104 F.3d 462, 469 (D.C. Cir.

1997) (FERC could rely on economic viability finding from a license grant

proceeding in a later transfer proceeding); *see also Nuclear Info. Res. Serv. v.

NRC,* 969 F.2d 1169, 1174-75 (D.C. Cir. 1992) (NRC was not required to

reconsider "every material issue" and could instead rely on findings made in

the earlier stages of a licensing proceeding). Thus, in the proceeding below,

the Commission "was entitled to rely on its … findings" in the *Interim Cap

Order* because they "[were] directly relevant to" the matter before it and

because "petitioners were given a full opportunity to contest the [FCC's]

earlier findings with new evidence." *Consol. Rail Corp.,* 646 F.2d at 655.

Petitioners' other attempts to distinguish the *Interim Cap Order* are no

more persuasive. Petitioners, for example, characterize the *Interim Cap

Order* as finding that duplicative support results from the sale of multiple

wireless handsets to a single household, and then criticize the agency for

failing to "undertak[e] some type of structural reform to address th[at]

purported concern." Br. 57. However, the *Interim Cap Order* (¶ 21 (JA   ))

found that duplicate support results from the fact that "the majority of households do not view wireline and wireless services to be direct substitutes," so that "many households subscribe to both services."

Finally, petitioners seem to contend that the *Interim Cap Order* only survived judicial review because it was an interim regulation adopted as an emergency cost-control measure. Br. 58. That is incorrect. This Court's finding that the interim cap was consistent with universal service principles was not predicated on the cap's interim nature. *Rural Cellular Ass'n,* 588 F.3d 1101-05.

## III.  PETITIONERS' CHALLENGE TO THE TEMPORARY RESERVE IS NOT PROPERLY BEFORE THIS COURT AND, IN ANY EVENT, IS WITHOUT MERIT

### A.  The Court Lacks Jurisdiction To Entertain Petitioners' Arguments Because They Are Effectively Challenges To The *Corr Wireless Order,* Not The *Order* On Review.

Petitioners contend that the Commission lacked authority to reserve temporarily, for a period of 18 months (*i.e.*, until January 31, 2012), any high-cost support surrendered by competitive ETCs. Br. 31-49. This challenge is not properly before this Court because petitioners have challenged the wrong order.

The Commission established the temporary reserve in the earlier *Corr Wireless Order.* In that order, the Commission "direct[ed] USAC to reserve

44

any reclaimed funds as a fiscally responsible down payment on proposed broadband universal service reforms, as recommended in the National Broadband Plan." *Corr Wireless Order* ¶ 20 (JA   ). "To reserve these funds," the Commission "waive[d] section 54.709(b)" of its rules, which requires "that USAC carry forward any 'excess payments' from contributors to the next quarter." *Id.*, ¶¶ 21, 22, n.45 (*citing* 47 C.F.R. § 54.709(b)) (JA   ). "The effect of this rule," the Commission explained, "is to reduce the contribution factor in the subsequent quarter." *Id.*, n.45 (JA   ).  In other words, absent the 18-month waiver of rule 54.709(b), any support reclaimed from Verizon Wireless and Sprint Nextel could not be held in reserve. Instead, by operation of the rule, those payments would have rolled forward to reduce the next quarter's universal service contribution factor.

The Commission, in the *Order,* took no further action with respect to the temporary reserve generally, or rule 54.709(b) specifically; rather, its only discussion of the reserve was in reference to the *Corr Wireless Order*. *See Order* ¶ 4, n.8 (JA   ) (noting that the FCC in the *Corr Wireless Order* "waived, for 18 months, section 54.709(b) of the Commission's rules to enable it to direct USAC to reserve reclaimed funds."); *see also id.* n.15 (JA   ) (referencing the same waiver).  Nor did the Commission have to do so, because once it had waived rule 54.709(b), any "excess payments" collected

45

by USAC, whatever their source, would be held in reserve during the 18-month waiver period.  Pursuant to a different rule (*i.e.,* 47 C.F.R. § 54.709(a)(3)), the Commission directed USAC to collect universal service contributions as if any amounts relinquished by competitive ETCs were still being distributed.  *Order,* n.15 (JA   ).  But it is the *holding* of those funds – permitted by the prior waiver of rule 54.709(b) in the *Corr Wireless Order* – not the continued *collection* of those funds, that created the temporary reserve that petitioners seek to challenge in this case.

Petitioners' challenges are both too early and too late, thereby depriving this Court of jurisdiction to hear their arguments regarding the temporary reserve.  For its part, RCA is too late because it neither sought agency reconsideration nor judicial review of the *Corr Wireless Order.*  The statutory deadline for challenging the *Corr Wireless Order* has passed.  Hence, RCA's claims with respect to the temporary reserve are time-barred and should be dismissed for want of jurisdiction.  *See* 47 U.S.C. § 402(a); 28 U.S.C. § 2344 (requiring petitions for review of FCC orders to be filed within 60 days after issuance); *Cellular Telecomms. & Internet Ass'n v. FCC,* 330 F.3d 502, 508 (D.C. Cir. 2003) ("The 60-day statutory deadline is jurisdictional.").

46

The Coalition's challenge, on the other hand, is too early – or, under this Court's cases, "incurably premature," *BellSouth Corp. v. FCC*, 17 F.3d 1487, 1489-90 (D.C. Cir. 1994). The Coalition sought further administrative review of the *Corr Wireless Order* by filing a petition for reconsideration with the FCC. In that petition, it raised the same APA, statutory, and constitutional arguments that it now attempts to advance before this Court.[10] Because that petition remains pending before the Commission, the Coalition is prohibited from litigating the same claims before this Court, and those claims should be dismissed. *See BellSouth Corp.*, 17 F.3d 1487 at 1489-90 (petition for reconsideration pending before the FCC renders the appeal of the agency's order "incurably premature," thereby requiring dismissal for lack of jurisdiction).[11]

---

[10] *See* USA Coalition Recon. Petition at 7-11 (constitutional claims), 11-16 (APA claims), 17-18 (statutory claims) (JA    ).

[11] The Coalition's pending petition for reconsideration tolls the period for it to file a petition for review of the *Corr Wireless Order*. *BellSouth Corp.*, 17 F.3d at 1490. Thus, the Coalition can await an FCC order on reconsideration and then seek judicial review of that order. Or it could withdraw its petition for reconsideration and then challenge the *Corr Wireless Order*.

### B.   The Commission Acted Within Its Discretion In Temporarily Reserving Reclaimed High-Cost Support.

#### 1.   The Commission's rules authorize the FCC to adjust the demand projection used to determine the quarterly contribution factor.

Even if petitioners' challenge to the temporary reserve were not procedurally barred, it lacks merit.  Contrary to petitioners' contention (Br. 45-49), the *Order* is fully consistent with section 54.709(a) of the Commission's rules, 47 C.F.R. § 54.709(a).

Under that rule, USAC calculates the quarterly contribution factor based on the ratio of total projected quarterly expenses of the four universal service programs to contributors' total projected end-user interstate and international revenues.  47 C.F.R. § 54.709(a)(2).  But an exception to that rule provides that "[t]he Commission reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest."  47 C.F.R. § 54.709(a)(3); *see also Corr Wireless Order* ¶ 26 & n.54 (JA   ).

