**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 15, 2011**

**Case No. 11-1094**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**RURAL CELLULAR ASSOCIATION and
UNIVERSAL SERVICE FOR AMERICA COALITION
Petitioners,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION,**

**Respondent.**

_____

**ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION**

_____

**REPLY BRIEF FOR PETITIONERS
RURAL CELLULAR ASSOCIATION and
UNIVERSAL SERVICE FOR AMERICA COALITION**

_____

**Todd D. Daubert**              **Richard P. Bress**
**Jennifer A. Morrissey**        **Matthew A. Brill**
**J. Isaac Himowitz**            **Katherine I. Twomey**
**SNR Denton US LLP**            **Latham & Watkins LLP**
**1301 K Street, NW**            **555 11th Street, NW**
**Suite 600, East Tower**        **Suite 1000**
**Washington, DC 20005**         **Washington, DC 20004**

*Attorneys for the USA Coalition*    *Attorneys for the Rural Cellular
                                     Association*

**September 9, 2011**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..................................................................i

TABLE OF AUTHORITIES ......................................................... ii

GLOSSARY .............................................................................vi

SUMMARY OF ARGUMENT........................................................1

ARGUMENT ............................................................................4

I.    PETITIONERS' ARGUMENTS ARE PROPERLY BEFORE THIS
      COURT.............................................................................4

II.   THE FCC LACKS AUTHORITY TO DIVERT USF
      CONTRIBUTIONS INTO THE DISCRETIONARY POOL...................7

      A.    The FCC's Interpretation of Section 254 Cannot Be
            Reconciled with the Statutory Text and Structure. .........................8

      B.    The FCC's Interpretation Runs Afoul of the Origination and
            Taxing Clauses. ...............................................................13

      C.    The *Order* Does Not Limit the Potential Uses of the Diverted
            Funds to the Four Existing Universal Service Programs..............17

III.  THE FCC VIOLATED, OR UNLAWFULLY AMENDED *SUB
      SILENTIO*, SECTION 54.709(a) OF ITS RULES.................................22

IV.   THE FCC FAILED TO JUSTIFY THE ORDER'S REDUCED
      LEVEL OF SUPPORT............................................................25

      A.    The FCC's Explanation for Freezing Support Under the
            *Interim Cap Order* Cannot Justify the Reductions in Support
            at Issue Here. ................................................................25

      B.    The Facts Underlying the *Interim Cap Order* Have Changed.......29

CONCLUSION..........................................................................31

CERTIFICATE OF COMPLIANCE.................................................32

CERTIFICATE OF SERVICE ........................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967) ............................................................................12

*Alenco Commc'ns, Inc. v. FCC*,
   201 F.3d 608 (5th Cir. 2000) ............................................................ 9, 28

*Comcast v. FCC*,
   600 F.3d 642 (D.C. Cir. 2010) ...........................................................20

*\*Fed. Power Comm'n v. Texaco Inc.*,
   417 U.S. 380 (1974) ........................................................................ 18, 23

*\*Nat'l Cable Television Ass'n, Inc. v. United States*,
   415 U.S. 336 (1974) ...........................................................................17

*\*Nat'l Mining Ass'n v. Kempthorne*,
   512 F.3d 702 (D.C. Cir. 2008) ...................................................... 13-14

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) ............................................. 26, 27, 28

*\*Skinner v. Mid-Am. Pipeline Co.*,
   490 U.S. 212 (1989) ...........................................................................17

*\*Solid Waste Agency of N. Cook County v. United States Army Corps of
   Engineers*,
   531 U.S. 159 (2001) ...........................................................................14

*State of Wisconsin v. FERC*,
   104 F.3d 462 (D.C. Cir. 1997) ...........................................................30

*\*Sudbrink Broad, Inc. of Fla. v. FCC*,
   509 F.2d 418 (D.C. Cir. 1974) ..................................................... 22, 23

**\* Authorities upon which we chiefly rely are marked with an
   asterisk.**

*Talk Am. Inc. v. Michigan Bell Tel. Co.*,
   131 S. Ct. 2254 (2011) ............................................................ 24, 25

*\*Texas Office of Pub. Util. Counsel v. FCC*,
   183 F.3d 393 (5th Cir. 1999)...................................................... 15, 16

*\*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) .......................................................................9

*\*United States v. Munoz-Flores*,
   495 U.S. 385 (1990) ...................................................................14

## CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS

47 C.F.R. § 54.709(a) .....................................................................3

*47 C.F.R. § 54.709(a)(3)........................................................ 22, 23, 24

*47 C.F.R. § 54.709(b)……………………………….. …………… ..4, 5, 6, 23

47 U.S.C. § 153(20) .................................................................. 14, 15

47 U.S.C. § 153(46) ....................................................................15

47 U.S.C. § 214(e)(2)..................................................................28

47 U.S.C. § 214(e)(6)..................................................................28

47 U.S.C. § 254(a)(1)..................................................................11

47 U.S.C. § 254(a)(2)..................................................................11

47 U.S.C. § 254(b)......................................................................11

47 U.S.C. § 254(c)(1).............................................................. 10, 11, 20

47 U.S.C. § 254(c)(2).............................................................. 10, 11

*47 U.S.C. § 254(d) ....................................... 1, 8, 9, 10, 11, 17

62 Fed. Reg. 41,294 ................................................................ 12, 13

*Communications Act of 1934, Pub. L. No. 73-416,
    48 Stat. 1064 ............................................................ 1, 2, 4, 7, 8, 13, 14

*U.S. Const. art. I, § 7, cl. 1 ................................................ 7, 13, 14

*U.S. Const. art. I, § 8, cl. 1 ...................................................... 7, 13

## ADMINISTRATIVE DECISIONS

*Connect America Fund*, Notice of Inquiry and Notice of Proposed
    Rulemaking, 25 FCC Rcd 6657 (2010)............................................16

*Connect America Fund*, Notice of Proposed Rulemaking and Further
    Notice of Proposed Rulemaking, 26 FCC Rcd 4554 (2011) .................. 16, 19

*Federal-State Joint Board on Universal Service*, Recommended
    Decision, 17 FCC Rcd 14095 (2002) ............................................20

*Federal-State Joint Board on Universal Service*, Order, 19 FCC Rcd
    1563 (2004) ........................................................................28

*High-Cost Universal Service Support*, Order, 23 FCC Rcd 8834
    (2008) ..................................................................... 26, 27, 29

*High-Cost Universal Service Support; Federal-State Joint Board on
    Universal Service*, Order, 25 FCC Rcd 18146
    (2010) ............................................... 2, 5, 6, 14, 18, 22, 23, 26, 30

*High-Cost Universal Service Support; Federal-State Joint Board on
    Universal Service, Request for Review of Decision of Universal Service
    Administrator by Corr Wireless Communications, LLC*, 25 FCC Rcd
    12854 (2010) ................................................ 4, 6, 13, 20, 21, 22, 23

*Schools and Libraries Universal Service Support Mechanism*, Order, 25
    FCC Rcd 18762 (2010) .............................................................19

# OTHER AUTHORITIES

*Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Fourteenth Report, FCC 10-81 (2010) ...................................................... 29, 30

*Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services,* Fifteenth Report, FCC 11-103A (2011)..................................... 29, 30

*Connecting America: The National Broadband Plan* (2010), *available at* http://download.broadband.gov/plan/national-broadband-plan.pdf......... 18, 19