The exception set forth in rule 54.709(a)(3) thus affords the Commission discretion to adjust the expense projections used to calculate the quarterly universal service contribution factor.  47 C.F.R. § 54.709(a)(3). The Commission, in the *Order*, exercised that discretion to "project competitive ETC demand" for high-cost support "at the full amount of the

cap as established by the *Interim Cap Order*, without reflecting any adjustments to the cap due to relinquishment or revocation of ETC status by a competitive ETC." *Order*, n.15 (JA   ).  The Commission's reasonable interpretation of its own rule is entitled to deference. *Talk Am. Inc.,* 131 S. Ct. at 2261; *Auer v. Robbins,* 519 U.S. 452, 461 (1997).

Petitioners nonetheless contend that the Commission exceeded its discretion under rule 54.709(a)(3) because that rule, which "gives the FCC authority to alter the 'projections of demand,' … can only reasonably refer to the estimated demand for the four established universal service programs." Br. 47.  Yet the Commission's proposals for using the funds reclaimed from competitive ETCs all fall squarely within those four programs.  The Commission envisioned in the *Corr Wireless Order* that any reclaimed funds will be used to increase the funding and utilization of the schools and libraries and rural health care programs, as well as to create new funding mechanisms within the high-cost support program (*i.e.,* the proposed Mobility Fund and, in the long term, a mechanism that directly supports broadband Internet services).  *See Corr Wireless Order* ¶ 20 (JA   ).  Because the Commission, in the *Order*, directed USAC to continue to project competitive ETC demand

49

"[c]onsistent with the *Corr Wireless Order*," *Order,* n.15 (JA   ), it did not exceed its discretion under rule 54.709(a)(3).[12]

Nor does the Commission's interpretation of rule 54.709(a)(3) give the agency "unfettered discretion."  Br. 47.  Petitioners assert that the Commission's interpretation would "allow[] the FCC to project 'demand' to include, for example, a new fleet of vehicles."  *Id.*; *see also id.* 40.  That claim is baseless.  The Commission has repeatedly explained that it intends to use the temporary reserve solely for universal service purposes.  *See Corr Wireless Order* ¶¶ 20, 23-24 (JA   ); *Order* ¶ 5 & n.15 (JA   ).  And the Commission has made good on its word:  since it established the temporary reserve in the *Corr Wireless Order*, it has used those monies once – to provide a slight increase in universal service support for the long-established schools and libraries program.  *Schools and Libraries Order,* 25 FCC Rcd at 18780-83 (¶¶ 34-40).  Petitioners thus "cannot, by sheer multiplication of innuendo, overcome the strong presumption of agency regularity."  *Louisiana Ass'n of Indep. Producers and Royalty Owners v. FERC,* 958 F.2d 1101, 1111 (D.C. Cir. 1992); *see also Int'l Bhd. of Teamsters v. United States,* 735

---

[12]  Contrary to petitioners' assertion, *see* Br. 48-49, the Commission did not amend rule 54.709 in the *Order.*  Rather, it exercised its discretion to revise USAC's demand projections pursuant to subsection (a)(3) of that rule.

50

F.2d 1525, 1534 (D.C. Cir. 1984) ("Agency action comes before [the court] for review accompanied by a presumption of regularity.").

### 2. Section 254 of the Act permits the Commission to collect universal service contributions before it establishes mechanisms for distributing subsidies.

Petitioners next argue that section 254 of the Act prohibits the Commission from collecting universal service contributions to fund broadband universal service reforms, as the Commission has proposed to do in subsequent proceedings (*see* pp. 21-23, above),  prior to the implementation of those proposals.  Br. 32-38.  "The short answer" to this argument "is that Congress did not write the statute that way."  *United States v. Naftalin,* 441 U.S. 768, 773 (1979).[13]

1.  Petitioners contend that "the *Order* violates the Act's mandate that the FCC assess contributions only for 'specific, predictable, and sufficient mechanisms [already] established by the Commission to preserve and advance universal service.'"  Br. 34 (*citing* 47 U.S.C. § 254(d)).  Petitioners,

_____

[13] Petitioners also complain that the Commission "violat[ed] the APA's reasoned decisionmaking requirement" because it allegedly "did nothing to explain" how the temporary reserve is "consistent with the Act."  Br. 37-38. The Commission created the temporary reserve in the *Corr Wireless Order*, *see* pp. 44-47, above, and took no further action with respect to the reserve in the proceeding below.  As such, the Commission had no APA obligation to discuss the statutory basis for the temporary reserve in the *Order* on review.

in so arguing, read a temporal limitation into section 254(d) that is not present in the statute.

Section 254(d) states that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service."  47 U.S.C. § 254(d).  This provision cross-references the section 254(b)(5) "principle" that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service."  47 U.S.C. § 254(b)(5); *see Motion Picture Ass'n of Am., Inc. v. FCC,* 309 F.3d 796, 801 (D.C. Cir. 2002) ("Statutory provisions *in pari materia* normally are construed together to discern their meaning.").

Petitioners' argument hinges on their unsupported view that the Commission must "establish" the "specific" and "predictable" mechanisms required by section 254(b)(5) prior to collecting universal service contributions pursuant to section 254(d).  Br. 34-38.  In fact, the reading of section 254(b)(5) and (d) that is most consistent with the text, legislative history, and purpose of the statute is that those provisions do not prohibit the FCC from collecting the contributions required to fund the universal service

52

program in advance. *Corr Wireless Order* ¶¶ 20-22 (JA   ). In particular, the word "established" in section 254(d) references the Commission's obligation to "establish[]" distribution mechanisms that comport with section 254(b)(5), not a separate obligation to "establish[]" such mechanisms *prior to* collecting contributions from telecommunications carriers to "preserve and advance universal service." Petitioners therefore miss the mark in arguing that the use of the temporary reserve must be "specific" and "predictable" at the time of collection. Br. 34-35. Those principles only apply to the section 254(b)(5) mechanisms for *distributing* universal service support – not section 254(d) mechanisms for collecting *contributions* to the universal service fund, which only need be "equitable and nondiscriminatory."

The Commission's reading is consistent with the legislative history. Congress, in describing the universal service provisions in the 1996 Act, broadly stated that "[n]ew section 254(d) requires that all telecommunications carriers providing interstate telecommunications services shall contribute to the preservation and advancement of universal service." S. Conf. Rep. 104-230 at 131; *see also* S. Rep. 104-23 at 27 (explaining that "[s]ubsection (c) of new section 253 [later codified as section 254(d)] requires all telecommunications carriers … to contribute on an equitable and nondiscriminatory basis to the preservation and advancement of universal

service.").  Nowhere did Congress direct the Commission to establish

distribution mechanisms as a condition precedent to collecting universal

service contributions.

This reading is also consistent with the Fifth Circuit's decision in

*Alenco,* 201 F.3d 608, on which petitioners rely (Br. 36).  In determining

whether certain universal service distribution mechanisms were "predictable,"

as required by section 254(b)(5), the *Alenco* court found that "the

Commission reasonably construed the predictability principle to require only

predictable rules that govern *distribution* of the subsidies …."  *Id.* at 623

(emphasis altered); *see also id.* at 622 (explaining that universal service

support for high-cost loops was "predictable" because "[t]he methodology

governing subsidy *disbursements* [wa]s plainly stated and made available to

LECs.") (emphasis added).  The court never suggested that the Commission

is required to establish "predictable rules that govern the distribution of …

subsidies" before collecting universal service contributions.  *Id.* at 623.