# GLOSSARY

| Abbreviation | Definition |
|---|---|
| "1996 Act" | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| "Act" | Communications Act of 1934, as amended |
| "APA" | Administrative Procedure Act |
| "CETC" | competitive eligible telecommunications carrier |
| "*Corr Order*" | *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service, Request for Review of Decision of Universal Service Administrator by Corr Wireless Communications, LLC*, Order and Notice of Proposed Rulemaking, 25 FCC Rcd 12854 (2010) |
| "ETC" | eligible telecommunications carrier |
| "FCC" | Federal Communications Commission |
| "*Interim Cap Order*" | *High-Cost Universal Service Support*, Order, 23 FCC Rcd 8834 (2008) |
| "LEC" | local exchange carrier |
| "NBP" | National Broadband Plan, *Connect America: The National Broadband Plan (2101), available at http://download.broadband.gov/ plan/national-broadband-plan.pdf.* |
| "NPRM" | *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service, Request for Review of Decision of Universal Service Administrator by Corr Wireless Communications, LLC,* Order and Notice of Proposed Rulemaking, 25 FCC Rcd 12854 (2010) |

| Abbreviation | Definition |
|---|---|
| "*Order*" | *High-Cost Universal Service Support; Federal-State Joint Board on Universal Service*, Order, 25 FCC Rcd 18146 (2010) |
| "Origination Clause" | U.S. Const. art. I, § 7, cl. 1 |
| "RCA" | Rural Cellular Association |
| "Recovery Act" | American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 |
| "Taxing Clause" | U.S. Const. art. I, § 8, cl. 1 |
| "*TOPUC*" | *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) |
| "USA Coalition" | Universal Service for America Coalition |
| "USAC" | Universal Service Administrative Company |
| "USF" | universal service fund |

## SUMMARY OF ARGUMENT

The *Order* on review should be vacated because neither the Act nor the agency's own rules authorize the FCC to divert and hold mandatory universal service contributions for future use at an unspecified time for unspecified purposes. The FCC's attempts to avoid review of the *Order* by this Court and to provide *post hoc* explanations cannot save the *ultra vires Order*.

The FCC first tries to avoid the problem altogether by claiming that it did nothing new in the *Order* on review, and thus Petitioners instead should have challenged the *Corr Order*. Both the *Order* and the underlying notice of proposed rulemaking make clear, however, that the *Order* diverts and holds an entirely different set of funds than the *Corr Order* addressed. Prior to the *Order*, the FCC had never addressed funds "surrendered" by the relinquishment of ETC designations. Petitioners thus could not have challenged that action earlier.

Turning to the merits, the FCC protests that Section 254(d)'s textual limit that providers of telecommunications services contribute "to the specific, predictable, and sufficient mechanisms established by the Commission," 47 U.S.C. § 254(d), applies only to the distribution of funds, not their collection. The FCC thus broadly asserts authority under the Act to mandate contributions in any amount and hold the collected funds for as long as it wants, so long as it *eventually* spends them in furtherance of the statutory goals. The

1

agency's interpretation contradicts the plain text and structure of the Act. Importantly, Congress could not have authorized the FCC in the Act to collect or hold mandatory contributions before the agency has identified the specific distribution program for which they will be used without violating the Origination Clause and Taxing Clause of the Constitution. Congress therefore could not have authorized the *Order* because it merely identifies possible general purposes for which the funds potentially could be used without establishing any connection between the payors and the beneficiaries of the funds.

In an attempt to make the *Order's* fatal flaws less apparent, the FCC now tries to characterize the potential uses of the funds as fitting "squarely" within the existing four universal service programs. The *Order* itself, however, establishes no limit on the potential uses of the diverted funds, referring instead only to possibility that they "could" be used for "universal service broadband initiatives, as recommended by the National Broadband Plan." *Order* ¶ 5 (JA__) The *Order* makes clear that the point of diverting the funds is so that they will not be used for the existing "legacy high-cost program." *Id.* (JA__). Indeed, the NBP itself recommends *replacing* the existing high-cost program with entirely new mechanisms to support broadband Internet access services, which cannot reasonably be characterized as fitting within the existing USF programs.

2

The *Order* also violates, or amends *sub silentio*, Section 54.709(a) of the agency's own rules by directing USAC to determine contributions based on the Interim Cap before the relinquishment of ETC designations rather than based on quarterly projections of the expenses actually generated by the existing four USF programs. The FCC's *post hoc* reliance on the exception in Section 54.709(a)(3) fails because that provision only authorizes the FCC to adjust "projections of demand" for the four USF programs for the next quarter (not for unadopted programs for the indefinite future) and only within 14 days of the publication of USAC's projections.

Finally, the FCC cannot sustain the *Order's* unjustified reduction in the level of high-cost support. The FCC points to the *Interim Cap Order* in a *post hoc* attempt to supply explanations and justifications missing from the seven-paragraph *Order*, but the agency's explanation for freezing support under the *Interim Cap Order* cannot justify the reductions in support at issue here, particularly since the facts underlying the *Interim Cap Order* have changed.

## ARGUMENT

## I. PETITIONERS' ARGUMENTS ARE PROPERLY BEFORE THIS COURT

The FCC contends that Petitioners have "challenged the wrong order" because the FCC first reserved funds for future use in the *Corr Order* when it

3

temporarily waived Section 54.709(b).[1] FCC Br. 44-45. This procedural objection is meritless.

The *Corr Order* applies only to funds voluntarily surrendered by two specific CETCs — Verizon Wireless and Sprint Nextel — *without* relinquishing their ETC status. *See Corr Order* ¶ 11 (JA__). The *Corr Order* explained that, although Section 54.709(b) "require[s] that USAC carry forward any 'excess payments' from contributors to the next quarter," the FCC believed a different approach was warranted where "the excess payments would be due to the reduction in disbursements to **Sprint Nextel** and **Verizon Wireless**."[2] *Id.* ¶ 22 n.45 (JA__).

Petitioners do not challenge here the FCC's decision in the *Corr Order* to divert and hold funds surrendered by Verizon and Sprint without relinquishing their ETC status. Petitioners instead challenge the FCC's independent decision in the *Order* to divert and hold *different* funds — specifically, to reduce the Interim Cap when **any carrier relinquishes** its ETC designation for any reason, but to continue calculating the contribution factor as if the carrier had not relinquished its ETC designation, diverting the excess contributions into a

---

[1]     The FCC's procedural objection is only to "Petitioners' challenge to the Temporary Reserve." FCC Br. 44. The FCC does not contest Petitioners' entitlement to argue that the *Order* violates the APA by failing to explain how its reduction in support will be "sufficient" under the Act. *See supra* Section IV.

[2]     All emphases in citations added unless otherwise noted.

Discretionary Pool that the FCC may use to fund initiatives of its choosing at some unspecified point in the future. *See, e.g.*, *Order* ¶ 1 (JA__). The effect of the *Order* is fundamentally different from that of the *Corr Order* because it applies to all CETCs (not just Verizon and Sprint) and to the withheld disbursements that arise from a CETC's relinquishment of its ETC status (as opposed to Verizon's and Sprint's voluntary reduction in support notwithstanding their retention of ETC status). *See Order* ¶ 6 (JA__).

Contrary to the FCC's argument that the *Order* "took no further action," FCC Br. 45, the *Order* both amended *sub silentio*, or violated, Section 54.709(a) and significantly expanded the earlier waiver of Section 54.709(b) in the *Corr Order* in order to divert and hold contributions made available when a CETC relinquishes its ETC status. The *Order* directs that "until the expiration of the waiver of Section 54.709(b) or otherwise directed by the Commission, USAC shall continue to project competitive ETC demand at the full amount of the cap as established by the *Interim Cap Order*, without reflecting any adjustments to the cap due to *relinquishment or revocation of ETC status* by a competitive ETC." Order ¶ 6 n.15 (JA__). The *Order* notes that this approach is "[c]onsistent" with the *Corr Order*, *id.*, but it also goes well beyond the *Corr Order*, which waived Section 54.709(b) only with respect to "these funds" —

5

those surrendered by Verizon and Sprint while they remained CETCs. *Corr Order* ¶ 22.