The Commission is in the process of reforming its existing

mechanisms, and potentially developing new mechanisms, for distributing

universal service support.  *Order* ¶ 5 (JA   ); *see also Corr Wireless Order*

¶¶ 20, 23-24 (JA   ).  Those mechanisms must comport with the requirements

of section 254(b)(5).  To the extent petitioners believe that they do not,

petitioners may challenge them in court, once they are established.  But

neither the statute nor *Alenco* requires the Commission to establish those

mechanisms prior to collecting the universal service contributions necessary

to fund them – only that the Commission establish them prior to distributing

universal service support.

The Commission's interpretation of section 254(d) is also consistent

with the framework of section 254.  Congress, in section 254(c), directed the

Commission, in consultation with the Joint Board, to periodically revise the

definition of universal service and the funding mechanisms that support it.  47

U.S.C. § 254(c)(1)-(2).  The Commission, in the *Corr Wireless Order* (¶ 20 &

n.48 (JA   ))*,* created the temporary reserve because "[r]eserving funds now,

rather than collecting them through a higher contribution factor at a later

time, will ensure that [it] ha[s] the funds on hand to rapidly implement" the

proposals to advance universal service broadband initiatives "while

minimizing unnecessary volatility in the contribution factor, which would

otherwise decline and increase as the universal service fund transitions to

support broadband."  *See also USF/ICC Transformation NPRM,* 26 FCC Rcd

at 4559, 4584 (¶¶ 10, 80) (stating the FCC's intent to control the size of the

USF as it implements broadband universal service reform).  Under

petitioners' cramped reading of section 254(d), however, there would either

be a substantial lag between enactment and implementation of the reforms anticipated by section 254(c), or a significant, sudden increase in the quarterly universal service contribution factor paid by consumers – outcomes that hardly "preserv[e] and advance[]" universal service consistent with the Commission's statutory mandate.  47 U.S.C. § 254(b).

In any event, section 254(d) is ambiguous, and the Commission construed it reasonably. "[E]ven if the agency's reading differs from what the court believes is the best statutory interpretation," it is clearly not precluded by the statute's language or structure and therefore must be affirmed.  *Brand X*, 545 U.S. at 980; *see also Rural Cellular Ass'n*, 588 F.3d at 1102 (this Court "will uphold the agency's interpretation as long as it is reasonable … even if 'there may be other reasonable, or even more reasonable, views.'") (citations omitted); *Troy v. Browner,* 120 F.3d 277, 291 (D.C. Cir. 1997) (this Court "will not reverse an agency's interpretation of a statute merely because it is not the most obvious one.").

2.  Petitioners further contend that the temporary reserve "does not support any of the services *currently* designated by the Joint Board and the FCC as 'supported services' and is not part of the *current* High-Cost Program or any of the other specific support mechanisms," so "it violates Sections 254(c)(1) and 254(a)(2) of the Act."  Br. 34.

56

Petitioners' argument fails for reasons similar to those set forth above. Section 254(c)(1), which the Commission has used to designate services eligible for support from the high-cost and low-income support programs, only requires the Commission, in consultation with the Joint Board, to "establish[] the definition of the services that are supported by Federal universal service support mechanisms." 47 U.S.C. § 254(c)(1). The "Federal universal service support mechanisms" referenced in that provision are the "specific and predictable support mechanisms" required by section 254(b)(5). Section 254(c)(1) thus requires the Commission only to identify the services eligible for support prior to developing the mechanisms that distribute universal service support. Nothing in that provision requires the Commission to designate the services eligible for support before it collects contributions for its universal service programs pursuant to section 254(d), however.

Petitioners also overlook that the *Corr Wireless Order* (¶ 20 (JA   )) in fact identified four potential uses of the temporary reserve fund, two of which were "index[ing] the E-rate funding cap to inflation" and "improving utilization of the Rural Health Care program." Both the schools and libraries program and the rural health care program subsidize services long-designated as eligible for universal service support by the Commission (including broadband Internet access) under 47 U.S.C. § 254(h). *See First Report and*

57

*Order,* 12 FCC Rcd 8776 (¶¶ 426-463; 609-637), *aff'd, TOPUC,* 183 F.3d at 440-46.

Petitioners further fail to acknowledge that the Commission recently indexed schools and libraries support to inflation. *Schools and Libraries Order*, 25 FCC Rcd at 18780-83 (¶¶ 34-40). "[A]dditional universal service funds required to" make this adjustment "will be offset by the Commission's recent decision to use reclaimed funds surrendered [by] competitive [ETCs] as a 'fiscally responsible down payment on proposed broadband universal service reforms.'" *Id.,* 25 FCC Rcd at 18781-82 (¶ 38) (*quoting Corr Wireless Order* ¶ 20). Accordingly, petitioners are wrong when they claim that the temporary reserve "is not intended to support the designated services as the Act requires." Br. 33. In fact, the temporary reserve currently is being used to subsidize designated services – and only designated services – today.

### 3.    The Commission's interpretation of the Act is consistent with constitutional requirements.

Finally, in an effort to bolster their statutory argument, petitioners invoke the canon of constitutional avoidance, contending that the Commission's "broad interpretation" of section 254 "raise[s] serious doubts about the constitutionality of the Act." Br. 38. Not so. Courts (including this one) have uniformly rejected arguments that universal service contributions violate the Origination Clause (art. 1, § 7, cl. 1) and the Taxing

Clause (art. 1, § 8, cl. 1) of the Constitution.  The temporary reserve is consistent with that precedent and the Constitution.

1.  The temporary reserve does not violate the Origination Clause because it is not a revenue bill that must originate in the House of Representatives.  As the Supreme Court has explained, "a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause."  *United States v. Munoz-Flores,* 495 U.S. 385, 398 (1990).  The Commission created the temporary reserve in anticipation of possible universal service reforms before February 2012.  *Corr Wireless Order* ¶ 20 (JA   ).  The temporary reserve thus is a fund dedicated to the particular purpose of preserving and advancing universal service, consistent with section 254(b) of the Act, not to raise revenues for the general treasury.

Petitioners argue that "the *Order* raises money for a vague purpose." Br. 40.  But the specificity or vagueness of an agency's purpose plays no role in Origination Clause analysis; the relevant question instead is whether the funds are directed to a particular program rather than to the general support of the Government.  *See Munoz-Flores*, 495 U.S. at 398.  In any event, the

Commission's proposals for using the temporary reserve are hardly vague. *See* pp. 21-23, above.

Petitioners speculate that "[n]othing in the *Order* prevents the FCC from" using the temporary reserve for a non-universal service purpose, such as "financing the construction of a new wing at its headquarters." Br. 40. This ignores the fact that such hypothetical expenditures for patently non-universal service purposes would violate federal law. *See* 31 U.S.C. § 1301 (prohibiting expenditures for purposes not authorized by Congress); *id.* §§ 1341-1342 (banning spending in excess of, or in advance of, an appropriation, in violation of the Antideficiency Act).

The Commission, moreover, has repeatedly affirmed that it will use the temporary reserve either to implement universal service reform or to reduce the universal service contribution factor, and this Court "must presume an agency acts in good faith." *Comcast v. FCC,* 526 F.3d 763, 769, n.2 (D.C. Cir. 2008) (rejecting petitioners' "assertions bordering on accusations of the Commission's bad faith."). Indeed, since the Commission established the temporary reserve, it has expended those funds only once – for the universal service purpose of re-indexing support for the schools and libraries program to inflation, consistent with the *Corr Wireless Order. Schools and Libraries Order*, 25 FCC Rcd at 18780-83 (¶¶ 34-40).