Indeed, the FCC proposed this significant expansion of the *Corr Order* through an accompanying NPRM precisely because notice and comment were required to effect such an expansion. *Id.* ¶¶ 23-24 (JA__). The FCC conceded that the *Corr Order* could apply only where Verizon and Sprint "continue to be competitive ETCs in a particular state" and thus "remain eligible for high-cost support," *id.* ¶ 10 (JA__), because "removing from the interim cap amount the support formerly associated with a carrier that has relinquished its ETC status would effectively change the interim cap amount." *Id.* ¶ 12 (JA__). The *Corr Order* further acknowledged that the interim cap amount could not "be changed except through further notice-and-comment rulemaking." *Id.* It is the broad result of that notice-and-comment rulemaking, not the earlier reserving of funds surrendered by Verizon and Sprint, that Petitioners challenge here.

Because the *Order* authorized the reserving of funds well beyond what the FCC directed in the *Corr Order*, it is independently subject to challenge. Indeed, the FCC's express concession that the *Corr Order* did not (and could not) reserve additional funds surrendered as a result of a carrier's relinquishment of its CETC designation forecloses its argument that Petitioners

should have brought their challenge to such conduct in response to the *Corr Order*.

## II.    THE FCC LACKS AUTHORITY TO DIVERT USF CONTRIBUTIONS INTO THE DISCRETIONARY POOL

The *Order* should be vacated because the plain language of the Act does not (and could not, consistent with the Origination and Taxing Clauses) authorize the FCC to divert and hold mandatory contributions to be used by the agency for unspecified purposes at an indeterminate future time. Contrary to the FCC's argument that the Act limits only the distribution of funds, the relevant provisions of the Act clearly constrain the purposes for which the FCC may collect contributions. And the FCC's vague proposals for potential future uses of the diverted mandatory contributions plainly do not satisfy those constraints. The *Order* does not limit the use of the diverted mandatory contributions to the four established USF programs; to the contrary, it expressly contemplates escrowing funds for an entirely new broadband support program, and thereby violates the Act.

### A.    The FCC's Interpretation of Section 254 Cannot Be Reconciled with the Statutory Text and Structure.

The FCC insists that the statutory provisions on which Petitioners rely constrain only the distribution of funds, not their collection. *See* FCC Br. 51-58. Although Section 254(d) requires telecommunications carriers to contribute "to

the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service," the FCC claims authority to assess contributions for vaguely described potential programs that have *not* been "established" and may never be. Indeed, the agency asserts that it may assess contributions in *any* amount, so long as it *eventually* — perhaps 10, 20, or 50 years later — distributes the money pursuant to a support mechanism that preserves and advances universal service. That position is untenable.

*First*, the FCC's novel theory is inconsistent with the plain language of the Act. The FCC claims that the statutory references to "specific" and "predictable" support mechanisms "only apply to the Section 254(b)(5) mechanisms for *distributing* universal service support — not Section 254(d) mechanisms for collecting *contributions* to the universal service fund, which only need be 'equitable and nondiscriminatory.'" FCC Br. 53. That is incorrect. The terms "specific" and "predictable" are an essential component of Section 254(d): they define *to what* the providers must contribute. Section 254(d) states that certain providers of interstate telecommunications services "shall contribute, on an equitable and nondiscriminatory basis, *to* the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). The phrase "equitable and nondiscriminatory basis," by contrast, describes *how* those

8

contributions must be apportioned. The FCC's interpretation that contributions "only need be 'equitable and nondiscriminatory,'" FCC Br. 53, improperly reads the phrase "to the specific, predictable, and sufficient mechanisms established by the Commission" completely out of the statute. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).[3] The FCC likewise reads that phrase out of the statute when it repeatedly suggests that reserving funds is permissible because those funds allegedly are "dedicated to ... preserving and advancing universal service." FCC Br. 59. The use of both phrases by Congress in Section 254(d) itself provides further confirmation that they are not synonymous. It is not enough for the FCC to seek to "preserve and advance" universal service; the statute requires that contributions be assessed only for specific, established mechanisms.

The FCC's interpretation also ignores the words "the" and "established" in the same provision. Section 254(d) states that providers "shall contribute, on an equitable and nondiscriminatory basis, to *the* specific, predictable, and sufficient mechanisms *established* by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). The word "the" unmistakably refers to existing support mechanisms, and the past tense use of "established" confirms

---

[3]     The FCC's reliance (at 54) on *Alenco Commc'ns Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000), for the proposition that the word "predictable" governs only distribution is unavailing because that case did not address a predictability challenge to the FCC's method of collecting contributions.

that the reference is to support mechanisms that the agency has adopted, not programs that are merely contemplated. Section 254(d) thus clearly *does* impose a temporal limitation: the FCC must establish programs before it requires contributions for them.

The FCC's contrary position also conflicts with Section 254(d)'s textual requirement that the support mechanisms to which providers contribute must "preserve and advance universal service" as it is currently defined under Section 254(c)(1). *See* 47 U.S.C. § 254(d). Section 254(c)(1) defines "universal service" as "an evolving level of telecommunications services that the Commission shall establish periodically." 47 U.S.C. § 254(c)(1). This definition undeniably contemplates that "universal service" will include different services at different times. *See also id*. § 254(c)(2) ("[t]he Joint Board may, *from time to time*, recommend to the Commission modifications in the definition of the services that are supported by Federal universal services support mechanisms."). Accordingly, the phrase "preserve and advance universal service" necessarily refers to the definition of "universal service" in existence when the contributions are assessed, not at some future unspecified point.

*Second*, the FCC's position is inconsistent with the structure of the statute. Under the statutory framework, the FCC must:

1.  institute a Federal-State Joint Board (47 U.S.C. § 254(a)(1));

10

2. work with the Joint Board to adopt, no later than May 8, 1997,

    a. a definition of services that are supported by Federal universal service support mechanisms,

    b. specific, predictable, and sufficient support mechanisms to preserve and advance universal service consistent with the principles set forth in Section 254(b), and

    c. a specific timetable for implementation of such mechanisms (47 U.S.C. § 254(a)(2)); and

3. require "[e]very telecommunications carrier that provides interstate telecommunications services to contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." (47 U.S.C. § 254(d));

    and, thereafter,

4. "complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations" (47 U.S.C. § 254(a)(2)), which the Joint Board may make "from time to time" on the issue of "modifications in the definition of the services that are supported" (47 U.S.C. § 254(c)(2)).

The FCC's claim that it can collect and hold mandatory contributions before it has established the specific, predictable and sufficient mechanisms for which the contributions will be used turns this statutory framework on its head. The agency would have no basis for determining the amount of contributions to mandate until *after* it has established the specific distribution mechanisms for which the contributions will be used. And without knowing the scope and authorized uses of funds that will be made available by a particular support

program — such as the "Connect America Fund" on which the FCC has sought comment but has not yet "established" — it is impossible to determine how much funding would be "sufficient" or whether the mechanism will be "specific" and "predictable." Congress did not give the agency carte blanche to maintain contributions without accountability, refusing indefinitely to specify how those contributions will be used. Congress would have spoken far more clearly had it intended to insulate the FCC's actions from meaningful judicial review. *Cf. Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (requiring "'clear and convincing evidence of a legislative intention' to bar [judicial] review").

Contrary to the FCC's position, the regulations governing the calculation of the contribution factor — beginning with the original version adopted in 1997 — confirm Petitioners' reading of the statute. Those rules have always based total contributions on USAC's quarterly "projections of demand" for the four established USF programs. *See Changes to the Board of Directors of the National Exchange Carrier Association, Inc. and Federal-State Board on Universal Service,* 62 Fed. Reg. 41,294, 41,305 (Aug. 1, 1997). The concept of a projection of *demand* makes sense only in connection with an existing program; there is no rational way to determine "demand" for a potential future program with undefined parameters.