Relying on the Fifth Circuit's decision in *TOPUC,* petitioners next contend that the *Order* violates the Origination Clause because it "requires no connection between the payors" (providers of interstate telecommunications) and "the future beneficiaries" of the temporary reserve. Br. 40. In fact, that decision undermines, rather than supports, petitioners' argument. In *TOPUC,* the court rejected a very similar contention made by several paging carriers, finding a sufficient nexus between those carriers' contributions and the Commission's overall universal service *program*, without regard to any of the specific *mechanisms* for distributing support under that program.

The court explained:

> [U]niversal service contributions are part of a particular program supporting the expansion of, and increased access to, the public institutional telecommunications network. Each paging carrier directly benefits from a larger and larger network and, with that in mind, Congress designed the universal service scheme to exact payments from those companies benefiting from the provision of universal service. This design prevents the sums being used to support the universal service program from being classified as 'revenue' within the meaning of the Origination Clause.

*TOPUC,* 183 F.3d at 428.[14]

---

[14] The *TOPUC* court relied on dicta from *Munoz-Flores*, 495 U.S. at 400, n.7, wherein the Supreme Court simply noted without deciding that "[a] different case might be presented if the program funds were entirely unrelated to the persons paying for the program." *See TOPUC,* 183 F.3d at 427-28. In any event, no such case is presented here.

Petitioners are wireless carriers.  Like the paging carriers in *TOPUC,*
they "are … dependant on a widespread telecommunications network for the
maintenance and expansion of their business."  *Id.*  Also like those paging
carriers, they benefit from the fact that the Commission's universal service
program "expan[ds] …, and increase[s] access to, the public institutional
telecommunications network."  *Id.*  And irrespective of any proposed changes
to the specific *mechanisms* that distribute universal service support, the larger
universal service *program* will continue to promote universal access to
telecommunications and information services, consistent with the principles
set forth in section 254(b) of the Act.  *See* pp. 21-23, above.  It follows that
contributions to the temporary reserve, which have been set aside to fund the
Commission's universal service program, *Corr Wirless Order* ¶¶ 20-22, 24
(JA   ), *Order* ¶ 5 & nn.8, 15 (JA   ), "target[] a group 'to which some part of
the expenses' of sustaining the universal service program 'can be fairly
attributed.'"  *TOPUC*, 183 F.3d at 428 (*citing Munoz-Flores,* 495 U.S. at 400,
n.7).

2.  Petitioners assert that the Act, as interpreted by the Commission,
amounts to an unconstitutional delegation of the power to "tax" as opposed to
a constitutional delegation of the power to set "fees."  Br. 43.  But "the
delegation of discretionary authority under Congress' taxing power is subject

to no constitutional scrutiny greater than that … applied to other nondelegation challenges." *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 223 (1989). Accordingly, whether a particular assessment is described as a "tax" or a "fee" plays no role in deciding a nondelegation claim. *Id.*; *see also Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988). In either case, the question is simply whether Congress has laid down an intelligible principle to guide the agency's actions. *Skinner*, 490 U.S. at 218-19. Here, Congress has done so. Section 254(b) of the Act sets forth a list of principles on which the Commission and the Joint Board must base universal service policies. And universal service contributions collected to subsidize those policies, once enacted, must be "equitable and nondiscriminatory." 47 U.S.C. § 254(d).

Petitioners rely on *National Cable Television Association v. United States,* 415 U.S. 336, 340 (1974) ("*NCTA*"), to claim that a regulatory fee, such as the temporary reserve, becomes an unauthorized tax if the fee is not based on the benefit received by the payor from the regulatory scheme. Br. 44. That case, however, "stand[s] only for the proposition that Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether

63

characterized as 'fees' or 'taxes,' on those parties." *Skinner*, 490 U.S. at 224.

Congress clearly indicated its intention to do so here. The Act requires

telecommunications carriers to contribute "to … preserve and advance

universal service," 47 U.S.C. § 254(d), a purpose that, unlike the statute at

issue in *NCTA*, takes into account considerations broader than the value of the

benefit conferred on the particular carrier. In any event, as set forth above,

*see* pp. 21-23, the temporary reserve, by its terms, will be used to subsidize

the expansion and reform of three of the Commission's four existing

universal service programs (*i.e.,* high-cost, schools and libraries, and rural

health care) – programs that the Fifth Circuit already found confer substantial

benefits to telecommunications carriers such as petitioners. *TOPUC*, 183

F.3d at 428.

Finally, this Court, as well as the Fifth Circuit, have already rejected

the claim that a universal service assessment is an unauthorized tax. *See*

*Rural Tel. Coal. v. FCC,* 838 F.2d 1307, 1314 (D.C. Cir. 1988); *TOPUC,* 183

F.3d at 427, n.52. There is no reason for this Court to revisit its earlier

decision.

## CONCLUSION

The Court should dismiss the challenge to the temporary reserve for lack of jurisdiction, and should otherwise deny the petition for review.

Respectfully submitted,

AUSTIN C. SCHLICK
GENERAL COUNSEL

SHARIS A. POZEN
ACTING ASSISTANT ATTORNEY
   GENERAL

PETER KARANJIA
DEPUTY GENERAL COUNSEL

ROBERT B. NICHOLSON
KRISTEN C. LIMARZI
ATTORNEYS

RICHARD K. WELCH
DEPUTY ASSOCIATE GENERAL
   COUNSEL

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

/s/ Maureen K. Flood

MAUREEN K. FLOOD
COUNSEL

FEDERAL COMMUNICATIONS
   COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

August 11, 2011

65

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

RURAL CELLULAR ASSOCIATION AND UNIVERSAL
SERVICE FOR AMERICA COALITION,

PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

RESPONDENTS.

NO. 11-1094

CERTIFICATE OF COMPLIANCE

Pursuant to the requirements of Fed. R. App. P. 32(a)(7), I hereby

certify that the accompanying "Brief for Respondents" in the captioned case

contains 13,525 words.

/s/ Maureen K. Flood
Maureen K. Flood
Counsel
Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740 (Telephone)
(202) 418-2819 (Fax)

August 11, 2011

# Appendix:
# Statutes and Regulations

5 U.S.C. § 706
28 U.S.C. § 2344
31 U.S.C. § 1301
31 U.S.C. § 1341
31 U.S.C. § 1342
47 U.S.C. § 151
47 U.S.C. § 214
47 U.S.C. § 251
47 U.S.C. § 252
47 U.S.C. § 253
47 U.S.C. § 254
47 U.S.C. § 402
47 C.F.R. § 1.3
47 C.F.R. § 54.706
47 C.F.R. § 54.709

**5 U.S.C. § 706**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**28 U.S.C. § 2344**

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of--

(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

**31 U.S.C. § 1301**

(a) Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.

(b) The reappropriation and diversion of the unexpended balance of an appropriation for a purpose other than that for which the appropriation originally was made shall be construed and accounted for as a new appropriation. The unexpended balance shall be reduced by the amount to be diverted.

(c) An appropriation in a regular, annual appropriation law may be construed to be permanent or available continuously only if the appropriation--

(1) is for rivers and harbors, lighthouses, public buildings, or the pay of the Navy and Marine Corps; or

(2) expressly provides that it is available after the fiscal year covered by the law in which it appears.

(d) A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made.

**31 U.S.C. § 1341**

(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not--

(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;

(B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law;

(C) make or authorize an expenditure or obligation of funds required to be sequestered under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985; or

(D) involve either government in a contract or obligation for the payment of money required to be sequestered under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985.