12

As the FCC contemplates overhauling the universal service program, it no doubt would prefer to have "'the funds on hand to rapidly implement'" new broadband support mechanisms. FCC Br. 55 (quoting *Corr Order* ¶ 20 (JA__)). But that desire cannot excuse the agency's departure from the clear terms of the Act.[4]

### B. The FCC's Interpretation Runs Afoul of the Origination and Taxing Clauses.

The FCC's interpretation of the Act would permit the agency to raise any amount of money and hold it indefinitely while determining how to spend it. That interpretation, at a minimum, raises serious constitutional doubts under the Origination Clause (U.S. Const. art. I, § 7, cl. 1) and the Taxing Clause (U.S. Const. art. I, § 8, cl. 1). Accordingly, even if the agency's interpretation were permissible under the statute (and it is not), the Court could not accord it deference. *See Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) (The "canon of constitutional avoidance trumps *Chevron* deference, and we will not submit to an agency's interpretation of a statute if it 'presents serious constitutional difficulties.'" (internal citations omitted)); *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173

---

[4]     Nor has the FCC refuted the argument that it violated the APA by failing to articulate the statutory basis for its actions in the *Order*. *See* Pet. Br. 24, 37-38, 49. The FCC's contention that it did not need to provide an explanation here because it "created the temporary reserve in the *Corr Wireless Order*," FCC Br. 51 n.13, is incorrect, as previously explained. *See supra* Section I.

(2001) (statute must be construed to avoid "'serious constitutional problems …

unless such construction is plainly contrary to the intent of Congress'" (internal

citations omitted)).

As Petitioners have explained, the FCC's interpretation of the Act

conflicts with the Origination Clause because it would make the Act a "Bil[l]

for raising Revenue" that did not "originate in the House of Representatives."

U.S. Const. art. I, § 7, cl. 1. *See* Pet. Br. 39-43. The FCC responds that the

*Order* does not render the Act a "Bil[l] for raising Revenue" because the funds

collected are "directed to a particular program." FCC Br. 59. But the FCC

concedes that it is diverting and holding the mandatory contributions at issue

here "in anticipation of *possible* universal service reforms." FCC Br. 59.

Undefined potential future reforms do not constitute an extant "particular

governmental program," *United States v. Munoz-Flores*, 495 U.S. 385, 398

(1990). Moreover, the *Order* does not even limit the use of the funds to those

potential reforms. Instead, it refers to things for which the funds "could" (rather

than "must") be used, *Order* ¶ 5 (JA__). *See* Pet. Br. 33-34. And the FCC

ignores that the proposed broadband reforms to which the *Order* vaguely refers

may be incompatible with the definition of universal service because they

would support "information services," rather than "telecommunications

services." 47 U.S.C. §§ 153(20) and (46) (2006). *See* Section II.C. *infra*.

The Act would be a revenue bill if it authorized the *Order* because the *Order* does not require a connection between the payors (providers of telecommunications services) and the future beneficiaries of the funds. The FCC asserts that there is a connection between wireless carriers and universal service because the wireless carriers that contribute to universal service are "'dependant on a widespread telecommunications network.'" FCC Br. 62 (quoting *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 428 (5th Cir. 1999)("*TOPUC*"). However, until the FCC has adopted a specific support program, it is impossible to know whether wireless carriers will benefit from the diverted contributions. For example, many wireless carriers are not dependant upon broadband services or networks, which are what the NBP recommends supporting instead of traditional telecommunications services. The FCC tries to mask this distinction by describing the transition from telecommunications services to information services as merely a "proposed chang[e] to the specific *mechanisms* that distribute universal service support." FCC Br. 62. But the agency cannot simply label anything "universal service," no matter how tenuous its connection to telecommunications services. Mere labeling cannot provide the relationship necessary to avoid constitutional issues.

The *Order* unlawfully eliminated the requisite relationship between contributions and distributions. The FCC does not, and cannot, deny that:

15

- Congress has not authorized the FCC to implement the NBP, and the NBP contains recommendations that the FCC likely cannot implement without further legislation;

- The *Order* does not identify any specific recommendations from the NBP that the diverted funding would eventually be used to support;

- The FCC had not, as of the date of the *Order*, formally proposed any of the broadband initiatives recommended in the NBP for which the diverted contributions potentially could be used;[5]

- The FCC does not know whether any of the broadband initiatives for which the diverted contributions could be used will eventually be adopted; and

- As of the *Order's* adoption date, both the potential beneficiaries of the diverted contributions and the specific programs for which the contributions would be used were unknowable.

Under these circumstances, the FCC's intentionally vague and uncertain future reforms cannot satisfy the requirement that there be "*some* relationship" between the specific programs and specific beneficiaries. *TOPUC*, 183 F.3d at 428 n.56.

The Taxing Clause also prohibits the FCC's interpretation. Under *National Cable Television Association v. United States*, 415 U.S. 336 (1974), Congress must "indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the

---

[5]     *See Connect America Fund*, Notice of Inquiry and Notice of Proposed Rulemaking, 25 FCC Rcd 6657 ¶¶ 49-62 (April 21, 2010) (seeking comment on proposals to eliminate or reduce existing universal service support, none of which would require more funding); *see also Connect America Fund*, Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 FCC Rcd 4554 (Feb. 8, 2011) ("*USF Transformation NPRM*").

benefit of regulated parties by imposing additional financial burdens … on those parties." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 223-24 (1989). The FCC argues that this clear statement rule is satisfied because "[t]he Act requires telecommunications carriers to contribute 'to … preserve and advance universal service." FCC Br. 64 (quoting 47 U.S.C. § 254(d)). The ellipsis conveniently covers up the phrase "the specific, predictable, and sufficient mechanisms established by the Commission." 47 U.S.C. § 254(d). Unlike those existing mechanisms, unspecified broadband reforms to provide expanded access to information services do not inure directly to the benefit of regulated parties. *See infra* Section II.C. The clear statement rule is not satisfied.

C.     **The *Order* Does Not Limit the Potential Uses of the Diverted Funds to the Four Existing Universal Service Programs.**

The FCC falls back on the argument that the potential uses of the Discretionary Pool are limited to the four existing universal service programs in an effort to undermine Petitioners' objections as a factual matter. *See, e.g.,* FCC Br. 49. But the language of the *Order* does not support that characterization, and the Court "cannot 'accept appellate counsel's post hoc rationalizations for agency action'; for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 397 (1974) (internal citation omitted).

The *Order* states only that "reducing the pool of support in a state *could* enable excess funds from the legacy high-cost program to be used more effectively *to advance universal service broadband initiatives, as recommended by the National Broadband Plan*." *Order* ¶ 5 (JA___). The *Order* does not limit the potential uses of the diverted funds solely to the NBP's specific recommendations for supporting broadband information services, but even if it had, many of the recommendations are not within the existing programs and indeed cannot be implemented absent further legislation, as the agency itself has recognized. *See, e.g.,* NBP at 337.