(2) This subsection does not apply to a corporation getting amounts to make loans (except paid in capital amounts) without legal liability of the United States Government.

(b) An article to be used by an executive department in the District of Columbia that could be bought out of an appropriation made to a regular contingent fund of the department may not be bought out of another amount available for obligation.

**31 U.S.C. § 1342**

An officer or employee of the United States Government or of the District of Columbia government may not accept voluntary services for either government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property. This section does not apply to a corporation getting amounts to make loans (except paid in capital amounts) without legal liability of the United States Government. As used in this section, the term "emergencies involving the safety of human life or the protection of property" does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property.

**47 U.S.C. § 151**

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

**47 U.S.C. § 214**

(a) Exceptions; temporary or emergency service or discontinuance of service; changes in plant, operation or equipment

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: Provided, That no such certificate shall be required under this section for the construction, acquisition, or operation of (1) a line within a single State unless such line constitutes part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any line acquired under section 221 of this title: Provided further, That the Commission may, upon appropriate request being made, authorize temporary or emergency service, or the supplementing of existing facilities, without regard to the provisions of this section. No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: Provided, however, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.

(b) Notification of Secretary of Defense, Secretary of State, and State Governor

Upon receipt of an application for any such certificate, the Commission shall cause notice thereof to be given to, and shall cause a copy of such

8

application to be filed with, the Secretary of Defense, the Secretary of State (with respect to such applications involving service to foreign points), and the Governor of each State in which such line is proposed to be constructed, extended, acquired, or operated, or in which such discontinuance, reduction, or impairment of service is proposed, with the right to those notified to be heard; and the Commission may require such published notice as it shall determine.

(c) Approval or disapproval; injunction

The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, extension, acquisition, operation, or discontinuance, reduction, or impairment of service covered thereby. Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest.

(d) Order of Commission; hearing; penalty

The Commission may, after full opportunity for hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier, party to such proceeding, to provide itself with adequate facilities for the expeditious and efficient performance of its service as a common carrier and to extend its line or to establish a public office; but no such authorization or order shall be made unless the Commission finds, as to such provision of facilities, as to such establishment of public offices, or as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier which refuses or

9

neglects to comply with any order of the Commission made in pursuance of this subsection shall forfeit to the United States $1,200 for each day during which such refusal or neglect continues.

(e) Provision of universal service

(1) Eligible telecommunications carriers

A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received--

(A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and

(B) advertise the availability of such services and the charges therefor using media of general distribution.

(2) Designation of eligible telecommunications carriers

A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

(3) Designation of eligible telecommunications carriers for unserved areas

10

If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

(4) Relinquishment of universal service

A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

(5) "Service area defined"

The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

(6) Common carriers not subject to state commission jurisdiction

In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

12

**47 U.S.C. § 251**

(a) General duty of telecommunications carriers

Each telecommunications carrier has the duty--

(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and

(2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256 of this title.

(b) Obligations of all local exchange carriers

Each local exchange carrier has the following duties:

(1) Resale

The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

(2) Number portability

The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.

(3) Dialing parity

The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

(4) Access to rights-of-way

The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title.

13

(5) Reciprocal compensation

The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.

(c) Additional obligations of incumbent local exchange carriers

In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:

(1) Duty to negotiate

The duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

(2) Interconnection

The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--

(A) for the transmission and routing of telephone exchange service and exchange access;

(B) at any technically feasible point within the carrier's network;

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

(3) Unbundled access

The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

(4) Resale

The duty--

(A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

(B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

(5) Notice of changes

The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

(6) Collocation

The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of

15

the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

(d) Implementation

(1) In general

Within 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section.

(2) Access standards

In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether--

(A) access to such network elements as are proprietary in nature is necessary; and

(B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

(3) Preservation of State access regulations

In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--

(A) establishes access and interconnection obligations of local exchange carriers;

(B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

16

(e) Numbering administration

(1) Commission authority and jurisdiction

The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

(2) Costs

The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.

(3) Universal emergency telephone number

The Commission and any agency or entity to which the Commission has delegated authority under this subsection shall designate 9-1-1 as the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance. The designation shall apply to both wireline and wireless telephone service. In making the designation, the Commission (and any such agency or entity) shall provide appropriate transition periods for areas in which 9-1-1 is not in use as an emergency telephone number on October 26, 1999.

(f) Exemptions, suspensions, and modifications

(1) Exemption for certain rural telephone companies

(A) Exemption

Subsection (c) of this section shall not apply to a rural telephone company until (i) such company has received a bona fide request for interconnection, services, or network elements, and (ii) the State commission determines (under subparagraph (B)) that such request is not unduly economically

17

burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof).
(B) State termination of exemption and implementation schedule

The party making a bona fide request of a rural telephone company for interconnection, services, or network elements shall submit a notice of its request to the State commission. The State commission shall conduct an inquiry for the purpose of determining whether to terminate the exemption under subparagraph (A). Within 120 days after the State commission receives notice of the request, the State commission shall terminate the exemption if the request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof). Upon termination of the exemption, a State commission shall establish an implementation schedule for compliance with the request that is consistent in time and manner with Commission regulations.

(C) Limitation on exemption

The exemption provided by this paragraph shall not apply with respect to a request under subsection (c) of this section, from a cable operator providing video programming, and seeking to provide any telecommunications service, in the area in which the rural telephone company provides video programming. The limitation contained in this subparagraph shall not apply to a rural telephone company that is providing video programming on February 8, 1996.

(2) Suspensions and modifications for rural carriers

A local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c) of this section to telephone exchange service facilities specified in such petition. The State commission shall grant such petition to the extent that, and for such duration as, the State commission determines that such suspension or modification--

(A) is necessary--

(i) to avoid a significant adverse economic impact on users of telecommunications services generally;

(ii) to avoid imposing a requirement that is unduly economically burdensome; or

(iii) to avoid imposing a requirement that is technically infeasible; and

(B) is consistent with the public interest, convenience, and necessity.

The State commission shall act upon any petition filed under this paragraph within 180 days after receiving such petition. Pending such action, the State commission may suspend enforcement of the requirement or requirements to which the petition applies with respect to the petitioning carrier or carriers.

(g) Continued enforcement of exchange access and interconnection requirements

On and after February 8, 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding February 8, 1996 under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996. During the period beginning on February 8, 1996 and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

(h) Definition of incumbent local exchange carrier

(1) Definition

For purposes of this section, the term 'incumbent local exchange carrier' means, with respect to an area, the local exchange carrier that--

19

(A) on February 8, 1996, provided telephone exchange service in such area; and

(B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or

(ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

(2) Treatment of comparable carriers as incumbents

The Commission may, by rule, provide for the treatment of a local exchange carrier (or class or category thereof) as an incumbent local exchange carrier for purposes of this section if—

(A) such carrier occupies a position in the market for telephone exchange service within an area that is comparable to the position occupied by a carrier described in paragraph (1);

(B) such carrier has substantially replaced an incumbent local exchange carrier described in paragraph (1); and

(C) such treatment is consistent with the public interest, convenience, and necessity and the purposes of this section.

(i) Savings provision

Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.

**47 U.S.C. § 252**

(a) Agreements arrived at through negotiation

(1) Voluntary negotiations

Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

(2) Mediation

Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

(b) Agreements arrived at through compulsory arbitration

(1) Arbitration

During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.