The FCC once again seeks to remedy the *Order's* insufficiencies by bootstrapping from the *Corr Order*. FCC Br. 49, 57-58, 60, 62, 64. Even if the *Corr Order* could somehow supply limits that the *Order* itself does not include, it merely confirms several of the *Order's* defects. The FCC concedes that only two of the "four *potential* uses" of the funds set forth in the *Corr Order* are for services currently designated under the USF programs. *See* FCC Br. 57 (indexing the E-rate funding cap to inflation relates to the schools and libraries program and improving utilization of the Rural Health Care program to advance telemedicine in rural areas relates to that program).[6] The other two — the

---

[6]     The FCC's use of a fraction of the funds diverted by the *Corr Order* months before the agency adopted the *Order* at issue here is not relevant or properly before this Court. FCC Br. 58. *See Schools and Libraries Universal*

Mobility Fund and direct broadband Internet service "for all Americans" — clearly do not relate to services designated under the four *established* USF programs. Elsewhere, the FCC contends that, if adopted, they would be "new funding mechanisms *within* the high-cost support program." FCC Br. 49. But if they were adopted, the new mechanisms aim to support *different* (and potentially unauthorized) services. Indeed, as explained in the NBP, these two programs would *replace* the existing high-cost support mechanism for *telecommunications services* with new support mechanisms for broadband Internet access services, which are *information services*. *See* NBP at 135. Merely labeling them part of the existing "high-cost support program" cannot make them so. *See USF Transformation NPRM* ¶ 18 (proposing to phase out all existing high-cost support following establishment of the new broadband-oriented programs); *id.* ¶¶ 318-19 (proposing to designate eligible broadband providers outside the existing framework governing the established high-cost support mechanism).

Critically, it is unclear how the FCC could, absent further legislation, eliminate support for telecommunications services so that all available funding would be dedicated to supporting information services. *See, e.g.*, 47 U.S.C. § 254(c)(1) ("Universal service is an evolving level of ***telecommunications***

*Service Support Mechanism*, Order, 25 FCC Rcd 18762, 18780-83 (¶¶ 34-40) (rel. Sept. 28, 2010).

*services* that the Commission shall establish periodically under this section …."); *Comcast v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) (discussing FCC's authority to regulate telecommunications services and information services); Pet. Br. at 13-14 (citing FCC orders classifying broadband Internet access services as "information services," regardless of platform); *Federal-State Joint Board on Universal Service*, Recommended Decision, 17 FCC Rcd 14095 ¶ 19 (2002) (stating that information-service classification precludes inclusion of broadband Internet access "within the definition of supported services, because Section 254(c) limits the definition of supported services to telecommunications services"); *id.* ¶ 39 (rejecting proposed support for voicemail because "voicemail services … are information services, not telecommunications services").

Moreover, the FCC refused to limit the potential uses of the funds "reserved" in the *Corr Order* to any specific distribution mechanisms. The *Corr Order* explicitly acknowledged that the FCC had not yet adopted the broadband-focused programs at issue: it reserved the funds so that it could "rapidly implement the [programs] *if* adopted." *Id.* ¶ 20 (JA__). And Commissioner Copps recognized that "[r]ight now" the agency "lacked the needed mechanisms for the timely and efficient deployment of these newly-available funds." *Id.*, Statement of Comm'r Copps at 1. Agency counsel's *post*

*hoc* rationalization that reserved funds would be used only for "established" USF mechanisms blinks reality.

The FCC engages in a further *post hoc* rationalization in suggesting *for the first time* that it would use the Discretionary Pool to reduce the contribution rate in the future if it fails to adopt universal service reform by February 2012 (*see* FCC Br. 19-20, 24, 60). The FCC claims it has "repeatedly affirmed" that proposition, *id.* at 60, but the argument finds no support in the *Order*. The *Order's* silence on this point is conspicuous since the Petitioners raised the issues now before this Court in comments filed in the underlying proceeding.

Even if the FCC were to later return the funds, however, that would not cure the violation that has occurred. Unlawfully setting aside universal service contributions would not be rendered lawful by a later reduction in collections. There is no assurance that the carriers that contributed to the Discretionary Pool would still be contributors to the USF, and more fundamentally the pool of end-user customers who ultimately bore the contribution burdens associated with the Discretionary Pool will not be the same as whatever pool of customers would benefit from a reduced contribution factor in the future. Moreover, right now, CETCs are being deprived of the USF support to which they would be entitled but for the *Order*. A future reduction in the contribution factor would not redress or undo that harm.

21

### III.   THE FCC VIOLATED, OR UNLAWFULLY AMENDED *SUB SILENTIO*, SECTION 54.709(a) OF ITS RULES

Petitioners' opening brief further explained that the FCC violated or unlawfully amended *sub silentio* Section 54.709(a) of its rules when it directed USAC to "continue to project competitive ETC demand at the full amount of the cap as established by the *Interim Cap Order*, without reflecting any adjustments to the cap due to relinquishment or revocation of ETC status by a competitive ETC," *Order*, ¶ 6 n.15 (JA__), rather than to project demand based on the estimated expenses of the four established USF programs as required by Section 54.709(a). *See* Pet. Br. 45-49. The FCC contends that its action was justified under the exception set forth in Section 54.709(a)(3), which allows the FCC to modify USAC's projections of demand and administrative expenses within a narrow window following publication of USAC's projections. *See* 47 C.F.R. § 54.709(a)(3); FCC Br. 28. But that limited exception cannot justify the FCC's actions here.

*First*, this theory appears nowhere in the *Order*.[7] Rather, it is a "'post hoc rationalization[]' by counsel that this Court may not consider." *Sudbrink Broad, Inc. of Fla. v. FCC*, 509 F.2d 418, 423 n.7 (D.C. Cir. 1974); *see also Texaco*,

---

[7]    The FCC's reference to Section 54.709(a)(3) in the NPRM does not cure the problem. The FCC mentioned Section 54.709(a)(3) only in its discussion of its proposed amendment to Section 54.709(b), *NPRM* ¶ 26 (JA__), which it did not adopt, *Order* ¶ 4 n.9 (JA__).

417 U.S. at 397.

*Second*, the FCC's invocation of Section 54.709(a)(3) conflicts with the substance of the regulation. Section 54.709(a)(3) requires that "[f]or each quarter" USAC project demand for the four established USF programs — "high-cost areas, low-income consumers, schools and libraries, and rural health care providers" — 60 days in advance of that quarter. 47 C.F.R. § 54.709(a)(3). It then authorizes the FCC to "set projections of demand," which can only reasonably refer to demand *for those four programs*, "within the fourteen-day period" following the publication of USAC's projections. *Id.* As demonstrated above, *see* II.C. *supra,* the FCC's "proposals for using the funds reclaimed from competitive ETCs" manifestly do *not* fall "within those four programs" as the FCC contends, FCC Br. 49. And the agency's use of a small percentage of the funds *reclaimed by the Corr Order* for the schools and libraries program, FCC Br. 50, does not limit the use of those funds to that program in the future — much less limit the use of the different funds reserved in the *Order*.

Moreover, the level at which the FCC has supposedly "set projections of demand," 47 C.F.R. § 54.709(a)(3), is the Interim Cap before the relinquishment of ETC status. But that amount does not correlate with the *next quarter's demand* for the high-cost program, even if that program were somehow to include future broadband uses. Under the *Order*, once a CETC

23

relinquishes its ETC status and funding, the Interim Cap is no longer a projection of *demand* for anything. Instead, the FCC is simply setting aside funds for programs that do not even exist.

*Third*, even if the exception otherwise could justify the agency's actions, the FCC has not properly invoked it. Under Section 54.709(a)(3), the FCC must set projections "within the fourteen day period following release of the Commission's public notice" of USAC's projections. 47 C.F.R. § 54.709(a)(3). Neither the *Order* nor the *Corr Order* was adopted within 14 days of any public notice of USAC's contribution calculation.[8] Moreover, the FCC would have to repeat the adjustment each quarter under the exception, but instead the *Order* in one fell swoop purports to change the calculation that USAC uses going forward, effectively eliminating USAC's role under Section 54.709(a)(3) to accurately calculate and "submit its projections of demand" for the four USF programs in the first instance. The FCC's *post hoc* interpretation of the exception is not entitled to deference because it is "plainly erroneous" and "inconsistent with the regulations." *Talk Am. Inc. v. Michigan Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011).