(2) Duty of petitioner

(A) A party that petitions a State commission under paragraph (1) shall, at the same time as it submits the petition, provide the State commission all relevant documentation concerning--

(i) the unresolved issues;

21

(ii) the position of each of the parties with respect to those issues; and

(iii) any other issue discussed and resolved by the parties.

(B) A party petitioning a State commission under paragraph (1) shall provide a copy of the petition and any documentation to the other party or parties not later than the day on which the State commission receives the petition.

(3) Opportunity to respond

A non-petitioning party to a negotiation under this section may respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition.

(4) Action by State commission

(A) The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3).

(B) The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues. If any party refuses or fails unreasonably to respond on a timely basis to any reasonable request from the State commission, then the State commission may proceed on the basis of the best information available to it from whatever source derived.

(C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.

(5) Refusal to negotiate

The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the

presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.

(c) Standards for arbitration

In resolving by arbitration under subsection (b) of this section any open issues and imposing conditions upon the parties to the agreement, a State commission shall--

(1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;

(2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and

(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

(d) Pricing standards

(1) Interconnection and network element charges

Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section--

(A) shall be--

(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

(ii) nondiscriminatory, and

(B) may include a reasonable profit.

(2) Charges for transport and termination of traffic

(A) In general

For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5) of this title, a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless--

(i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

(ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

(B) Rules of construction

This paragraph shall not be construed--

(i) to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements); or

(ii) to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls, or to require carriers to maintain records with respect to the additional costs of such calls.

(3) Wholesale prices for telecommunications services

For the purposes of section 251(c)(4) of this title, a State commission shall determine wholesale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

(e) Approval by State commission

(1) Approval required

24

Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

(2) Grounds for rejection

The State commission may only reject

(A) an agreement (or any portion thereof) adopted by negotiation under subsection (a) of this section if it finds that--

(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or

(ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity; or

(B) an agreement (or any portion thereof) adopted by arbitration under subsection (b) of this section if it finds that the agreement does not meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title, or the standards set forth in subsection (d) of this section.

(3) Preservation of authority

Notwithstanding paragraph (2), but subject to section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(4) Schedule for decision

If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No

25

State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.

(5) Commission to act if State will not act

If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

(6) Review of State commission actions

In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

(f) Statements of generally available terms

(1) In general

A Bell operating company may prepare and file with a State commission a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251 of this title and the regulations thereunder and the standards applicable under this section.

(2) State commission review

A State commission may not approve such statement unless such statement complies with subsection (d) of this section and section 251 of this title and the regulations thereunder. Except as provided in section 253 of this title, nothing in this section shall prohibit a State commission from establishing or

enforcing other requirements of State law in its review of such statement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(3) Schedule for review

The State commission to which a statement is submitted shall, not later than 60 days after the date of such submission--

(A) complete the review of such statement under paragraph (2) (including any reconsideration thereof), unless the submitting carrier agrees to an extension of the period for such review; or

(B) permit such statement to take effect.

(4) Authority to continue review

Paragraph (3) shall not preclude the State commission from continuing to review a statement that has been permitted to take effect under subparagraph (B) of such paragraph or from approving or disapproving such statement under paragraph (2).

(5) Duty to negotiate not affected

The submission or approval of a statement under this subsection shall not relieve a Bell operating company of its duty to negotiate the terms and conditions of an agreement under section 251 of this title.

(g) Consolidation of State proceedings

Where not inconsistent with the requirements of this chapter, a State commission may, to the extent practical, consolidate proceedings under sections 214(e), 251(f), 253 of this title, and this section in order to reduce administrative burdens on telecommunications carriers, other parties to the proceedings, and the State commission in carrying out its responsibilities under this chapter.

(h) Filing required

A State commission shall make a copy of each agreement approved under subsection (e) of this section and each statement approved under subsection (f) of this section available for public inspection and copying within 10 days after the agreement or statement is approved. The State commission may charge a reasonable and nondiscriminatory fee to the parties to the agreement or to the party filing the statement to cover the costs of approving and filing such agreement or statement.

(i) Availability to other telecommunications carriers

A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.

(j) "Incumbent local exchange carrier" defined

For purposes of this section, the term "incumbent local exchange carrier" has the meaning provided in section 251(h) of this title.

**47 U.S.C. § 253**

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

(e) Commercial mobile service providers

Nothing in this section shall affect the application of section 332(c)(3) of this title to commercial mobile service providers.

29

(f) Rural markets

It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) of this title for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply--

(1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) of this title that effectively prevents a competitor from meeting the requirements of section 214(e)(1) of this title; and

(2) to a provider of commercial mobile services.

**47 U.S.C. § 254**

(a) Procedures to review universal service requirements

(1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

(2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

(b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

(1) Quality and rates

Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced services

Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Access in rural and high cost areas

Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions

All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms

There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries

Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h) of this section.

(7) Additional principles

Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

(c) Definition

(1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services--

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

(2) Alterations and modifications

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

(3) Special services

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section.

(d) Telecommunications carrier contribution

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient

33

mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

(e) Universal service support

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

(f) State authority

A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

(g) Interexchange and interstate services

Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to its

subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

(h) Telecommunications services for certain providers

(1) In general

(A) Health care providers for rural areas

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

(B) Educational providers and libraries

All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3) of this section, provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall--

(i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

(ii) notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

(2) Advanced services

The Commission shall establish competitively neutral rules--

(A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

(B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

(3) Terms and conditions

Telecommunications services and network capacity provided to a public institutional telecommunications user under this subsection may not be sold, resold, or otherwise transferred by such user in consideration for money or any other thing of value.

(4) Eligibility of users

No entity listed in this subsection shall be entitled to preferential rates or treatment as required by this subsection, if such entity operates as a for-profit business, is a school described in paragraph (7)(A) with an endowment of more than $50,000,000, or is a library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act [20 U.S.C.A. § 9121 et seq.].

(5) Requirements for certain schools with computers having internet access

(A) Internet safety

(i) In general

Except as provided in clause (ii), an elementary or secondary school having computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the school, school board, local educational agency, or other authority with responsibility for administration of the school--

(I) submits to the Commission the certifications described in subparagraphs (B) and (C);

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the school under subsection (l) of this section; and

(III) ensures the use of such computers in accordance with the certifications.

(ii) Applicability

The prohibition in clause (i) shall not apply with respect to a school that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

(iii) Public notice; hearing

An elementary or secondary school described in clause (i), or the school board, local educational agency, or other authority with responsibility for administration of the school, shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy. In the case of an elementary or secondary school other than an elementary or secondary school as defined in section 8801 of Title 20, the notice and hearing required by this clause may be limited to those members of the public with a relationship to the school.

(B) Certification with respect to minors

A certification under this subparagraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school--

(i) is enforcing a policy of Internet safety for minors that includes monitoring the online activities of minors and the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

(I) obscene;

(II) child pornography; or

(III) harmful to minors;

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors; and

(iii) as part of its Internet safety policy is educating minors about appropriate online behavior, including interacting with other individuals on social networking websites and in chat rooms and cyberbullying awareness and response.

(C) Certification with respect to adults

A certification under this paragraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school--

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

38

(D) Disabling during adult use

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

(E) Timing of implementation

(i) In general

Subject to clause (ii) in the case of any school covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made--

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

(ii) Process

(I) Schools with internet safety policy and technology protection measures in place

A school covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

(II) Schools without internet safety policy and technology protection measures in place

A school covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)--

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any school that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such school comes into compliance with this paragraph.