---

[8]      The *Corr Order* was adopted on August 31, 2010, 82 days after the Proposed Third Quarter 2010 Universal Service Contribution Factor notice was released on June 10, 2010. The *Order* was adopted on December 30, 2010, 17 days after the Proposed First Quarter 2011 Universal Service Contribution Factor notice was released on December 13, 2010. *See* http://transition.fcc.gov/omd/contribution-factor.html.

## IV.  THE FCC FAILED TO JUSTIFY THE ORDER'S REDUCED LEVEL OF SUPPORT

The FCC effectively admits that the *Order* does not explain how its reduced level of support is "sufficient," as required by Section 254(b) and the APA. Instead of defending the *Order* as adequately reasoned in its own right, the FCC argues that it "satisfied [its APA] duty in the *Interim Cap Order*." FCC Br. 31-32. *See also id.* 37. But the FCC's rationale for *freezing* support levels in the *Interim Cap Order* does not justify the *Order*'s significant *reductions* in support below the levels previously established, and the facts underlying the *Interim Cap Order* also have changed in any event. Accordingly, the FCC cannot here satisfy its duty to "cogently explain" its present action simply by referring to an earlier ruling; this is manifestly not a case where prior "'reasoning remains applicable and adequately refutes the challenge.'" FCC Br. 36 (citation omitted); *see also id.* 41, 43.

### A.  The FCC's Explanation for Freezing Support Under the *Interim Cap Order* Cannot Justify the Reductions in Support at Issue Here.

The FCC's attempt to bootstrap from the *Interim Cap Order* (and this Court's affirmance of that order) is unavailing because the *Interim Cap Order* and the *Order* on review had very different effects that required independent analyses and explanations. The *Interim Cap Order* imposed an emergency interim cap that limits CETC support in any given state to a fixed level during

25

the very short time until the FCC could adopt long-term universal service reform, which the FCC represented to this Court would be completed by the end of 2008. This Court affirmed that the level of support available under the *Interim Cap Order* was sufficient in light of the purpose, and limited duration, of the cap. *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009). By contrast, the *Order* provides for substantial *reductions* in total support available to CETCs based on a particular carrier's (or carriers') relinquishment of support. The FCC's previous justification for a freeze does not cover the subsequent reductions in support — especially reductions that could withdraw otherwise-available funding for the extension of service to currently unserved or underserved areas.[9]

The FCC explained that the Interim Cap was consistent with the sufficiency principle because it furthered the sustainability of the fund — specifically, the interim step of "capping" support would "provide a necessary *constraint* on the *growth* of support until comprehensive reform is adopted." *Interim Cap Order* ¶¶ 8-9 (JA__). This Court likewise upheld the FCC's determination that the Interim Cap was "sufficient" on a fund sustainability rationale. *See Rural Cellular*, 588 F.3d at 1102. That rationale does not apply to

---

[9]     The *Order* could eliminate CETC support altogether in a given state, which would make it difficult, if not impossible, for other carriers to enter the market. *See* Pet. Br. 18 n.10 (citing comments).

the *Order* because, after the Interim Cap, there was no longer any "growth" in CETC support to limit.[10] The FCC therefore cannot simply refer to its reasoning from the *Interim Cap Order*, as the need to prevent overall funding *increases* cannot be invoked as a justification for making arbitrary *reductions*.

The FCC protests that the *Order* did not reduce *Petitioners'* support levels. *See, e.g.*, FCC Br. 34, 36-37. That contention is misleading as a factual matter and misplaced as a legal matter. As a factual matter, before the *Order*, CETCs could obtain additional funding (up to the level of the cap) as they expanded their high-cost lines in service or entered new rural areas, whereas after the *Order* another carrier's relinquishment of support lowers the cap and makes such growth/entry potentially infeasible. The FCC does not even acknowledge this important change. Instead, the FCC denigrates the significant benefits CETCs provide to consumers, apparently hoping to persuade the Court that the funding was unnecessary in the first place. Contrary to the FCC's insinuation that CETCs are receiving excessive funding, all CETCs must satisfy

---

[10]     The FCC repeatedly points to the problem identified in the *Interim Cap Order* — that unanticipated flaws in the identical support rule were causing rapid growth in CETC support. FCC Br. 35, 41-43. Petitioners agree that the identical support rule should be eliminated. *See, e.g.*, Comments of the Rural Cellular Association and Comments of the Universal Service for America Coalition, both filed in *Connect America Fund*, WC Docket No. 10-90 (April 18, 2011). But the *Order* does not address structural problems with the identical support rule; instead it relies on the existence of this problem to justify arbitrary reductions in support. That is not reasoned decisionmaking.

a public interest review before receiving any support;[11] they must provide an FCC-prescribed list of services throughout the area for which they are designated to receive support;[12] and they must commit to use high-cost funding to build out and operate infrastructure in rural areas that otherwise might lack adequate service, with annual certifications by state commissions or the FCC to ensure fulfillment of those commitments.[13] The *Order* diminishes CETCs' ability to deliver these public interest benefits to high-cost areas without explanation.

More fundamentally, as a legal matter, the FCC's focus on the specific pre-cap funding levels flowing to Petitioners conflicts with this Court's construction of the sufficiency standard. This Court has made clear that the statute mandates that support be sufficient from the standpoint of *consumers*, which the FCC intermittently acknowledges, FCC Br. 33, 38. *See Rural Cellular*, 588 F.3d at 1103 (the "pertinent question" is whether the *Order* "will undercut adequate telephone service for consumers"); *accord Alenco*, 201 F.3d at 620. The *Order* clearly reduces the amount of support available to finance the construction of wireless infrastructure in high-cost areas, to the direct detriment

---

[11]    *See* 47 U.S.C. §§ 214(e)(2), (e)(6).
[12]    *Id.*
[13]    *See, e.g.*, *Federal-State Joint Board on Universal Service*, Order, 19 FCC Rcd 1563 ¶¶ 4, 46 (2004).

of consumers. The FCC wholly ignored that effect. Its insistence that particular

carriers will not have their funding reduced is beside the point.

**B.    The Facts Underlying the *Interim Cap Order* Have Changed.**

Even if the reasoning underlying the funding freeze adopted in the

*Interim Cap Order* could somehow justify later reductions in support, the facts

have changed sufficiently to render continued reliance on it unreasonable. The

FCC relies in particular on the *Interim Cap Order*'s finding that the identical

support rule misallocated universal service funds because CETCs generally

provided wireless service in addition to (rather than as a replacement for) a

customer's existing wireline service. FCC Br. 41-44. The *Interim Cap Order*

cited statistics indicating that "'only approximately 11.8 percent of U.S.

households relied exclusively on wireless phones in 2006.'" ¶ 20 n.62 (citation

omitted) (JA__); *see also id.* at ¶ 21 n.65 (JA__).

Those historical statistics do not reflect current consumer behavior. The

FCC recently reported that approximately 21.1% of adults lived in households

that relied exclusively on wireless phones in the first half of 2009, and that

percentage continues to increase significantly.[14] The number of incumbent LEC

---

[14]    *See Annual Report and Analysis of Competitive Market Conditions With
Respect to Mobile Wireless, Including Commercial Mobile Services*, Fourteenth
Report, FCC 10-81 ¶ 339 (May 20, 2010); *Annual Report and Analysis of
Competitive Market Conditions With Respect to Mobile Wireless, Including
Commercial Mobile Services*, Fifteenth Report, FCC 11-103A ¶ 363 (June 27,

lines, including voice over IP subscriptions, has plunged correspondingly from 142,293,000 in June 2006 to 102,388,000 in June 2010 — a 28% reduction.[15] The dramatic increase in consumers' substitution of wireless services for wireline phones undercuts the FCC's reliance on the *Interim Cap Order* as having established that wireless support is "'duplicative.'" FCC Br. 42 (quoting *Order* ¶ 5). Thus, this is not a case where an "an agency can 'rely, *absent changed circumstances*, on earlier findings.'" FCC Br. 43 (quoting *State of Wisconsin v. FERC*, 104 F.3d 462, 469 (D.C. Cir. 1997)). The FCC must give a reasoned explanation for the *Order* that addresses the dramatic increase in wireless substitution for wireline services and the implication of that change for the FCC's decision to reduce funding available to wireless providers while holding wireline carriers harmless against reductions in support even as their line counts plummet.