(III) Waivers

Any school subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year program may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A school, school board, local educational agency, or other authority with responsibility for administration of the school shall notify the Commission of the applicability of such subclause to the school. Such notice shall certify that the school in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the school is applying for funds under this subsection.

(F) Noncompliance

(i) Failure to submit certification

Any school that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

(ii) Failure to comply with certification

Any school that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse any funds and discounts received under this subsection for the period covered by such certification.

(iii) Remedy of noncompliance

(I) Failure to submit

A school that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the school shall be eligible for services at discount rates under this subsection.

(II) Failure to comply

A school that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the school shall be eligible for services at discount rates under this subsection.

(6) Requirements for certain libraries with computers having internet access

(A) Internet safety

(i) In general

Except as provided in clause (ii), a library having one or more computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the library--

41

(I) submits to the Commission the certifications described in subparagraphs (B) and (C); and

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the library under subsection (l) of this section; and

(III) ensures the use of such computers in accordance with the certifications.

(ii) Applicability

The prohibition in clause (i) shall not apply with respect to a library that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

(iii) Public notice; hearing

A library described in clause (i) shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

(B) Certification with respect to minors

A certification under this subparagraph is a certification that the library--

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

(I) obscene;

(II) child pornography; or

(III) harmful to minors; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors.

42

(C) Certification with respect to adults

A certification under this paragraph is a certification that the library--

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are--

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

(D) Disabling during adult use

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

(E) Timing of implementation

(i) In general

Subject to clause (ii) in the case of any library covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made--

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

(ii) Process

(I) Libraries with Internet safety policy and technology protection measures in place

A library covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

(II) Libraries without internet safety policy and technology protection measures in place

A library covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)--

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any library that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such library comes into compliance with this paragraph.

(III) Waivers

Any library subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A library, library board, or other authority with responsibility for administration of the library shall notify the Commission of the applicability of such subclause to the library. Such notice shall certify that the library in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the library is applying for funds under this subsection.

(F) Noncompliance

(i) Failure to submit certification

Any library that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

(ii) Failure to comply with certification

Any library that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse all funds and discounts received under this subsection for the period covered by such certification.

(iii) Remedy of noncompliance

(I) Failure to submit

A library that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the library shall be eligible for services at discount rates under this subsection.

(II) Failure to comply

A library that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the library shall be eligible for services at discount rates under this subsection.

(7) Definitions

For purposes of this subsection:

(A) Elementary and secondary schools

The term "elementary and secondary schools" means elementary schools and secondary schools, as defined in section 7801 of Title 20.

(B) Health care provider

The term "health care provider" means--

(i) post-secondary educational institutions offering health care instruction, teaching hospitals, and medical schools;

(ii) community health centers or health centers providing health care to migrants;

(iii) local health departments or agencies;

(iv) community mental health centers;

(v) not-for-profit hospitals;

(vi) rural health clinics; and

(vii) consortia of health care providers consisting of one or more entities described in clauses (i) through (vi).

46

(C) Public institutional telecommunications user

The term "public institutional telecommunications user" means an elementary or secondary school, a library, or a health care provider as those terms are defined in this paragraph.

(D) Minor

The term "minor" means any individual who has not attained the age of 17 years.

(E) Obscene

The term "obscene" has the meaning given such term in section 1460 of Title 18.

(F) Child pornography

The term "child pornography" has the meaning given such term in section 2256 of Title 18.

(G) Harmful to minors

The term "harmful to minors" means any picture, image, graphic image file, or other visual depiction that--

(i) taken as a whole and with respect to minors, appeals to a prurient interest in nudity, sex, or excretion;

(ii) depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals; and

(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value as to minors.

(H) Sexual act; sexual contact

The terms "sexual act" and "sexual contact" have the meanings given such terms in section 2246 of Title 18.

(I) Technology protection measure

The term "technology protection measure" means a specific technology that blocks or filters Internet access to the material covered by a certification under paragraph (5) or (6) to which such certification relates.

(i) Consumer protection

The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

(j) Lifeline assistance

Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

(k) Subsidy of competitive services prohibited

A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

(l) Internet safety policy requirement for schools and libraries

(1) In general

In carrying out its responsibilities under subsection (h) of this section, each school or library to which subsection (h) of this section applies shall--

(A) adopt and implement an Internet safety policy that addresses--

(i) access by minors to inappropriate matter on the Internet and World Wide Web;

(ii) the safety and security of minors when using electronic mail, chat rooms, and other forms of direct electronic communications;

(iii) unauthorized access, including so-called "hacking", and other unlawful activities by minors online;

(iv) unauthorized disclosure, use, and dissemination of personal identification information regarding minors; and

(v) measures designed to restrict minors' access to materials harmful to minors; and

(B) provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

(2) Local determination of content

A determination regarding what matter is inappropriate for minors shall be made by the school board, local educational agency, library, or other authority responsible for making the determination. No agency or instrumentality of the United States Government may--

(A) establish criteria for making such determination;

(B) review the determination made by the certifying school, school board, local educational agency, library, or other authority; or

(C) consider the criteria employed by the certifying school, school board, local educational agency, library, or other authority in the administration of subsection (h)(1)(B) of this section.

(3) Availability for review

Each Internet safety policy adopted under this subsection shall be made available to the Commission, upon request of the Commission, by the

49

school, school board, local educational agency, library, or other authority responsible for adopting such Internet safety policy for purposes of the review of such Internet safety policy by the Commission.

(4) Effective date

This subsection shall apply with respect to schools and libraries on or after the date that is 120 days after December 21, 2000.

**47 U.S.C. § 402**

(a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

(b) Right to appeal

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

(2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

(3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

(4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

(5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

(8) By any radio operator whose license has been suspended by the Commission.

(9) By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

(10) By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

(c) Filing notice of appeal; contents; jurisdiction; temporary orders

Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of. Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission. Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper. Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

(d) Notice to interested parties; filing of record

Upon the filing of any such notice of appeal the appellant shall, not later than five days after the filing of such notice, notify each person shown by the records of the Commission to be interested in said appeal of the filing and pendency of the same. The Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28.

(e) Intervention

Within thirty days after the filing of any such appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission. Any person who would be aggrieved or whose interest would be adversely affected by a reversal or modification of the order of the Commission complained of shall be considered an interested party.

(f) Records and briefs

The record and briefs upon which any such appeal shall be heard and determined by the court shall contain such information and material, and shall be prepared within such time and in such manner as the court may by rule prescribe.

(g) Time of hearing; procedure

The court shall hear and determine the appeal upon the record before it in the manner prescribed by section 706 of Title 5.

(h) Remand

In the event that the court shall render a decision and enter an order reversing the order of the Commission, it shall remand the case to the Commission to carry out the judgment of the court and it shall be the duty of the Commission, in the absence of the proceedings to review such judgment, to forthwith give effect thereto, and unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record upon which said appeal was heard and determined.

(i) Judgment for costs

The court may, in its discretion, enter judgment for costs in favor of or against an appellant, or other interested parties intervening in said appeal, but not against the Commission, depending upon the nature of the issues involved upon said appeal and the outcome thereof.

(j) Finality of decision; review by Supreme Court

The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 1254 of Title 28, by the appellant, by the Commission, or by any interested party intervening in the appeal, or by certification by the court pursuant to the provisions of that section.

**47 C.F.R. § 1.3**

The provisions of this chapter may be suspended, revoked, amended, or waived for good cause shown, in whole or in part, at any time by the Commission, subject to the provisions of the Administrative Procedure Act and the provisions of this chapter. Any provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown.