---

2011) (approximately 25% of adults lived in households that relied exclusively on wireless phones in the first half of 2010). The percentage is even higher (33.5-45.8%) for adults aged 34 and younger. *See* Fourteenth Report at ¶ 339. Both reports are available at http://wireless.fcc.gov/index.htm?job=cmrs_reports.

[15]    *See* FCC, Local Telephone Competition: Status as of June 30, 2010, http://transition.fcc.gov/Daily_Releases/Daily_Business/2011/db0321/DOC-305297A1.pdf.

## **CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Court grant its Petition for Review and vacate the *Order*.

Respectfully submitted,

  /s/ Todd D. Daubert
Todd D. Daubert
Jennifer A. Morrissey
J. Isaac Himowitz
SNR Denton US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
202-408-6400 telephone
202-408-6399 facsimile
todd.daubert@snrdenton.com
jennifer.morrissey@snrdenton.com

*Attorneys for USA Coalition*

  /s/ Matthew A. Brill
Richard P. Bress
Matthew A. Brill
Katherine I. Twomey
Latham & Watkins LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004
202-637-2200 telephone
202-637-2201 facsimile
matthew.brill@lw.com

*Attorneys for Rural Cellular Association*

31

## CERTIFICATE OF COMPLIANCE

**Certificate of Compliance with Type-Volume Limitation
Typeface Requirements, and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,959 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2002 in Times New Roman size 14.

   /s/   Jennifer A. Morrissey

         Jennifer A. Morrissey
          On behalf of the *USA Coalition* and the
          *Rural Cellular Association*


Dated: September 9, 2011

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and the Court's Administrative Order dated March 30, 2011, I hereby certify that on September 9, 2011, I electronically filed the following with the Clerk of the Court via the CM/ECF System:

## PETITIONERS' REPLY BRIEF

I further certify that on the same date, I served the foregoing by the Notice of Docket Activity generated by the CM/ECF System, or by U.S. First Class mail, postage prepaid on the following participants to this proceeding:

*For the Federal Communications Commission:*

> Maureen K. Flood
> Peter Karanjia
> Austin C. Schlick
> Richard Kiser Welch
> Federal Communications Commission
> Office of General Counsel
> 445 12th Street, SW
> Washington, DC 20554

*For the United States Department of Justice:*

> Sharis A. Pozen, Acting Assistant Attorney General
> Robert B. Nicholson, Attorney
> Kristen C. Limarzi, Attorney
> United States Department of Justice
> Washington, DC 20530

*For Intervenor Verizon*

Michael E. Glover                          Brett A. Shumate
Edward Shakin                              Helgi C. Walker
Christopher M. Miller                      Wiley Rein, LLP
Verizon                                    1776 K Street, NW
1320 North Courthouse Road                 Washington, DC 20006-2359
Ninth Floor
Arlington, VA 22201

John T. Scott, III
Verizon Wireless
1300 I Street, NW
Suite 400 West
Washington, DC 20005


*For Intervenor the National Association of State Utility Consumer Advocates*

Christopher J. White
New Jersey Department of the Public Advocate
Division of Rate Counsel
31 Clinton Street, 11th Floor
PO Box 46005
Newark, NJ 07101

Respectfully submitted,

/s/ Jennifer Morrissey
Jennifer Morrissey
SNR Denton US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
202-408-9112 telephone
202-408-6399 facsimile
jennifer.morrissey@snrdenton.com

**STATUTORY ADDENDUM**

# Statutory Addendum Table of Contents

Article I § 7, cl. 1 ........................................................................................1

Article I § 8, cl. 1 ........................................................................................1

5 U.S.C. § 553 ..............................................................................................2

47 U.S.C. § 151 ............................................................................................3

47 U.S.C. § 153(20) ......................................................................................4

47 U.S.C. § 153(46) ......................................................................................4

47 U.S.C. § 214(e) ........................................................................................5

47 U.S.C. §§ 254 (a) - (e) ............................................................................8

47 CFR § 54.101 ........................................................................................11

47 CFR § 54.307(a)(1) ..............................................................................14

47 CFR § 54.709 ........................................................................................15

American Recovery and Reinvestment Act of 2009 ................................17

**United States Constitution**

## Article I § 7, cl. 1

All bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.
…

## Article I § 8, cl. 1

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; …

# 5 U.S.C. § 553

TITLE 5 - GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I - THE AGENCIES GENERALLY
CHAPTER 5 - ADMINISTRATIVE PROCEDURE
SUBCHAPTER II - ADMINISTRATIVE PROCEDURE

Sec. 553. Rule making

…

b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include -
(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply -
(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or
without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and
purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

# 47 U.S.C. § 151

TITLE 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS

Sec. 151. Purposes of chapter; Federal Communications Commission
created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

# 47 U.S.C. § 153 (2006)

TITLE 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS

Sec. 153. Definitions

For the purposes of this chapter, unless the context otherwise requires—

...

(20) Information service. The term ''information service'' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

 ...

(46) Telecommunications service.  The term ''telecommunications service'' means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

# 47 U.S.C. § 214(e)

Title 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation

Sec. 214. Extension of lines or discontinuance of service; certificate of public convenience and necessity


(e) Provision of universal service
(1) Eligible telecommunications carriers
A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received— (A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and (B) advertise the availability of such services and the charges therefor using media of general distribution.

(2) Designation of eligible telecommunications carriers
A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

(3) Designation of eligible telecommunications carriers for unserved areas
If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common

5

carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

(4) Relinquishment of universal service
A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

(5) "Service area" defined
The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

6

(6) Common carriers not subject to State commission jurisdiction

In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

# 47 U.S.C. §§ 254 (a) - (e)

TITLE 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part II - Development of Competitive Markets

Sec. 254. Universal service

(a) Procedures to review universal service requirements

　　(1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

　　(2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.


(b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

　　(1) Quality and rates: Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced services: Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Access in rural and high cost areas: Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions: All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms: There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries: Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h) of this section.

(7) Additional principles: Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

(c) Definition

(1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services -

(A) are essential to education, public health, or public safety;
(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
(C) are being deployed in public telecommunications networks by

9

telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

## (2) Alterations and modifications

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

## (3) Special services

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section.

## (d) Telecommunications carrier contribution

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

## (e) Universal service support

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

## 47 CFR § 54.101

Sec. 54.101   Supported services for rural, insular and high cost areas.