**47 C.F.R § 54.706**

(a) Entities that provide interstate telecommunications to the public, or to such classes of users as to be effectively available to the public, for a fee will be considered telecommunications carriers providing interstate telecommunications services and must contribute to the universal service support mechanisms. Certain other providers of interstate telecommunications, such as payphone providers that are aggregators, providers of interstate telecommunications for a fee on a non-common carrier basis, and interconnected VoIP providers, also must contribute to the universal service support mechanisms. Interstate telecommunications include, but are not limited to:

(1) Cellular telephone and paging services;

(2) Mobile radio services;

(3) Operator services;

(4) Personal communications services (PCS);

(5) Access to interexchange service;

(6) Special access service;

(7) WATS;

(8) Toll-free service;

(9) 900 service;

(10) Message telephone service (MTS);

(11) Private line service;

(12) Telex;

(13) Telegraph;

(14) Video services;

(15) Satellite service;

(16) Resale of interstate services;

(17) Payphone services; and

(18) Interconnected VoIP services.

(19) Prepaid calling card providers.

(b) Except as provided in paragraph (c) of this section, every entity required to contribute to the federal universal service support mechanisms under paragraph (a) of this section shall contribute on the basis of its projected collected interstate and international end-user telecommunications revenues, net of projected contributions.

(c) Any entity required to contribute to the federal universal service support mechanisms whose projected collected interstate end-user telecommunications revenues comprise less than 12 percent of its combined projected collected interstate and international end-user telecommunications revenues shall contribute based only on such entity's projected collected interstate end-user telecommunications revenues, net of projected contributions. For purposes of this paragraph, an "entity" shall refer to the entity that is subject to the universal service reporting requirements in § 54.711 and shall include all of that entity's affiliated providers of interstate and international telecommunications and telecommunications services.

(d) Entities providing open video systems (OVS), cable leased access, or direct broadcast satellite (DBS) services are not required to contribute on the basis of revenues derived from those services. The following entities will not be required to contribute to universal service: non-profit health care providers; broadcasters; systems integrators that derive less than five percent of their systems integration revenues from the resale of telecommunications. Prepaid calling card providers are not required to contribute on the basis of revenues derived from prepaid calling cards sold by, to, or pursuant to contract with the Department of Defense (DoD) or a DoD entity.

(e) Any entity required to contribute to the federal universal service support mechanisms shall retain, for at least five years from the date of the

contribution, all records that may be required to demonstrate to auditors that the contributions made were in compliance with the Commission's universal service rules. These records shall include without limitation the following: Financial statements and supporting documentation; accounting records; historical customer records; general ledgers; and any other relevant documentation. This document retention requirement also applies to any contractor or consultant working on behalf of the contributor.

**47 C.F.R. § 54.709**

(a) Prior to April 1, 2003, contributions to the universal service support mechanisms shall be based on contributors' end-user telecommunications revenues and on a contribution factor determined quarterly by the Commission. Contributions to the mechanisms beginning April 1, 2003 shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission.

(1) For funding the federal universal service support mechanisms prior to April 1, 2003, the subject revenues will be contributors' interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of prior period actual contributions. Beginning April 1, 2003, the subject revenues will be contributors' projected collected interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of projected contributions.

(2) Prior to April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues, net of prior period actual contributions. Beginning April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions. The Commission shall approve the Administrator's quarterly projected costs of the universal service support mechanisms, taking into account demand for support and administrative expenses. The total subject revenues shall be compiled by the Administrator based on information contained in the Telecommunications Reporting Worksheets described in § 54.711(a).

(3) Total projected expenses for the federal universal service support mechanisms for each quarter must be approved by the Commission before they are used to calculate the quarterly contribution factor and individual contributions. For each quarter, the Administrator must submit its projections of demand for the federal universal service support mechanisms

for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. For each quarter, the Administrator must submit its projections of administrative expenses for the high-cost mechanism, the low-income mechanism, the schools and libraries mechanism and the rural health care mechanism and the basis for those projections to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. Based on data submitted to the Administrator on the Telecommunications Reporting Worksheets, the Administrator must submit the total contribution base to the Office of the Managing Director at least thirty (30) days before the start of each quarter. The projections of demand and administrative expenses and the contribution factor shall be announced by the Commission in a public notice and shall be made available on the Commission's website. The Commission reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest at any time within the fourteen-day period following release of the Commission's public notice. If the Commission take no action within fourteen (14) days of the date of release of the public notice announcing the projections of demand and administrative expenses, the projections of demand and administrative expenses, and the contribution factor shall be deemed approved by the Commission. Except as provided in § 54.706(c), the Administrator shall apply the quarterly contribution factor, once approved by the Commission, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions.

(b) If the contributions received by the Administrator in a quarter exceed the amount of universal service support program contributions and administrative costs for that quarter, the excess payments will be carried forward to the following quarter. The contribution factors for the following quarter will take into consideration the projected costs of the support mechanisms for that quarter and the excess contributions carried over from the previous quarter.

(c) If the contributions received by the Administrator in a quarter are inadequate to meet the amount of universal service support program payments and administrative costs for that quarter, the Administrator shall request authority from the Commission to borrow funds commercially, with

such debt secured by future contributions. Subsequent contribution factors will take into consideration the projected costs of the support mechanisms and the additional costs associated with borrowing funds.

(d) If a contributor fails to file a Telecommunications Reporting Worksheet by the date on which it is due, the Administrator shall bill that contributor based on whatever relevant data the Administrator has available, including, but not limited to, the number of lines presubscribed to the contributor and data from previous years, taking into consideration any estimated changes in such data.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**Rural Cellular Association, et al., Petitioners**

**v.**

**Federal Communications Commission and United States of America, Respondents.**

## <u>CERTIFICATE OF SERVICE</u>

I, Maureen K. Flood, hereby certify that on August 11, 2011, I electronically filed the foregoing Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Some of the participants in the case, denoted with asterisks below, are not CM/ECF users. I certify further that I have directed that copies of the foregoing document be mailed by First-Class Mail to those persons, unless another attorney at the same mailing address is receiving electronic service.

Matthew A. Brill
Latham & Watkins LLP
555 11th Street, N.W.
Suite 1000
Washington, D.C. 20004
*Counsel for: Rural Cellular Association*

Todd D. Daubert
Jennifer A. Morrissey
Joseph I. Himowitz
SNR Denton US LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20005
*Counsel for: USA Coalition*

*Michael E. Glover
Edward Shakin
Christopher M. Miller
1320 North Courthouse Road
Ninth Floor
Arlington, VA 22201
*Counsel for: Verizon*

*John T. Scott, III
1300 I Street, N.W.
Suite 400 West
Washington, D.C. 20005
*Counsel for: Verizon Wireless*

Robert B. Nicholson
Kristen C. Limarzi
U.S. Department of Justice
Antitrust Division
Appellate Section
950 Pennsylvania Avenue, N.W.
Room 3224
Washington, D.C. 20530
*Counsel for:  USA*

*Joel H. Cheskis
Assistant Consumer Advocate
Pennsylvania Office of Consumer
Advocate
555 Walnut Street, 5th Floor
Forum Place
Harrisburg, PA  17101-1923
*Counsel for: National Association of
State Utility Consumer Advocates*

Helgi C. Walker
Brett A. Shumate
Wiley Rein LLP
1776 K Street, N.W.
Washington, D.C.  20006-2359
*Counsel for:  Verizon*

/s/ Maureen K. Flood