(a) Services designated for support. The following services or functionalities shall be supported by federal universal service support mechanisms:

(1) Voice grade access to the public switched network. "Voice grade access" is defined as a functionality that enables a user of telecommunications services to transmit voice communications, including signalling the network that the caller wishes to place a call, and to receive voice communications, including receiving a signal indicating there is an incoming call. For the purposes of this part, bandwidth for voice grade access should be, at a minimum, 300 to 3,000 Hertz;

(2) Local usage. "Local usage" means an amount of minutes of use of exchange service, prescribed by the Commission, provided free of charge to end users;

(3) Dual tone multi-frequency signaling or its functional equivalent. "Dual tone multi-frequency" (DTMF) is a method of signaling that facilitates the transportation of signaling through the network, shortening call set-up time;

(4) Single-party service or its functional equivalent. "Single-party service" is telecommunications service that permits users to have exclusive use of a wireline subscriber loop or access line for each call placed, or, in the case of wireless telecommunications carriers, which use spectrum shared among users to provide service, a dedicated message path for the length of a user's particular transmission;

(5) Access to emergency services. "Access to emergency services" includes access to services, such as 911 and enhanced 911, provided by local governments or other public safety organizations. 911 is defined as a service that permits a telecommunications user, by dialing the three-digit code "911," to call emergency services through a Public Service Access Point (PSAP) operated by the local government. "Enhanced 911" is defined as 911 service that includes the ability to provide automatic numbering information (ANI), which enables the PSAP to call back if the call is disconnected, and automatic location information (ALI), which permits emergency service providers to identify the geographic location of the calling party. "Access to emergency services" includes access to 911 and enhanced

11

911 services to the extent the local government in an eligible carrier's service area has implemented 911 or enhanced 911 systems;

(6) Access to operator services. "Access to operator services" is defined as access to any automatic or live assistance to a consumer to arrange for billing or completion, or both, of a telephone call;

(7) Access to interexchange service. "Access to interexchange service" is defined as the use of the loop, as well as that portion of the switch that is paid for by the end user, or the functional equivalent of these network elements in the case of a wireless carrier, necessary to access an interexchange carrier's network;

(8) Access to directory assistance. "Access to directory assistance" is defined as access to a service that includes, but is not limited to, making available to customers, upon request, information contained in directory listings; and

(9) Toll limitation for qualifying low-income consumers. Toll limitation for qualifying low-income consumers is described in subpart E of this part.

(b) Requirement to offer all designated services. An eligible telecommunications carrier must offer each of the services set forth in paragraph (a) of this section in order to receive federal universal service support.

(c) Additional time to complete network upgrades. A state commission may grant the petition of a telecommunications carrier that is otherwise eligible to receive universal service support under §54.201 requesting additional time to complete the network upgrades needed to provide single-party service, access to enhanced 911 service, or toll limitation. If such petition is granted, the otherwise eligible telecommunications carrier will be permitted to receive universal service support for the duration of the period designated by the state commission. State commissions should grant such a request only upon a finding that exceptional circumstances prevent an otherwise eligible telecommunications carrier from providing single-party service, access to enhanced 911 service, or toll limitation. The period should extend only as long as the relevant state commission finds that exceptional circumstances exist and should not extend beyond the time that the state commission deems necessary for that eligible telecommunications carrier to complete network upgrades. An otherwise eligible telecommunications carrier that is incapable of offering one or more of these three specific universal services must

12

demonstrate to the state commission that exceptional circumstances exist with respect to each service for which the carrier desires a grant of additional time to complete network upgrades.

## 47 CFR § 54.307(a)(1)

Sec. 54.307 Support to a competitive eligible telecommunications carrier.

(a) Calculation of support. A competitive eligible telecommunications carrier shall receive universal service support to the extent that the competitive eligible telecommunications carrier captures the subscriber lines of an incumbent local exchange carrier (LEC) or serves new subscriber lines in the incumbent LEC's service area.

(1) A competitive eligible telecommunications carrier serving loops in the service area of a rural incumbent local exchange carrier, as that term is defined in Sec. 54.5 of this chapter, shall receive support for each line it serves in a particular service area based on the support the incumbent LEC would receive for each such line, disaggregated by cost zone if disaggregation zones have been established within the service area pursuant to Sec. 54.315 of this subpart. A competitive eligible telecommunications carrier serving loops in the service area of a non-rural incumbent local exchange carrier shall receive support for each line it serves in a particular wire center based on the support the incumbent LEC would receive for each such line. A competitive eligible telecommunications carrier serving loops in the service area of a rate- of-return carrier shall be eligible to receive Interstate Common Line Support for each line it serves in the service area in accordance with the formula in Sec. 54.901.

## 47 CFR § 54.709

Sec. 54.709 Computations of required contributions to universal service support mechanisms.

(a) Prior to April 1, 2003, contributions to the universal service support mechanisms shall be based on contributors' end-user telecommunications revenues and on a contribution factor determined quarterly by the Commission. Contributions to the mechanisms beginning April 1, 2003 shall be based on contributors' projected collected end- user telecommunications revenues, and on a contribution factor determined quarterly by the Commission.

> …

    (2) Prior to April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues, net of prior period actual contributions. Beginning April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions. The Commission shall approve the Administrator's quarterly projected costs of the universal service support mechanisms, taking into account demand for support and administrative expenses. The total subject revenues shall be compiled by the Administrator based on information contained in the Telecommunications Reporting Worksheets described in Sec. 54.711(a).

    (3) Total projected expenses for the federal universal service support mechanisms for each quarter must be approved by the Commission before they are used to calculate the quarterly contribution factor and individual contributions. For each quarter, the Administrator must submit its projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. For each quarter, the Administrator must submit its projections of administrative expenses for the high-cost mechanism, the low-income mechanism, the schools and libraries mechanism and the rural health care mechanism and the basis for those projections to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. Based on data submitted to the

15

Administrator on the Telecommunications Reporting Worksheets, the
Administrator must submit the total contribution base to the Office of the
Managing Director at least thirty (30) days before the start of each quarter. The
projections of demand and administrative expenses and the contribution factor
shall be announced by the Commission in a public notice and shall be made
available on the Commission's website. The Commission reserves the right to set
projections of demand and administrative expenses at amounts that the
Commission determines will serve the public interest at any time within the
fourteen-day period following release of the Commission's public notice. If the
Commission take no action within fourteen (14) days of the date of release of the
public notice announcing the projections of demand and administrative expenses,
the projections of demand and administrative expenses, and the contribution factor
shall be deemed approved by the Commission. Except as provided in Sec.
54.706(c), the Administrator shall apply the quarterly contribution factor, once
approved by the Commission, to contributor's interstate and international end-user
telecommunications revenues to calculate the amount of individual contributions.


(b) If the contributions received by the Administrator in a quarter exceed the
amount of universal service support program contributions and administrative costs
for that quarter, the excess payments will be carried forward to the following
quarter. The contribution factors for the following quarter will take into
consideration the projected costs of the support mechanisms for that quarter and
the excess contributions carried over from the previous quarter.

…

**American Recovery and Reinvestment Act of 2009**
**Pub. L. No. 111-5, 123 Stat. 115  § 6001(a) and (k)**

SEC. 6001. BROADBAND TECHNOLOGY OPPORTUNITIES PROGRAM.

(a) The Assistant Secretary of Commerce for Communications and Information (Assistant Secretary), in consultation with the Federal Communications Commission (Commission), shall establish a national broadband service development and expansion program in conjunction with the technology opportunities program, which shall be referred to as the Broadband Technology Opportunities Program. The Assistant Secretary shall ensure that the program complements and enhances and does not conflict with other Federal broadband initiatives and programs.

…

(k)(1) Not later than 1 year after the date of enactment of this section, the Commission shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate, a report containing a national broadband plan.

(2) The national broadband plan required by this section shall seek to ensure that all people of the United States have access to broadband capability and shall establish benchmarks for meeting that goal. The plan shall also include--

> (A) an analysis of the most effective and efficient mechanisms for ensuring broadband access by all people of the United States;

> (B) a detailed strategy for achieving affordability of such service and maximum utilization of broadband infrastructure and service by the public;

> (C) an evaluation of the status of deployment of broadband service, including progress of projects supported by the grants made pursuant to this section; and

> (D) a plan for use of broadband infrastructure and services in advancing consumer welfare, civic participation, public safety and homeland security, community development, health care delivery, energy independence and efficiency, education, worker training, private sector investment, entrepreneurial activity, job creation and economic growth, and other national purposes.

(3) In developing the plan, the Commission shall have access to data provided to other Government agencies under the Broadband Data Improvement Act (47 U.S.C. 1301 note).